UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

**SAMUEL RICARLOS MITCHELL, JR.**,                                    Docket No.:

Plaintiff,

-against-

**VERIFIED COMPLAINT**

**PLANNED PARENTHOOD OF GREATER NEW YORK, INC.,
WENDY STARK, ANDREA HAGAN, GILLIAN DEAN
And Anne Davis**

Filed on:_____

Defendants.
-----------------------------------------------------------------X

Plaintiff SAMUEL RICARLOS MITCHELL, JR. (hereinafter referred to as
"Plaintiff" or "Mr. Mitchell"), by and through his undersigned counsel, THE
COCHRAN FIRM, as and for Plaintiff's Verified Complaint in this action against the
Defendants **PLANNED PARENTHOOD OF GREATER NEW YORK, INC.** hereby
alleges as follows:

**STATEMENT**

Planned Parenthood was founded by Margaret Sanger who was an unabashed
racist, eugenics believer and KKK sympathizer.  As late as April 2021, Planned
Parenthood's leadership acknowledged that Sanger was coddled by the organization
and protected despite her discriminatory animus:

> *"Planned Parenthood has failed to own the impact of our founder's actions.
> We have defended Sanger as a protector of bodily autonomy and self-determination,
> while excusing her association with white supremacist groups and eugenics as an
> unfortunate product of her time."[1]*

---

[1] New York Times op ed April 17, 2021, "I'm the Head of Planned Parenthood.  We're Done Making Excuses for
our Founder." Alexis McGill Johnson

While this statement was meant to reflect a new beginning for the Planned Parenthood organization as it relates to addressing issues of racial, gender, and disability equality within its own walls, the reality is that Planned Parenthood continues to be run by people who are openly hostile to racial minorities, the disabled, older workers and those who complain about discriminatory practices.

Proof of this reality lies in the lawsuit filed by Nicole Moore, who on October 19, 2022, a year and half after the organization's acknowledgement of its racist history, alleged that Planned Parenthood continued to discriminate against its African American employees and against those who complained about this racial discrimination.  Ms. Moore clearly had insight into this topic as she was the director of Multicultural brand engagement until she was fired for complaining about discriminatory practices within Planned Parenthood Federation of America, the governing body responsible for accrediting all Planned Parenthood affiliates.  As stated in her complaint:

*"When Moore politely spoke up about the inequitable distribution of work, she was falsely accused of being negative, angry, difficult to work with, and chastised for her "tone" – complaints that had no basis in reality but comported with well-trafficked stereotypes about Black women. Planned Parenthood executives then proceeded to thwart Moore's ideas, sabotage her projects, and subject her to unfounded disciplinary measures that were clearly intended to silence her complaints. The barrage of mistreatment caused Moore to suffer a panic attack so severe that she spent a day in the hospital. After complaining to HR that the disciplinary measures appeared to be retaliation for her complaints of racial inequality at the organization, she was summarily fired."[2]*

Planned Parenthood of Greater New York has been no exception to the discriminatory practices against historically marginalized individuals including African Americans.  It's former CEO Laura McQuade was ousted from her job after hundreds of former and current employees signed a series of public letters complaining about her

---

[2] *Moore v. Planned Parenthood Federation of America, et al,* 22-cv-8899, SDNY, Document 1 at paragraph 8.

abusive and discriminatory practices including underpaying black staff members, preventing them from advancing in their careers and berating them.[3]  Amazingly, up until a week before her firing the **PPGNY** Board of Directors supported her continued racist and abusive leadership.  Most of that Board of Directors still leads the organization including Defendant **HAGAN**.

Now, Samuel Ricarlos Mitchell, Jr., the Chief Operational Officer ("C.O.O.") and highest ranking African American male in Planned Parenthood of Greater New York's ("PPGNY") history, is filing this lawsuit alleging that he too has been victimized by race, gender, age and disability discrimination in violation of Federal, State and New York City laws.  This lawsuit is meant to shine a light on the discriminatory and retaliatory employment practices that permeate the organization and bring justice to Mr. Mitchell for the unrelenting discriminatory practices he has and continues to endure.

## NATURE OF THE CLAIMS

This is a civil action for declaratory, injunctive, and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices against Plaintiff, including their discriminatory treatment, harassment, hostile work environment, and unlawful retaliation against the Plaintiff due to his age, race, color, disability, religion and gender, in violation of Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"), Americans with Disabilities Act of 1990 ("ADA"), Age Discrimination in Employment Act of 1967 ("ADEA"),42 U.S.C. §1981 and to remedy violations of the New York State Human Rights Law; New York

---

[3] *"N.Y. Planned Parenthood's C.E.O. Is Ousted After Staff Complaints,"* New York Times June 23, 2020.

Executive Law, § 290, *et seq.* ("the Executive Law"); and the NY City Human Rights

Law, Administrative Code of the City of New York 8-107 *et seq.* ("NYCHRL");

**Defendants'** conduct is knowing, malicious, willful, and wanton and/or shows a

reckless disregard for the Plaintiff.  It has caused and continues to cause the Plaintiff to

suffer substantial economic and non-economic damages, permanent harm to his

professional and personal reputations, and severe mental anguish and emotional distress.

## JURISDICTION AND VENUE

1.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§1331 in that the action involves federal questions, because the causes of action asserted

herein arise in part under Title VII, ADA, ADEA, 42 U.S.C. § 1981 ("1981"), and 42

U.S.C. § 1983 ("1983"), to

remedy violations based upon Federal Law and the supplemental jurisdiction of this Court

pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966) and 28

U.S.C. § 1367, seeking declaratory and injunctive relief and damages to redress the

injuries Plaintiff suffered as a result of being discriminated against, and retaliated against

by Plaintiff's employers and superiors on the basis of Plaintiff's age, race, color, religion,

disability, sex and gender, as well as a hostile work environment under State and Local

law.

2.   28 U.S.C. §1331 states that "The district courts shall have original jurisdiction of all civil

actions arising under the Constitution, laws, or treaties of the United States."

3.   Plaintiff further invokes the supplemental jurisdiction of this Court to adjudicate state and

local claims pursuant to 28. U.S.C. 1367. The matter in controversy exceeds, exclusive of

interests and costs, the sum of One Hundred Thousand Dollars ("$100,000").

4. Venue is proper in this District based upon the fact that the events or omissions which gave rise to the claims asserted herein occurred within the Southern District of New York, Manhattan.

5. Simultaneous with the filing of this complaint, Plaintiff is filing a charge with the EEOC and intends to amend the Complaint to add claims under Title VII, ADA and ADEA once Plaintiff is given a right to sue.

## PARTIES

### *The Plaintiff*

6. Plaintiff Samuel Ricarlos Mitchell, Jr. (hereinafter referred to as "Plaintiff" and/or "Mr. Mitchell") is an individual black, African American male who is a resident of the State of Florida and the State of New York.

7. Plaintiff is an ordained Pastor.

8. Plaintiff suffers from a disabling neurological condition which causes him to stutter and stammer excessively and involuntarily in the face of stressful situations.

9. Plaintiff is therefore a member of multiple protected classes.

### *The Defendant Employers*

10. At all times material, Defendant **PLANNED PARENTHOOD OF GREATER NEW YORK, INC.** (hereinafter referred to as "**PPGNY**" and/or "Defendants **PPGNY**") was, and still is, a domestic not-for-profit corporation, duly organized and existing under and by virtue of the laws of the State of New York with an office located at 26 Bleecker St, New York, NY 10012 (hereinafter referred to as the "Manhattan location").

11. At all times material, **PPGNY** meet the definition of an "employer," and/or "single employer."

12. At all times material, **PPGNY** acted, and continues to act, by and through their employees,

agents, board members, and servants who were acting in the scope and course of employment, agency, and servitude.

### *The Individual Defendants*

13.  At all times material, PPGNY employed Defendant **WENDY STARK** (hereinafter referred to as "Defendant STARK" and/or "STARK") as the PPGNY President and CEO.

14.  **STARK** held, and still holds, a supervisory position with **PPGNY**, controlling many tangible aspects of Plaintiff's job duties, including holding the power to control Plaintiff's work duties, work schedule, and work discipline including termination. **STARK** is an individual, white, Caucasian female.

15.  As Plaintiff's supervisor, **STARK** has also aided and abetted the unlawful conduct described herein.

16.  At all times material, **PPGNY** employed Defendant **ANDREA HAGAN** (hereinafter referred to as "Defendant **HAGAN**" and/or "**HAGAN**") as the Board Treasurer. **HAGAN** is an individual white, Caucasian female.

17.  **HAGAN** held, and still holds, a supervisory position at **PPGNY** controlling many tangible aspects of Plaintiff' job duties, including holding the power to control Plaintiff's work, to discipline Plaintiff, and to hire and fire Plaintiff.

18.  **HAGAN** was an active participant in the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff.

19.  At all times material, **PPGNY** employed Defendant **GILLIAN DEAN** (hereinafter referred to as "Defendant **DEAN**" and/or "**DEAN**") as Chief Medical Officer at **PPGNY**. **DEAN** is an individual white, Caucasian female.

20.   **DEAN** held, and still holds, a supervisory position at **PPGNY,** controlling many tangible aspects of Plaintiff' job duties.

21.   **DEAN** was an active participant in the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff.

22.   At all times material, **PPGNY** employed Defendant **ANNE DAVIS** (hereinafter referred to as "Defendant **DAVIS**" and/or "**DAVIS**") as Associate Chief Medical Officer. **DAVIS** is an individual white, Caucasian female.

23.   **DAVIS** held, and still holds, a supervisory position at **PPGNY,** controlling many tangible aspects of Plaintiff' job duties.

24.   **DAVIS** was an active participant in the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff.

25.   **STARK**, **HAGAN**, **DEAN,** and **DAVIS**  are hereinafter collectively referred to as "**the individual PPGNY Defendants**" and/or "t**he PPGNY Employees.**"

### FACTUAL ALLEGATIONS

26.   Plaintiff's employment background includes seventeen (17) years of professional experience.

27.   At all times relevant, Plaintiff was, and still is, an "employee" of **PPGNY**.

28.   On or about September 27, 2021, **PPGNY** hired Plaintiff as an interim Chief Operating Officer (hereinafter referred to as "COO") based at the Manhattan location.

29.   At all times material, Plaintiff was, and still is, qualified for the position of COO.

30.   At all times herein, Plaintiff was, and still is, an exemplary employee who obeyed orders and directives from his superiors.

31.   At all times material, Plaintiff performed all duties assigned in a diligent and thorough manner.

32.    Tellingly, in **PPGNY**'s one hundred and six (106) year history of holding itself out

as being committed to racial equity and stating that it is "turning [**PPGNY**'s] lens

inward to actively work

toward being a multicultural, inclusive, and anti-racist organization where all community

and staff thrive,[4]" Plaintiff is the first black, African American male on **PPGNY**'s

executive leadership team.

33.    At all times material, Plaintiff was, and still is, the sole disabled, Christian, black, African

American cisgender male on **PPGNY**'s executive leadership team.[5]

34.    Throughout his time as a **PPGNY** COO Plaintiff received numerous compliments for

his work performance, including praise from **PPGNY** executive Risa Zoll (hereinafter

referred to as "ZOLL") for providing guidance towards a "constructive

meeting…**devoid of tension,** and productive", and gratitude for his "incredible support"

in his voluntary oversight of an additional department from **PPGNY** Director of

Community Organizing, Nicole Margiasso-Tran (hereinafter referred to as

"MARGIASSO-TRAN". Plaintiff always got along well, and continues to get along

well, with all of his co-workers.

---

[4] Planned Parenthood of Greater New York, "*Equity at Planned Parenthood*", available at, https://www.plannedparenthood.org/planned- parenthood-greater-new-york/about/jobs/equity, accessed September 22, 2022
[5] "**Tokenism** is the practice of making only a perfunctory or symbolic effort to be inclusive to members of minority groups, especially by recruiting people from underrepresented groups in order to give the appearance of racial or gender equality within a workplace or educational context.[1][2][3] The effort of including a token individual in work or school is usually intended to create the impression of social inclusiveness and diversity (racial, religious, sexual, etc.).[4]"Wikipedia, "*Tokenism*", available at https://en.wikipedia.org/wiki/Tokenism, accessed September 22, 2022

| From: | Zoll, Risa |
|---|---|
| To: | Mitchell, Samuel |
| Cc: | Corso, Keith |
| Subject: | Update |
| Date: | Friday, April 8, 2022 10:55:57 AM |
| Attachments: | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |

Hi Samuel,

I think you could use some good news: I had a constructive meeting with Tamika this morning about grant collaboration moving forward.
It was devoid of tension, and productive, thanks to your guidance/framing and Keith's coaching. I appreciate you both very much!

I will let you know if any issues arise moving forward, but ever hopeful that the worst is behind us.

Many thanks and wishes for a great weekend,
Risa

35.     Plaintiff has been responsible for a considerable number of significant accomplishments

in his role as **PPGNY** COO, including, *inter alia*, successfully strategizing, and managing

CHN, successfully revamping Clinical Operations, and successfully managing 75% of

**PPGNY**'s workforce, including External Affairs/Comms/Marketing.

| From: | Maroiasso-Tran, Nicole |
|---|---|
| To: | Mitchell, Samuel; Calloway, Joy |
| Subject: | Thank you! |
| Date: | Thursday, August 25, 2022 10:48:31 AM |

Dear Joy and Sam,

I have had an email in mind to you both for some time now! And now that I'm on vacation I'm finding the space to write you .

When you both first came and met with the External Affairs Directors (after Sam was hired), Joy- I remember you asking for frank, honest feedback about how we felt the EA Team was doing. I said that I felt we were on a sinking ship and no one was giving us oars.
I remember feeling that you really heard me and took it to heart.

Since that meeting, I know I am not just speaking for myself, but for likely all of EA- we have felt truly tremendous support from you both with hiring (/hiring back) the necessary staff (and letting go of a staff person) we needed to upright our ship and do the important work of Community Organizing, Political Affairs, Govt Relations, and Communications on behalf of PPGNY. We are so grateful and proud to have built a very strong and healthy EA Team that is doing great work because we are feeling supported to do so.

I am writing this letter to you both together, because Joy- I want you to know what an incredible support Sam has been to us, as he's taken us on as an additional department to oversee on top of his own departments. Thank you for appointing him to support us.

Soon, we will have our new CEAO and we're so grateful and excited. But before that happens- Thank you Sam, for advocating and supporting us as strongly as you have. It has been such a pleasure working with you and I'm grateful we'll be staying on as colleagues.

Joy- I'm also writing this as we lead into the last days of your time with us. I cannot convey my gratitude and admiration for the role that you stepped in to and fulfilled as our CEO. You uprighted the whole damn ship!! It has been such a pleasure and an honor to work beneath you and play small part in the successful mission you've carried out here.

Thank you both for your tremendous support of our team- and that is meant in every way.

Joy, I wish you only the best in all your future endeavors. May you always be surrounded by strong, healthy, well-intentioned teams that support your leadership and do good in the world.

36.     However, despite his excellent work record and litany of accomplishments, almost immediately after being hired by **PPGNY** Plaintiff was forced by **PPGNY and Defendants Hagan,**

**Dean and Davis** to endure age, race, color, disability, religion, and gender discrimination at the highest level.

37.     Throughout Plaintiff's employment, he was, and still is, subjected to a continuing pattern

and practice of discrimination and hostile work environment based upon his age, race, color, disability, religion, and gender and in retaliation for complaining about **PPGNY**'s discriminatory actions and other wrongdoing.

38.     Plaintiff asserts that **PPGNY and Stark, Hagan, Dean and Davis** engaged, and continues to engage, in a pattern and practice of discrimination against older black male employees, African American male employees, employees with perceived disabilities, and employees who engage in protected conduct on behalf of themselves and other minority employees.

39.     By way of example, **PPGNY** required Plaintiff to endure a disproportionate number of background checks due to his age, race, color, disability, and gender.

40.     In fact, **PPGNY** required Plaintiff to undergo a disproportionate number of background checks which is so far above what younger, Caucasian, and non-disabled prospective employees go through as to be clearly discriminatory and harassing.

41.     **PPGNY**'s requirements in this regard were clearly discriminatory on these bases, because **PPGNY** did not require similarly situated younger, white, Caucasian, or female employees, to face this level of intrusive background checks, both in terms of sheer number and invasiveness.

42.     **PPGNY** and **PPGNY**'s  board members including Defendant **Hagan** forced Plaintiff to constantly defend himself against personal attacks by themselves and their employees relating to his character, experience, capabilities, and skillsets.

43.     **PPGNY** and/or **PPGNY**'s board members do not treat similarly situated white, non-disabled, Caucasian, or female employees in this manner.

44.     In or around October 2021 **PPGNY** and/or **PPGNY's** board members, including

Defendant **Hagan** discovered that Plaintiff is an ordained Pastor. Almost immediately following their discovery, Plaintiff was subjected to religious discrimination in the form of comments made by several **PPGNY** board members insinuating that Christians and pastors, like Plaintiff, were not welcome to work for **PPGNY**. These comments had the purpose and effect of negatively altering Plaintiff's work environment. Plaintiff was shunned by board members who made these comments. Non-African American, non-disabled, non-Christian ministers were not treated in a similar fashion.

45.   Plaintiff was forced to work in a hostile work environment as he endured these offensive comments and the cold shoulder that he received from **PPGNY** board members including defendant **Hagan**. Non-African American, non-disabled, non-Christian ministers were not treated in a similar fashion.

46.   Additionally, members of the **PPGNY** board conspired to force former **PPGNY** CEO to interrogate Plaintiff's pastor pursuant to obtaining a statement on Plaintiff's church's stance on abortion, in the hopes that they could paint Plaintiff and/or Plaintiff's church as "pro-life" in a particularly invasive attempt to terminate Plaintiff's employment. Non-African American, non- Christian, non-disabled employees were not subjected to similar harassment.

47.   Further, throughout Plaintiff's employment he has been subjected to a humiliating, defamatory, insulting, disrespectful, harassing, and demoralizing campaign of discrimination, in an effort to undermine Plaintiff's supervisory responsibilities, his ability to carry out his other job responsibilities, and his impeccable background and experience. The purpose of this discriminatory and hostile treatment was to subject Plaintiff to intimidation and humiliation in the workplace and negatively impact his

ability to do his job.   The conduct alleged above was spearheaded and orchestrated by **PPGNY** executive board member, **HAGAN** and encouraged by the participation of **PPGNY** Chief Medical Officer, **DEAN** and **PPGNY** Associate Chief Medical Officer, **DAVIS**.

48.   On or about October 14, 2021, Plaintiff formally complained to the then CEO of **PPGNY**, Joy Calloway and to board member Leslie Lindenbaum about the offensive and illegal race, color, and gender discrimination as well as the intimidating and humiliating, hostile work environment he was being subjected to by **PPGNY** executive board members, including specifically **HAGAN**.

49.   However, despite Plaintiff's complaint, **PPGNY** failed and/or refused to take any immediate or appropriate corrective action in response, and at no point did they reprimand the **PPGNY** employees and/or **PPGNY** executive board members responsible for the discrimination and harassment. The failure to adequately address Plaintiff's complaints emboldened **HAGAN, DEAN** and **DAVIS** to continue discriminating and retaliating against Plaintiff. Non-African American, Non-Christian, Non-disabled employees were not treated in the same fashion when they engaged in protected activity at **PPGNY**.

50.   Instead of following the policies in place for addressing complaints of discriminatory treatment which called for an internal investigation, **PPGNY** began a targeted campaign against Plaintiff in retaliation for his protected conduct.  This retaliation too was prohibited by **PPGNY's** employment policies.

51.   By way of example, almost immediately following Plaintiff's complaint, **HAGAN** began disproportionately and excessively monitoring and micromanaging Plaintiff, in direct retaliation against Plaintiff for having engaged in protected conduct by complaining about

unlawful discrimination, and because Plaintiff is the only black, African American and an older male employee on **PPGNY**'s executive leadership team.

52.    **HAGAN** did not hold other non-black, older, non-African American or female members of **PPGNY**'s executive team to the same standard with respect to monitoring or micromanagement.

53.    **HAGAN**'s holding of Plaintiff to a different standard than the other team members is stained with racist overtones which play into her preferred negative stereotypes about black and African American men in the workplace and beyond.

54.    Further, following Plaintiff's complaint, **PPGNY**'s discriminatory misconduct expanded and intensified.

55.    By way of another example, in November 2021, **PPGNY** Chief Development Officer, during a Teams Meeting amongst several of Plaintiff's colleagues - CORSO rudely, and abrasively, mocked Plaintiff's southern drawl and pronunciation. CORSO yelled at Plaintiff while on the call and in a snarky manner pronounced each syllable of a name Plaintiff had been having trouble pronouncing, as if Plaintiff was illiterate or dumb and repeated it several times in front of others in an active effort to intimidate, diminish and humiliate Plaintiff in front of his peers and subordinates.

56.    Also by way of example, starting around December 2021, **DEAN** and **DAVIS** both began subjecting Plaintiff to discriminatory comments based on Plaintiff's age, race, color, and gender, including referring to him with racist terms like "**ANGRY**," "**OFFENSIVE**," "**OUT OF CONTROL**," "**HARSH**," and "**AGGRESSIVE**."

57.    Each of these comments by **DEAN** and **DAVIS**, who are both older, white, Caucasian females, plays into cruelly racist stereotypes about black, African American men in the

workplace and beyond.[6]

58. Additionally, in or around February 2022, **DEAN** made offensive racially discriminatory comments regarding other black, African American employees, including "**SHE WAS A LOUD BLACK WOMAN,**" in reference to Merle McGee, a black, African American **PPGNY** Chief Equity & Engagement Officer.

59. These comments by **DEAN** and **DAVIS** are stained with racist overtones which play into their preferred negative stereotypes about black and African American men in the workplace and beyond.

60. Plaintiff was offended by these discriminatory comments, and always objected to them being uttered about him. These comments caused Plaintiff to feel emotional distress and negatively altered his conditions of employment by affecting his ability to concentrate and by undermining his authority within the organization. Non-African American employees were not treated in this fashion.

61. Plaintiff complained to Defendants **DEAN** and **DAVIS** about their racist comments and asked them not to refer to him or other non-white, non-Caucasian minority employees in this manner.

62. On or about February 23, 2022, as a result of Plaintiff's previous six (6) months' excellent work performance as an interim COO, **PPGNY** hired Plaintiff as a full-time Chief Operating Officer (hereinafter referred to as "COO") based at the Manhattan location.

63. At all times material, Plaintiff was, and still is, qualified for this position as a full-time

---

[6] Brea Love, "*NAACP explains the 'Angry Black Person' bias*", available at https://www.abc10.com/article/news/local/naacp-explains-angry- black-person-bias/103-dce57751-10bd-403e-81fd-4e7cec058671, accessed September 22, 2022 **BLACK WOMAN,**" in reference to Merle McGee, a black, African American **PPGNY** Chief Equity & Engagement Officer.

**PPGNY** COO.

64.     Despite Plaintiff's full-time position, **DEAN** and **DAVIS** continued their discriminatory and retaliatory onslaught.

65.     On or about March 28, 2022, Plaintiff formally complained about the offensive and illegal race and gender discrimination he was being subjected to by **DEAN** and **DAVIS.**

66.     However, despite Plaintiff's complaint, **PPGNY** failed and/or refused to take any immediate or appropriate corrective action in response, and at no point did they reprimand **DEAN** or **DAVIS**.

67.     As a result of **PPGNY**'s failure and/or refusal to investigate Plaintiff's complaint, the discriminatory and retaliatory campaign by **DEAN**, **DAVIS** and **HAGAN** continued unabated. **PPGNY** continues to subject Plaintiff to **DAVIS**, **DEAN** and **HAGAN**'s discriminatory comments on a consistent basis which has created a hostile work environment.

68.     These comments and discriminatory actions are made openly in front of others including Plaintiff's subordinates and has marginalized Mr. Mitchell and undermined his ability to effectively carry out his supervisory and other work responsibilities.

69.     By way of example, in or around July 2022, **DEAN** and **DAVIS** deliberately and unreasonably refuted, debated and refused Plaintiff's plan to engage world-renowned African American thought leader Dr. Ronald Wyatt as a consultant for **PPGNY**.

70.     On or about July 31, 2022, Plaintiff yet again formally complained to **PPGNY**'s Human Resources representative about race and age discrimination he was subjected to by **DEAN** and **DAVIS**.

71.     However, despite Plaintiff's complaint, **PPGNY** failed and/or refused to take any

immediate or appropriate corrective action in response, and at no point did they reprimand **DEAN** or **DAVIS**.

72. As a result of **PPGNY**'s failure and/or refusal to investigate Plaintiff's complaint, the discriminatory and retaliatory campaign by **PPGNY**, **DEAN**, **DAVIS** and **HAGAN** continued unabated.

73. By way of example, in or around August 2022, shortly following Plaintiff's complaint, and despite Plaintiff being the second in command as **PPGNY** COO, **PPGNY** announced that Plaintiff's white, Caucasian female peer, Rosalba Messina (hereinafter referred to as "MESSINA") would assume the duties of acting **PPGNY** interim CEO.

74. Plaintiff, as COO, was that the second in command and under long standing policy and custom he should have been elevated to the position of interim CEO.

75. **PPGNY**'s decision to appoint Plaintiff's white, Caucasian female peer to the position of interim CEO is clearly discriminatory against Plaintiff due to his age, race, color, disability and gender, and because Plaintiff engaged in protected activity by complaining about **PPGNY**'s unlawful misconduct.

76. Plaintiff was qualified for the position and should have been given the interim title of CEO.

77. **PPGNY** does not similarly withhold customary career advancement opportunities from white, Caucasian female, non-disabled employees and employees who have not engaged in protected conduct.

78. As a result of being passed over for, the interim CEO position, Plaintiff was denied payment of a thirteen-thousand-dollar ($13,000.00) bonus.

79. **PPGNY** paid this bonus to MESSINA and deliberately withheld it from Plaintiff, despite

the fact that he is better qualified, more experienced, and was better positioned to succeed in the interim CEO position.

80. The interim CEO position and the attendant cash bonus were discriminatorily withheld from Plaintiff due to his age, race, color, disabling condition, religion, and gender, and because Plaintiff engaged in protected activity by complaining about **PPGNY**'s unlawful misconduct.

81. **PPGNY** further discriminated by allowing its **Executive** Board to forego a residency requirement that permitted MESSINA to not have to relocate from her Connecticut residency to New York City, something that Plaintiff was required to do despite having an out of state residency from New York City.

82. Plaintiff was forced by Defendant **PPGNY** to have a New York City residency despite the fact that he had a  home in Florida.  MESSINA (Connecticut), ZOEE DAVIDSON (Caucasian Female – Illinois) and VIRGINIA MORIN (Caucasian – Female – Utah), were allowed to work for **PPGNY** without having to change residency to New York.

83. The disparate treatment related to residency requirements has caused Plaintiff to bear living expenses, travel costs and time away from family that his similarly situated PPGNY colleagues who do not have residency requirements do not have to bear.

84. By way of another example, on or about September 14, 2022, while attending an executive level Planned Parenthood Clinical Health Network for Transformation (hereinafter referred to as "CHN") meeting, **HAGAN** singled out and ridiculed Plaintiff with an onslaught of disparaging comments deliberately made in front of another **PPGNY** Board chairperson, Karen Seltzer (hereinafter referred to as "SELTZER").

85. Further, during the CHN meeting, **HAGAN** made attempts to professionally sabotage

Plaintiff with defamatory remarks to CHN employees, CHN Board of Directors, PPGNY Board of Directors, and CHN Membership peers and business partners.

86. Specifically, **HAGAN** approached Franklin Rosado, CHN Chief Information Officer, and proceeded to maliciously and falsely accuse Plaintiff of not being a good partner to CHN and encouraged him to report out in front of the entire membership, in an effort to defame, censor, restrict, constrain, and retaliate against Plaintiff's strong voice of opposition against CHN.

87. **HAGAN** subjected Plaintiff to this retaliatory onslaught of public ridicule because he engaged in protected activity and because he is the only black, African American male employee on **PPGNY**'s executive leadership team and because **HAGAN** is a Board Director for both **PPGNY** and CHN.

88. **HAGAN** intended to, and did, ridicule and humiliate Plaintiff, and by doing so diminished Plaintiff's professional reputation amongst his peers and business partners.

89. **HAGAN**'s humiliating comments had the purpose and effect of altering Plaintiff's work environment for the worse as his reputation and ability to lead were undermined.

90. **HAGAN**'s comments and conduct are clearly discriminatory because she does not subject white, Caucasian, and female employees to similarly humiliating, defamatory comments in the presence of their colleagues.

91. Plaintiff immediately complained about **HAGAN**'s discriminatory, defamatory, comments.

92. Despite Plaintiff's complaint, **HAGAN**'s discriminatory, retaliatory campaign against Plaintiff continued unabated.

93. Additionally, following the revelation of Plaintiff's perceived disability, **PPGNY** has allowed Plaintiff's co-workers to subject him to discriminatory conduct regarding his

disabling condition.

94.   By way of example, in or around September 2022, Plaintiff's white, female subordinate presented a report authored by Plaintiff during an executive committee meeting. Plaintiff was meant to present the report himself but was unable to do so due to the effects of Plaintiff's disabling condition.

95.   Upon information and belief, **PPGNY** board chairperson, SELTZER and a few other unnamed executive board committee members told Plaintiff's Chief Financial Officer that they believe that Plaintiff's white female subordinate employee is a much better communicator than Plaintiff.

96.   These comments were in direct, discriminatory reference to the symptoms of Plaintiff's disabling condition.

97.   On or about September 15, 2022, Plaintiff formally complained to **PPGNY** about being racially discriminated against "as the sole black male on the [**PPGNY**] Executive Leadership Team" and subjected to a hostile work environment by **HAGAN**.

98.   However, despite Plaintiff's complaint, **PPGNY** failed and/or refused to take any immediate or appropriate corrective action in response, and at no point did they reprimand **HAGAN**.

99.   Rather, in response to Plaintiff's protected conduct, **PPGNY** intensified its campaign of retaliatory adverse employment actions.

100.  By way of example, on or about September 21, 2022, during a full executive board meeting, a white, Caucasian male **PPGNY** executive board member suggested that Plaintiff should hold off from replacing/backfilling three (3) critical operational positions until the new permanent white, Caucasian, female hire assumed the role of CEO.

101. This direct order to hold off on filing these critical roles removed responsibilities that were directly associated with Plaintiff's success and the operational effectiveness of the organization and thereby negatively impacted Plaintiff's ability to do his job.

102. This adverse employment action was both retaliatory, given its temporal proximity to Plaintiff's protected conduct less than a week prior, but also discriminatory given that **PPGNY** and **PPGNY**'s executive board members do not similarly interfere with the job functions of younger, non-disabled, Caucasian, and female board members.

103. This adverse employment action was both retaliatory, given its temporal proximity to Plaintiff's protected conduct, but also discriminatory given that **PPGNY** and **PPGNY**'s executive board members do not similarly yell at and publicly humiliate white, Caucasian, and female board members.

104. In fact, **PPGNY** and **PPGNY**'s board members engaged, and continue to engage, in a pattern and practice of discrimination against black employees, African American male employees, disabled employees, and those African American and disabled employees who take protected activity like Mr. Mitchell.

105. The retaliation and discrimination has only intensified once **Defendant STARK** has been appointed.

106. Specifically, during a December 2022, Executive Leadership Team meeting, **Defendant STARK** rudely, condescendingly and with utter disdain, chastised Plaintiff by responding to a point he raised as follows: "**Samuel, I don't care and I don't agree with you!**

107. **Defendant STARK** repeated this statement multiple times in the presence of CORSO, MESSINA, DAWN McCLARY (chief legal and compliance officer), DIPAL SHAH (chief external affairs officer), **Defendant DEAN,** and chief of staff LISA WILLIAMS.

108.  **Defendant STARK's** comments at this meeting constituted an adverse employment action because it had the effect of belittling plaintiff in front of the executive leaders of the organization and undermining his authority as COO.  **STARK** signaled to the others that Plaintiff's opinions, position in the Organization and authority should be ignored.

109.  These adverse employment actions were both retaliatory, given its temporal proximity to Plaintiff's protected conduct, but also discriminatory given that **STARK** does not treat white, Caucasian, and female employees in a similar fashion.

110.  **STARK** has also allowed her female Chief of Staff, Lisa Williams to proudly wear a shirt stating "***WOMEN RUN SHIT"*** while at work so that others including Plaintiff can see.

111.  The sanctioning of this attitude of superiority, the dehumanization of African American employees including Plaintiff and abusive conduct was the same that existed when LAURA McQUADE was the CEO of PPGNY and received over 350 public complaints of racist and abusive conduct.

112.  **STARK'S and PPGNY'S** failure to address these discriminatory practices and complaints raised by the plaintiff have allowed the hostile work environment based on illegal discrimination to thrive.

113.   For example, on February 27, 2023, **PPGNY** Caucasian male Board member Andy Herz asked an African American female employee who wore her hair in twists and dreadlocks, "Hey Dawn, how do you get your hair all on one side, I can't do that?"

114.  Plaintiff, who witnessed this humiliating and racist comment was emotionally sickened at the racially hostile work environment that has been created and allowed to exist within **PPGNY**'s upper management.

115.  While Plaintiff's employment with **PPGNY** continues to be a harrowing, traumatic

experience, the events complained of herein do not reflect a unique incident, as rudimentary internet research paints a similarly distressing picture of discriminatory abuse and misconduct by **PPGNY** and those occupying the most powerful positions within **PPGNY**[7].

116.    The totality of these acts demonstrates a pattern of **PPGNY** failing to prevent or address incidents of discrimination, failing to implement antidiscrimination policies, and failing to adequately train staff concerning civil rights issues, intentionally perpetrated by the **PPGNY** management and staff.

117.    **PPGNY** and the individually named defendants, including Defendant **STARK** have devised, implemented, and executed a scheme through which they give disparate, preferential treatment and superior benefits to female and white, Caucasian employees, while knowingly and intentionally denying equal treatment and benefits to male and

---

[7] Ema O'Connor, '*Employees Are Calling Out Major Reproductive Rights Organizations For Racism And Hypocrisy*' available at https:// https://www.buzzfeednews.com/article/emaoconnor/employees-calling-out-reproductive-rights-groups, accessed September 22, 2022  Esther Wang, "*How an Ousted CEO Built a Culture of 'Covert Racism' and Fear at Planned Parenthood's Largest Affiliate*", available at  https://jezebel.com/how-an-ousted-ceo-built-a-culture-of-covert-racism-and-1844118541, accessed July 1, 2022 Carole Novielli, "More Former Planned Parenthood Employees Come Forward With Accusations of Racism", available at, https://www.liveaction.org/news/former-planned-parenthood-employees-accuse-racism/, accessed September 22, 2022  Dani McClain,  " The Racial Reckoning Inside Planned Parenthood", available  at, https://Www.Harpersbazaar.Com/Culture/Features/A34742021/Racial -Reckoning-Planned-Parenthood/ , accessed September 22 , 2022; Save PPGNY, "*Current and Former Planned Parenthood Great Plains Staff Statement On Laura Mcquade. Signatures Are Still Being Collected  and The List of Signers Will Be Updated Periodically*" available at https://saveppgny.wordpress.com/ppgp-statement/l, accessed September 22,  2022.

black, African American employees, including Plaintiff.

118.   Defendants discriminated against and continue to discriminate against Plaintiff on the basis of his age, race, color, disabling condition, gender and because Plaintiff complained or opposed the unlawful conduct of Defendants related to the above protected classes. Defendants retaliated against Plaintiff for engaging in protected activity.

119.   The above are just some examples of **PPGNY**'s unlawful discrimination of and retaliation against Plaintiff.

120.   As a result of **PPGNY**'s unlawful and discriminatory actions, Plaintiff has endured unlawful humiliation resulting in extreme emotional distress, severe depression, extreme anxiety, physical ailments and financial loss.

121.   As a result of **PPGNY**'s actions, Plaintiff has been and continues to feel extremely humiliated, degraded, victimized, marginalized, embarrassed, and emotionally distressed.

122.   As a result of **PPGNY**'s unlawful and discriminatory actions, Plaintiff has endured financial hardships and irreparable damage to his professional reputation.

123.   As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits, and other compensation, which such employment entails. Plaintiff has also suffered pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff further claims aggravation, activation, and/or exacerbation of any preexisting condition.

124.   Plaintiff claims a continuous practice of discrimination and makes all claims herein under the continuing violations doctrine.

## AS A FIRST CAUSE OF ACTION FOR DISCRIMINATION UNDER 42 U.S. CODE § 1981 (AGAINST ALL DEFENDANTS)

125.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

126.    42 U.S. Code § 1981 - Equal rights under the law states provides:

(a) **All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law**.

127.    Defendants constantly enforced a purposefully discriminatory pattern and practice of depriving African American individuals of the equal rights described therein, in further violation of 42 U.S.C. §1981.

128.    As a result of Defendants' discrimination in violation of Section 1981, Plaintiff has been denied the enjoyment of all benefits, privileges, terms, and conditions of Plaintiff's contractual relationship which provided substantial compensation and benefits, thereby entitling him to injunctive and equitable monetary relief; and having suffered such anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of **Defendants'** actions, thereby entitling Plaintiff to compensatory damages.

129.    As alleged above, **Defendants** acted with malice or reckless indifference to the rights of the

Plaintiff and  other individuals named herein, thereby entitling Plaintiff to an award of punitive damages.

130.   **Defendants** unlawfully discriminated against Plaintiff and unlawfully retaliated against Plaintiff in violation of 42 US.C. § 1981 and is entitled to damages as a result.

## AS A SECOND CAUSE OF ACTION FOR AGE, RACE, GENDER/SEX, AND DISABILITY DISCRIMINATION IN VIOLATION OF THE NY STATE AND THE NY CITY HUMAN RIGHTS LAWS (AGAINST ALL DEFENDANTS)

131.   Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of the complaint.

132.   New York State Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

133.   Similarly, New York City's Human Rights Law prohibits the same and or similar discriminatory practices under the Administrative Code of the City of NY, section 8-107, et. seq..

134.   **Defendants** engaged in and are still engaging in unlawful discriminatory practices by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy discrimination of Plaintiff thereby discriminating against the Plaintiff because of Plaintiff's age, race, gender, and disability as well as creating a hostile work environment based on Plaintiff's membership in the aforementioned protected classes.

135.    As a direct and proximate result of **Defendants'** unlawful and discriminatory conduct in violation of the New York State Executive Law § 296, and New York City's Human Rights Law Plaintiff suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which Plaintiff is entitled to an award of monetary damages and other relief.

136.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, in violation of the New York State Executive Law § 296 and the Administrative Code of the City of New York section 8-107 et. seq., Plaintiff suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

137.    Plaintiff hereby makes claims against Defendants under all applicable paragraphs of New York State Executive Law Section 296 and the Administrative Code of the City of New York section 8-107 et. seq.

**AS A THIRD CAUSE OF ACTION**
**FOR AGE, RACE, GENDER/SEX, AND DISABILITY HARASSMENT**
**IN VIOLATION OF STATE AND NYC**
**LAW (AGAINST ALL**
**DEFENDANTS)**

138.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

139.    New York State Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: (h) For an employer, licensing agency, employment agency or labor organization to subject any individual to harassment because of an individual's age,

race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, domestic violence victim status, or because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint, testified or assisted in any proceeding under this article, regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims."

140.   Similarly, the New York City Human Rights law prohibits discriminatory conduct against employees by their employers.

141.   **Defendants** engaged in an unlawful discriminatory practice by subjecting Plaintiff to inferior terms, conditions, and privileges of employment because of Plaintiff's age, race, disability, sex, and gender.

142.   As a direct and proximate result of **Defendants'** unlawful and discriminatory conduct in violation of the New York State Executive Law § 296, and New York City Human Rights law Plaintiff suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which Plaintiff is entitled to an award of monetary damages and other relief.

143.   As a direct and proximate result of **Defendants'** unlawful and discriminatory conduct, in violation of the New York State Executive Law § 296, and New York City Human Rights Law, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self- confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

144. Plaintiff hereby makes a claim against Defendants under all applicable paragraphs of New York State Executive Law Section 296 and the Administrative Code of the City of New York section 8-107 et. seq.

**AS A FOURTH CAUSE OF ACTION FOR RETALIATION IN VIOLATION OF STATE, CITY AND FEDERAL LAW (AGAINST ALL DEFENDANTS)**

145. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

146. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

147. Similarly, 42 USC § 1981 and New York City's Human Rights Law prohibit retaliation against those who engage in protected activity.

148. **Defendants** engaged in an unlawful discriminatory practice by, *inter alia*, harassing, threatening, humiliating, undermining and otherwise discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of Plaintiff's opposition to **Defendants'** discriminatory practices towards Plaintiff and other older, Christian, male employees and employees of color and/or Plaintiff's participation in criticizing and lodging complaints about Defendants' discriminatory practices towards Plaintiff and other employees.

149. As a direct and proximate result of **Defendants'** unlawful and retaliatory conduct, in violation of the New York State Executive Law §296(7), New York City's Human Rights Law and 42 USC § 1981, Plaintiff suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income,

compensation and benefits, for which Plaintiff is entitled to an award of monetary damages and other relief.

150. As a direct and proximate result of **Defendants'** unlawful and retaliatory conduct, in violation of the New York State Executive Law §296(7), the Administrative Code of the City of New York section 8-107 et. seq., and 42 U.S.C. § 1981Plaintiff, suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

151. Plaintiff hereby makes a claim against **Defendants** under all applicable paragraphs of New York State Executive Law Section 296, New York City's Human Rights Law and 42 USC § 1981 for retaliation.

## AS A FIFTH CAUSE OF ACTION FOR HOSTILE WORK ENVIRONMENT IN VIOLATION OF NEW YORK STATE AND CITY HUMAN RIGHTS LAWS (AGAINST ALL DEFENDANTS)

152. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

153. A work environment is "hostile" in violation of the NYSHRL when it is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014).

154. New York City's Human Rights Law, Administrative Code City of New York, section 8-107, et. seq. prohibits hostile work environments as well.

155.   Defendants created, maintained, and subjected Plaintiff to an unlawful hostile work environment in violation of New York State and New York City laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.   A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate Federal Law, the laws of the State of New York, and the City of New York;

B.   An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.   An award of damages in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, seniority, and other benefits of employment;

D.   An award of damages in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for his severe mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, emotional pain and suffering and other physical and mental injuries;

E.   An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus prejudgment interest;

F.   An award of punitive damages, in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court

which might otherwise have jurisdiction over this matter;

G.  An award of costs that Plaintiffs have incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

H.  Such other and further relief as the Court may deem just and proper.

**WHEREFORE, THE ABOVE BEING CONSIDERED,** Plaintiff respectfully prays for the judgment against all Defendants, including compensatory damages, punitive damages against individual Defendants, any and all damages allowed by state, local and federal law including pre-judgment interest, post-judgment interest, and attorney's fees in an aggregate amount well above the jurisdictional amount needed to bring this case to this Court.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages.

Dated: March 7, 2023
New York, New York

Yours, etc.,

*Derek Sells*
_____
Derek S. Sells, Esq. (DS-8891)
THE COCHRAN FIRM
Attorneys for Plaintiff
55 Broadway, 23rd Floor
New York, New York 10006
(212) 553-9215

<u>ATTORNEY'S VERIFICATION</u>

STATE OF NEW YORK  )
                                      ).SS:
COUNTY OF NEW YORK )

I, the undersigned, am an attorney admitted to practice in the Courts of the State of New York, and say that:

I am the Chairman of THE COCHRAN FIRM, attorneys for the plaintiff.  I have read the annexed **COMPLAINT** and know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters, I believe them to be true.  My belief, as to those matters therein not stated upon knowledge, is based upon the following: investigation, interviews with client, records, reports, documents, correspondence, data, memoranda, etc., contained in the file.

The reason I make this verification instead of plaintiff, is that the plaintiffs reside out of the County of New York, wherein I maintain my offices.

I affirm that the foregoing statements are true under the penalties of perjury.

Dated: New York, New York
        March 7, 2023

_Derek Sells_
DEREK S. SELLS