UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

**SAMUEL RICARLOS MITCHELL, JR.**,                    Docket No.:1:23-cv-01932
                                        Plaintiff,

      -against-
                                                        **THIRD AMENDED
                                                        COMPLAINT**

**PLANNED PARENTHOOD OF GREATER NEW YORK, INC.,
WENDY STARK individually,
ANDREA HAGAN individually,
GILLIAN DEAN individually,
KEITH CORSO individually,
and ANNE DAVIS individually**

                          Defendants.
----------------------------------------------------------------X

      Plaintiff SAMUEL RICARLOS MITCHELL, JR. (hereinafter referred to as "Plaintiff" or

"Mr. Mitchell"), by and through his undersigned counsel, THE COCHRAN FIRM, as and for

Plaintiff's Third Amended Complaint in this action against the Defendants **PLANNED**

**PARENTHOOD OF GREATER NEW YORK, INC., WENDY STARK, ANDREA HAGAN,**

**GILLIAN DEAN, KEITH CORSO,** and **ANNE DAVIS** hereby alleges as follows:

<u>STATEMENT</u>

      Planned Parenthood was founded by Margaret Sanger who was an unabashed racist,

eugenics believer and KKK sympathizer. As late as April 2021, Planned Parenthood's leadership

acknowledged that Sanger was coddled by the organization and protected despite her

discriminatory animus:

> *"Planned Parenthood has failed to own the impact of our founder's*
> *actions. We have defended Sanger as a protector of bodily autonomy and*
> *self-determination, while excusing her association with white*
> *supremacist groups and eugenics as an unfortunate product of her*

*time."[1]*

While this statement was meant to reflect a new beginning for the Planned Parenthood organization as it relates to addressing issues of racial, gender, and disability equality within its own walls, the reality is that Planned Parenthood continues to be run by people who are openly hostile to racial minorities, the disabled, older workers and those who complain about discriminatory practices.

Proof of this reality lies in the lawsuit filed by Nicole Moore, who on October 19, 2022, a year and half after the organization's acknowledgement of its racist history, alleged that Planned Parenthood continued to discriminate against its African American employees and against those who complained about this racial discrimination. Ms. Moore clearly had insight into this topic as she was the director of Multicultural brand engagement until she was fired for complaining about discriminatory practices within Planned Parenthood. As stated in her complaint:

> *"When Moore politely spoke up about the inequitable distribution of work, she was falsely accused of being negative, angry, difficult to work with, and chastised for her "tone" – complaints that had no basis in reality but comported with well-trafficked stereotypes about Black women. Planned Parenthood executives then proceeded to thwart Moore's ideas, sabotage her projects, and subject her to unfounded disciplinary measures that were clearly intended to silence her complaints. The barrage of mistreatment caused Moore to suffer a panic attack so severe that she spent a day in the hospital. After complaining to HR that the disciplinary measures appeared to be retaliation for her complaints of racial inequality at the organization, she was summarily fired."[2]*

Now, just five (5) months later, Samuel Ricarlos Mitchell, Jr., the Chief Operating Officer ("C.O.O.") and highest ranking African American male in Planned Parenthood of Greater New York's ("PPGNY") history, filed suit on March 7, 2023, alleging that he too had been victimized

---

[1] New York Times op ed April 17, 2021, "I'm the Head of Planned Parenthood. We're Done Making Excuses for our Founder." Alexis McGill Johnson

[2] *Moore v. Planned Parenthood Federation of America, et al*, 22-cv-8899, SDNY, Document 1 at paragraph 8.

by race, gender, age and disability discrimination in violation of Federal, State and New York City laws. That lawsuit was meant to shine a light on the discriminatory and retaliatory employment practices that permeate the organization and bring justice to Mr. Mitchell for the unrelenting discriminatory practices he had endured. The Defendants, instead of changing their ways, doubled down with their discriminatory and retaliatory practices by segregating Mr. Mitchell away from his colleagues, removing his responsibilities and ultimately terminating him illegally because he spoke up against PPGNY discriminating and retaliating against him and being forced to work in a hostile work environment, and spoke up against PPGNY causing harm to black and brown people, and raised several examples of medically negligent practices by Defendants DEAN and DAVIS. This Amended complaint follows.

## NATURE OF THE CLAIMS

This is a civil action for declaratory, injunctive, and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices against Plaintiff, including their discriminatory treatment, harassment, hostile work environment, and unlawful retaliation against the Plaintiff due to his age, race, color, disability, religion and gender, in violation of Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"), Americans with Disabilities Act of 1990 ("ADA"), Age Discrimination in Employment Act of 1967 ("ADEA"),42 U.S.C. §1981 and to remedy violations of the New York State Human Rights Law; New York Executive Law, § 290, *et seq.* ("the Executive Law"); and the NY City Human Rights Law, Administrative Code of the City of New York 8-107 *et seq.* ("NYCHRL");

**Defendants'** conduct is knowing, malicious, willful, and wanton and/or shows a reckless disregard for the Plaintiff. It has caused and continues to cause the Plaintiff to suffer substantial

economic and non-economic damages, permanent harm to his professional and personal reputations, and severe mental anguish and emotional distress.

## <u>JURISDICTION AND VENUE</u>

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 in that the action involves federal questions, because the causes of action asserted herein arise in part under Title VII, ADA, ADEA, 42 U.S.C. § 1981 ("1981"), and 42 U.S.C. § 1983 ("1983"), to remedy violations based upon Federal Law and the supplemental jurisdiction of this Court pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966) and 28 U.S.C. § 1367, seeking declaratory and injunctive relief and damages to redress the injuries Plaintiff suffered as a result of being discriminated against, and retaliated against by Plaintiff's employers and superiors on the basis of Plaintiff's age, race, color, religion, disability, sex and gender, as well as a hostile work environment under State and Local law.

2.    28 U.S.C. §1331 states that "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

3.    Plaintiff further invokes the supplemental jurisdiction of this Court to adjudicate state and local claims pursuant to 28. U.S.C. 1367. The matter in controversy exceeds, exclusive of interests and costs, the sum of One Hundred Thousand Dollars ("$100,000").

4.    Venue is proper in this District based upon the fact that the events or omissions which gave rise to the claims asserted herein occurred within the Southern District of New York, Manhattan.

5.    Plaintiff filed a charge with the Equal Employment Opportunity Commission (hereinafter referred to as "EEOC") with respect to the herein charges of harassment and discrimination on or about March 13, 2023 (hereinafter referred to as "EEOC Charge No. **520-2023-03767**").

6.    On or about **July 28, 2023**, Plaintiff received a Notice of Right to Sue letter (hereinafter referred

to as "Plaintiff's Notice of Right to Sue letter") from the EEOC for EEOC Charge No. **520-2023-03767**.

7.  Plaintiff satisfied all administrative prerequisites and filed this case within ninety (90) days of receiving the Notice of Right to Sue letter.

8.  Plaintiff has filed suit with this Court within all applicable statute of limitations periods.

9.  All conditions and requirements precedent to the commencement of this action have been met.

## PARTIES

### The Plaintiff

10. Plaintiff Samuel Ricarlos Mitchell, Jr. (hereinafter referred to as "Plaintiff" and/or "Mr. Mitchell") is an individual black, African American male who is a resident of the State of Florida and the State of New York. At all times material, Plaintiff was over the age of forty (40).

11. Plaintiff is an ordained Pastor.

12. Plaintiff suffers from a disabling neurological condition which causes him to stutter and stammer excessively and involuntarily in the face of stressful situations.

13. Plaintiff is therefore a member of multiple protected classes.

### The Defendant Employers

14. At all times material, Defendant **PLANNED PARENTHOOD OF GREATER NEW YORK, INC.** (hereinafter referred to as "**PPGNY**" and/or "Defendants **PPGNY**") was, and still is, a domestic not-for-profit corporation, duly organized and existing under and by virtue of the laws of the State of New York with an office located at 26 Bleecker St, New York, NY 10012 (hereinafter referred to as the "Manhattan location").

15. At all times material, **PPGNY** meet the definition of an "employer," and/or "single employer."

16. At all times material, **PPGNY** acted, and continues to act, by and through their employees, agents,

board members, and servants who were acting in the scope and course of employment, agency, and servitude.

***The Individual Defendants***

17.    At all times material, PPGNY employed Defendant **WENDY STARK** (hereinafter referred to as "Defendant STARK" and/or "STARK") as the PPGNY President and CEO.

18.    **STARK** held, and still holds, a supervisory position with **PPGNY**, controlling many tangible aspects of Plaintiff's job duties, including holding the power to control Plaintiff's work duties, work schedule, and work discipline including termination. **STARK** is an individual, white, Caucasian female.

19.    As Plaintiff's supervisor, **STARK** has also aided and abetted the unlawful conduct described herein.

20.    At all times material, **PPGNY** employed Defendant **ANDREA HAGAN** (hereinafter referred to as "Defendant **HAGAN**" and/or "**HAGAN**") as the Board Treasurer. **HAGAN** is an individual white, Caucasian female.

21.    **HAGAN** held, and still holds, a supervisory position at **PPGNY** controlling many tangible aspects of Plaintiff' job duties, including holding the power to control Plaintiff's work, to discipline Plaintiff, and to hire and fire Plaintiff.

22.    **HAGAN** was an active participant in the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff.

23.    At all times material, **PPGNY** employed Defendant **GILLIAN DEAN** (hereinafter referred to as "Defendant **DEAN**" and/or "**DEAN**") as Chief Medical Officer at **PPGNY**. **DEAN** is an individual white, Caucasian female.

24.    **DEAN** held, and still holds, a supervisory position at **PPGNY,** controlling many tangible aspects of Plaintiff's job duties.

25.    **DEAN** was an active participant in the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff.

26.    At all times material, **PPGNY** employed Defendant **KEITH CORSO** (hereinafter referred to as "Defendant **CORSO**" and/or "**CORSO**") as Chief Development Officer at **PPGNY**. **CORSO** is an individual homosexual white, Caucasian male.

27.    **CORSO** held, and still holds, a supervisory position at **PPGNY,** controlling many tangible aspects of Plaintiff's job duties.

28.    **CORSO** was an active participant in the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff.

29.    At all times material, **PPGNY** employed Defendant **ANNE DAVIS** (hereinafter referred to as "Defendant **DAVIS**" and/or "**DAVIS**") as Associate Chief Medical Officer. **DAVIS** is an individual white, Caucasian female.

30.    **DAVIS** held, and still holds, a supervisory position at **PPGNY,** controlling many tangible aspects of Plaintiff's job duties.

31.    **DAVIS** was an active participant in the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff.

32.    **STARK**, **HAGAN**, **DEAN, CORSO,** and **DAVIS** are hereinafter collectively referred to as "**the individual PPGNY Defendants**" and/or "**the PPGNY Employees.**"

## FACTUAL ALLEGATIONS

33.    Plaintiff's employment background includes twenty (20) years of professional experience.

34.    At all times relevant, Plaintiff was an "employee" of **PPGNY**.

35. At all times relevant after March 28, 2023, Plaintiff was, and still is, a "former employee" of **PPGNY**.

36. On or about September 27, 2021, **PPGNY** hired Plaintiff as an Interim Chief Operating Officer (hereinafter referred to as "COO") based at the Manhattan location.

37. At all times material, Plaintiff was, and still is, qualified for the position of COO.

38. At all times herein, Plaintiff was an exemplary employee who obeyed orders and directives from his superiors.

39. At all times material, Plaintiff performed all duties assigned in a diligent and thorough manner.

40. Tellingly, in **PPGNY**'s one hundred and six (106) year history of holding itself out as being committed to racial equity and stating that it is "turning [**PPGNY**'s] lens inward to actively work toward being a multicultural, inclusive, and anti-racist organization where all community and staff thrive,[3]" Plaintiff is the first black, African American male on **PPGNY**'s executive leadership team.

41. At all times material, Plaintiff was the sole disabled, Christian, black, African American, heterosexual male on **PPGNY**'s executive leadership team.[4]

42. Throughout his time as a **PPGNY** COO Plaintiff received numerous compliments for his work performance, including praise from **PPGNY** executive Risa Zoll (hereinafter referred to as "ZOLL") for providing guidance towards a "constructive meeting…**devoid of tension,** and productive", and gratitude for his "incredible support" in his voluntary oversight of an additional department from **PPGNY** Director of Community Organizing, Nicole Margiasso-Tran

---

[3]Planned Parenthood of Greater New York, "*Equity at Planned Parenthood*", available at, https://www.plannedparenthood.org/planned-parenthood-greater-new-york/about/jobs/equity, accessed September 22, 2022
[4]"**Tokenism** is the practice of making only a perfunctory or symbolic effort to be inclusive to members of minority groups, especially by recruiting people from underrepresented groups in order to give the appearance of racial or gender equality within a workplace or educational context.[1][2][3] The effort of including a token individual in work or school is usually intended to create the impression of social inclusiveness and diversity (racial, religious, sexual, etc.).[4]"Wikipedia, "*Tokenism*", available at https://en.wikipedia.org/wiki/Tokenism, accessed September 22, 2022

(hereinafter referred to as "MARGIASSO-TRAN". Plaintiff always got along well with all of his co-workers.



43. Plaintiff was responsible for a considerable number of significant accomplishments in his role as **PPGNY** COO, including, *inter alia*, successfully strategizing, and managing CHN, successfully revamping Clinical Operations, and successfully managing 75% of **PPGNY**'s workforce, including External Affairs/Comms/Marketing.



44. However, despite his excellent work record and litany of accomplishments, almost immediately after being hired by **PPGNY** Plaintiff was forced by **PPGNY, STARK, HAGAN, DEAN, CORSO,** and **DAVIS** to endure age, race, color, disability, religion, and gender discrimination at the highest level.

45.    Throughout Plaintiff's employment, he was, and still is, subjected to a continuing pattern and practice of discrimination and hostile work environment based upon his age, race, color, disability, religion, and gender and in retaliation for complaining about **PPGNY**'s discriminatory actions and other wrongdoing.

46.    Plaintiff asserts that **PPGNY** and **STARK, HAGAN, DEAN, CORSO,** and **DAVIS** engaged, and continue to engage, in a pattern and practice of discrimination against older black male employees, African American male employees, employees with perceived disabilities, and employees who engage in protected conduct on behalf of themselves and other minority employees.

47.    By way of example, **PPGNY** required Plaintiff to endure a disproportionate number of background checks due to his age, race, color, disability, and gender.

48.    In fact, **PPGNY** required Plaintiff to undergo a disproportionate number of background checks which is so far above what younger, Caucasian, and non-disabled prospective employees go through as to be clearly discriminatory and harassing.

49.    **PPGNY**'s requirements in this regard were clearly discriminatory on these bases, because **PPGNY** did not require similarly situated younger, white, Caucasian, or female employees, to face this level of intrusive background checks, both in terms of sheer number and invasiveness.

50.    Plaintiff, the sole black, African American, disabled, ordained Pastor, heterosexual male on **PPGNY**'s Executive Leadership Team and throughout the agency was the only employee who had to endure such intrusive invasiveness.

51.    Plaintiff went through several layers of background checks both with the interim agency, HealthTech Management Services, Inc., d/b/a HealthTechS3, and then by Planned Parenthood of Greater New York, by several members of the Board of Directors of Planned Parenthood of Greater New York, and Planned Parenthood Federation of America.

52.   Several Board members took it upon themselves to run unauthorized, unsolicited, and unconsented independent background checks in an effort to discredit the Plaintiff's character. The Board members, including Andrea Hagan, led and facilitated these discriminatory campaigns which were outside the scope of her responsibility as the COO does not report to the Board, the COO reports directly to the President & CEO.

53.   Both Plaintiff's and Dean's biographies were shared throughout the agency along with the Board in September of 2021 on the same day and time – the Plaintiff commenced his employment in September and Dean in November of the same year; it was then that the sole black, African American, disabled, ordained Pastor, heterosexual male endured an onslaught of discriminatory interference and interrogatories. This includes questioning of his political status as a registered Republican. He was required to always defend his stance via scripted responses from the Communications & Marketing teams and on his own accord.

54.   During September 27, 2021 – October 14, 2021, the Plaintiff was subjected to tortious attacks requiring the Plaintiff to respond to several questions daily defending his background all stemming/originating from the Board of whom the Plaintiff did not report to.

55.   Throughout Plaintiff's employment, Defendant PPGNY failed to follow its own policies and procedures when evaluating Mr. Mitchell's performance, considering him for promotion, conducting background checks, permitting remote work, and investigating and remedying his numerous complaints of discrimination.

56.   By way of example, PPGNY's HR-016A Recommendation for Promotion Form and process was not used in selecting the Acting CEO.

Policy Name: **Promotions, Title Changes, and Pay Adjustments**

Policy Number: **HR-016**

| Date Issued | August 17, 2020 |
|---|---|
| Most Recent Review | August 17, 2020 |
| Responsible Office | Human Resources |
| Responsible Officer | Chief People Officer |
| Scope | This policy applies to all PPGNY employees. |

**PURPOSE**

To outline a performance-based, transparent, and equitable approach for advancing and recognizing high performing employees at PPGNY. This policy includes the process that managers must follow when recommending an employee for a promotion, a change in the employee's job title, or a pay adjustment.

**DEFINITIONS**

Promotion – A promotion involves both (1) a move to a position of higher rank, title, responsibility and (2) an increase in pay. Promotions can happen through one-off structural re-organizations, or at the end of a performance evaluation cycle. Employees may be promoted within the same or another department or branch of the organization.

Title Change – A change in an employee's job title without an increase in pay. Title changes may involve an increase in an employee's scope of responsibility but is not considered a Promotion.

Pay Adjustment – An increase to an employee's pay that does not come with a change in title or increased scope of responsibility.

Senior Leadership Team – The decision-making group made up of the Chief Executive Officer, the Chief Executive Officer's direct reports, and any other individuals invited to join the group.

**POLICY**

Promotions must be signed off by the Senior Leadership Team (SLT) member of the relevant department and approved by SLT. Promotions that occur as a result of one-off structural reorganizations or at the end of a performance review cycle may be filled through a non-competitive process based on recommendation from departmental leadership. However, a competitive process is recommended where there may be multiple internal candidates for the role. Promotion opportunities that open because of an employee's departure or that are created as a result of an emergent business need must be filled through a competitive process.

Title Changes are approved based on the same process as a Promotion.

Salary adjustments will be considered in exceptional circumstances when an employee's compensation is determined to be below market for their scope of responsibility.

**PROCEDURE**

Promotions and Title Changes

Eligibility

All employees are considered eligible for promotion if they are in good standing. Employees on a performance improvement plan may not be promoted.

Criteria for Promotion

In order to meet the criteria for Promotion, an employee must demonstrate, at minimum:

1. If the employee was employed during a performance review cycle, strong performance in the last review cycle demonstrated by meets expectations or exceeds expectations rating

2. Skillsets that match the minimum requirements of the new role, including fulfillment of (race+) equity competencies

These criteria reflect the bigger picture of an employee's work. Managers should avoid making decisions for promotion based on recent or insignificant events. They should keep logs with important incidents that they might want to consider when it is time to promote one of their team members. Managers' subjective opinions unsupported by performance evaluations or metrics will not be considered.

Timing & Application

Consideration for promotion is ideally a collaborative conversation between managers and supervisees and should be considered as part of ongoing development conversations. Recommendations for promotion may be put forward:

- As part of a performance evaluation cycle every end of year
  - In these instances, the process does not need be open to external candidates. However, managers may still run a process if there are multiple internal candidates eligible for a single role.
- Via a one-off structural re-organization
- When a role becomes open due to emergent business needs or staff departures.
  - When a new role opens as a result of an emergent business need or an employee departure, internal candidates must apply and be considered

together with external candidates for the role, unless the department has a racially diverse pipeline or pool of internal candidates. This scenario happens in accordance with our internal protocols for external and internal hiring and may result in a promotion.

*Manager's Role*

Managers should follow the process outlined below:

1. Meet with employees to talk about their career goals and/or aspirations for a promotion. Managers should create career plans for their team members as part of standard performance evaluation cycles.

2. Identify opportunities to promote one or more team members, if applicable.

3. Outline the pool of eligible employees for a promotional opportunity to ensure equity has been factored into the process and no one has been unfairly overlooked in considerations for promotions.

4. Discuss the promotion with their direct supervisor and/or department head and SLT lead. Managers should also ask HR about the new position's salary range that they are considering.

5. Submit their recommendation for promotion, approved by SLT lead for their department before submission to the SLT for deliberation. Recommendations are supported by a "Recommendation for Promotion" form (see Form HR-016A).

Salary Adjustments

Salary adjustments made be approved in exceptional instances when compensation is below market for the scope of responsibility will be subject to the following process.

1. *Manager's recommendation:* Managers should submit a status change form, including the rationale for salary adjustment and the proposed new salary. The form will require sign off by the SLT lead for the department.

2. *Consideration by the Compensation Review Committee:* A Committee made up of the Chief Operating Officer, Chief People Officer and Chief Equity & Learning Officer will deliberate and approve the recommended salary adjustment.

3. *Communication with SLT:* The SLT will be informed of the Compensation Review Committee's decision regarding the salary adjustment.

**Budget Implications for Promotions and Salary Adjustments**

All Promotions and Salary Adjustments must be supported by the relevant department's approved budget.

**SLT Decision-making Process**

All recommendations for Promotions, Title Changes, and Pay Adjustments must be submitted to SLT for approval.

- SLT will evaluate the recommendation for promotion, with the support of the "Recommendation for Promotion" form and/or other required documentation.

- Recommendations for Promotions, Title Changes, and Pay Adjustments will be thoroughly considered. The decision-making process will include applying an equity prime to check for any racial diversity in staff being considered for such status changes. The equity prime includes:
  - Whether promotions entrench or worsen racial diversity at the highest levels of the department, and
  - If there is any racial diversity in the staff members (across all departments) being considered and approved for promotion.

- HR will then prepare a letter outlining the job description for the new role and salary information.

All Promotions, Title Changes, and Pay Adjustments must receive sign off both by the SLT lead of the relevant Department and by HR and signed off by the CEO.

**Planned Parenthood**
**of Greater New York**

**Recommendation for Promotion, Title Change, or Pay Adjustment**

Recommendations for promotion, pay adjustment, title change, and/or transfer must be supported by evidence of high performance and the ability to meet the requirements for the new role. All promotions, title changes, and pay adjustments as well as transfers to or into People Manager roles must be approved by the Senior Leadership Team lead of the relevant department before being considered by SLT.

I. **Manager Making the Recommendation**

Name: _____ Title: _____

Submission Date: _____ Department: _____

II. **Employee Information**

Employee Name: _____ Current Title: _____

Current Pay: _____

Proposed Status Change:

☐ Promotion    ☐ Title Change (no pay increase)    ☐ Transfer    ☐ Pay Adjustment

If a promotion, title change, or transfer, is the new position a People Manager role?

☐ Yes ☐ No

Proposed New Pay (if applicable): _____

Proposed New Title (if applicable): _____

III. **Supporting Information** Please attach additional pages or supporting documentation as needed.

i. **For promotions and title changes:** Employee's strengths and skills, including examples, that demonstrate how they will meet minimum requirements for new role.

**Planned Parenthood of Greater New York**

**Recommendation for Promotion, Title Change, or Pay Adjustment**

2. **For promotions only:** Employee's performance on (name)'s competencies, including specific race equity analysis, and equity-related skills and behaviors that support the current and new role.

3. **For promotions only:** Employee's strengths and skills, including examples, that demonstrate strong performance to be recognized through promotion.

4. Areas of support and development needed for employee.

5. **For Pay Adjustments:** Factors that suggest the employee is being paid a below-market rate for their current title.

Form #: HR-016A
Revision Date: 02/23/2021
Page 2 of 3

**Planned Parenthood of Greater New York**

**Recommendation for Promotion, Title Change, or Pay Adjustment**

IV.    **Senior Leadership Team Lead Approval**

☐ Approved   ☐ Denied

SLT Lead: _____ Title: _____

Date: _____

***The SLT Lead should submit this form and any accompanying documentation to SLT for consideration and approval.***

V.    **Senior Leadership Team Approval**

☐ Approved   ☐ Denied

Chief People Officer (on behalf of SLT): _____

Date: _____

SLT Review Notes (if applicable):

Form #: HR-016A
Revision Date: 02/23/2021
Page 3 of 3

57.    PPGNY's HR-018 Background Checks process was not used/followed for the Plaintiff. Non-black employees, including Dipal Shah, Chief External Officer, and Dawn McClary, General Counsel and Chief Compliance Officer, were not subjected to the background check process that Mr. Mitchell was forced to undergo.

Planned Parenthood of Greater New York
Policy & Procedure Manual
Human Resources

Policy Name: **Background Checks**
Policy Number: **HR-018**

| Date Issued: | May 22, 2020 |
| --- | --- |
| Most Recent Review: | July 13, 2022 |
| Responsible Office | Human Resources |
| Responsible Officer | Vice President, Human Resources |
| Policy Owner | Vice President, Human Resources |
| Scope | This policy applies to all staff including, employees, volunteers, clinical trainees, and interns |

**PURPOSE**

This policy establishes the guidelines and conditions under which background checks are conducted for employees, various types of volunteers, clinical trainees and interns and discusses required disclosures under the law.

**POLICY**

**For Employees:**

Following a conditional offer of employment, all prospective PPGNY employees must be processed through an application and background check conducted by Human Resources and a third-party administrator.

In accordance with applicable law, PPGNY will not deny employment to, or take adverse employment action against a person who has previously been convicted of one or more criminal offenses in this state or in any other jurisdiction, whose conviction(s) preceded their employment or application for employment with PPGNY, except where permitted or mandated by applicable law.

When applicable to determining whether an offer of employment will be made or continued employment is appropriate, the VP of Human Resources and General Counsel at PPGNY will weigh all factors set forth by New York Correction Law Article 23-A concerning an applicant's or employee's previous criminal conviction(s). These factors are:

- The public policy of New York state to encourage the employment of persons previously convicted of one or more criminal offenses;
- The specific duties and responsibilities necessarily related to the employment sought or held by the person;
- The bearing, if any, the criminal offense(s) for which the person was previously convicted will have on the individual's fitness or ability to perform one or more such duties or responsibilities;
- The time which has elapsed since the occurrence of the criminal offense(s);

Planned Parenthood of Greater New York
Policy & Procedure Manual
Human Resources

- The age of the person at the time of the criminal offense(s);
- The seriousness of the offense(s);
- Any information produced by the person, or produced on their behalf, in regard to their rehabilitation and good conduct; and
- The legitimate interest of PPGNY in protecting property, and the safety and welfare of specific individuals or the general public.

If PPGNY is considering taking adverse action, PPGNY will follow all legal requirements under applicable law, including notice requirements.

**For Volunteers:**

PPGNY has volunteers involved in many different aspects of our work. The need to background check an individual volunteer will depend on the risk-level assessment outlined by Planned Parenthood Federation of America Network of Volunteer Advocates (PPNOVA) below:

The risk level of each volunteer position is determined by considering the following:
- Specific activities and functions this volunteer role will be executing
- Any local or state labor, privacy or public health laws that apply to this role based upon its function
- Level of risk the volunteer role presents to the organization:
  - Low Risk Volunteers (do not require criminal background checks): may be episodic, large scale or highly controlled; they do not interact with patients, expose volunteers to confidential information or provide unsupervised access to Planned Parenthood facilities. Examples include: participating in a rally, protest, town hall, lobby day or march, Planned Parenthood Generation Action, neighborhood canvassers, phone bankers, supporters or activist fundraisers, happy hours or community meetings, volunteers recruited at "bring a friend" events
  - Medium Risk Volunteers (do not require criminal background checks): may include representing Planned Parenthood to the public, leading teams of volunteers or staying engaged for the long term. They may be exposed to limited confidential information. Examples include: Planned Parenthood Ambassador or community outreach volunteer at tabling events or volunteer fairs, fundraising event volunteers, volunteers engaging in administrative volunteer projects like preparing donor mailings or doing supporter data entry, volunteer leaders who direct teams of other volunteers (like phone bank captain or Planned Parenthood Generation Action leader)
  - High Risk Volunteers (require criminal background checks): often have direct interaction with patients, minors or confidential information. Examples include: patient escorts, greeters and hub volunteers, Patient Advocacy Program (formerly known as Health Center Advocacy Program, excludes

Healthy Neighborhood Canvassers), hand holders, volunteer doulas, volunteer options counselors and or other health center assistants, speakers bureau members, Promotores, referral or education hotline volunteers, peer education leaders, unpaid interns, clinical trainees (e.g., residents, fellows), Certified Application Counselor and other In-Person Assisters assisting with enrollment in healthcare plans through the Affordable Care Act.

PPGNY will not conduct background checks on minors who are engaged in volunteer programs through their school and our organization.

## PROCEDURE

For Employees:

1. PPGNY will make a verbal conditional offer of employment to selected applicant.

2. Following the offer of employment, Human Resources enlists the third-party background check vendor to provide appropriate disclosures and obtain appropriate releases before background checking begins, as well as provide the employee with a copy of "Disclosures and Authorization under the Fair Credit Reporting Act and Article 23-A of the New York State Correction Law. Human Resources provides the third-party administrator with the employee's information and authorization release prior to beginning the background check.

3. The post offer, pre-employment background check may include:

   • Reference checks on final candidates- these are conducted through a third-party vendor. Only Human Resources staff, and/or authorized staff as designated by the Vice President, Human Resources may conduct reference checks and written notes regarding any conversation with a reference which must be documented. These reference reports are stored in a confidential file maintained by Human Resources.

   • Confirmation of employment with past employers for past five years.

   • Confirmation of all educational credentials by requesting that the candidate supply transcripts and/or present diplomas for review, and/or by using web or other approved technology.

   • Confirmation of all professional license(s) or degree(s) by viewing the originals and by using web or other approved technology.

   • OMIG/OIG Exclusions or Sanctions

4. The post-offer, pre-employment background check also includes a criminal background check, which is performed by a third-party administrator, and other relevant background checks on employees as indicated by title, for example, a department of motor vehicle abstract and review if the employee will be responsible for driving organization vehicles.

   • The third-party administrator provides a confidential, written report on the background check.

   • Human Resources will evaluate all factors set forth above by New York Correction Law Article 23-A concerning an individual's previous criminal conviction(s).

5. If the results of the background check potentially impacts the hiring decision, Human Resources will engage with the third-party vendor in further evaluation as follows :

   • PPGNY provided a pre-adverse action letter and required enclosures to the individual under the Fair Credit Reporting Act.

   • PPGNY provides the individual with at least seven (7) days to respond and provide any information the individual deems relevant; during this time PPGNY will hold open the position.

   • PPGNY will consider any new information provided.

   • If PPGNY intends to withdraw an offer based on the results of the criminal background check, prior to taking adverse action, PPGNY will provide the individual with the results of the background check and a completed NYC Fair Chance Act Notice.

   • PPGNY provides the individual with at least seven days to respond and provide any information the individual deems relevant; during this time PPGNY will hold open the position.

   • If the offer is withdrawn, PPGNY will advise the individual that the offer has been withdrawn and provide an adverse action letter with required enclosures to the individual required under the Fair Credit Reporting Act.

6. Only Human Resources may make verbal offers of employment or send letters confirming employment.

**For Volunteers:**

PPGNY managers are responsible for informing Human Resources regarding all prospective volunteers to determine the type of volunteer, assess the need for criminal

background check screening based upon risk level, and for tracking and monitoring purposes. Prior to a high-risk volunteer engaging in work with PPGNY, Human Resources will enlist the third-party background check vendor to provide appropriate disclosures and obtain appropriate releases before background checking begins, as well as provide the volunteer with a copy of "Disclosures and Authorization under the Fair Credit Reporting Act and Article 23-A of the New York State Correction Law. Human Resources provides the third-party administrator with the employee's information and authorization release prior to beginning the background check.

Human Resources will advise the volunteer manager the status of the background report and overall standing of the volunteer. Human Resources will keep a copy of the report in a confidential volunteer record. The volunteer manager will not be given access to the background report in its entirety. Should an adverse action arise, Human Resources will follow the same procedure above for Employee Adverse Actions.

## RELATED INFORMATION

See also Confirmation of Employment

58.    PPGNY's HR-008 General Rules of Conduct process was not followed while managing Plaintiff's complaints. In contrast, complaints and issues raised by non-black male employees were investigated timely and protocols were followed.

Planned Parenthood of Greater New York
Policy & Procedure Manual
Human Resources

Policy Name: **General Rules of Conduct**
Policy Number: **HR-008**

| Date Issued | March 6, 2020 |
| Most Recent Review | March 6, 2020 |
| Responsible Office | Human Resources |
| Responsible Officer | Chief People Officer |
| Policy Owner | Chief People Officer |
| Scope | This policy applies to all staff including, employees, contractors, volunteers, residents, interns, and students. |

**STATEMENT OF POLICY**

This policy establishes General Rules of Conduct for all PPGNY staff.

**POLICY**

Central to PPGNY's mission is to create a professional and safe atmosphere for all individuals in contact with PPGNY. In our dealings with each other and our interactions with patients, clients and the general public we work to implement these principles on a daily basis.

The General Rules of Conduct for employees, established by PPGNY for everyone's' guidance, are not all-inclusive. Depending upon the circumstances, failure to comply with these rules or other expected behavioral standards may result in disciplinary action ranging from a verbal or written warning up to and including immediate termination of employment. The Company, in its sole discretion, will decide what disciplinary action to impose under the circumstances. The Company maintains the right to terminate an employee at any time, for any reason, with or without cause and this policy does not limit that right.

Examples of unacceptable conduct or behavior include:

- Rude, discourteous or abusive behavior towards patients, clients, or others

- Violation of PPGNY's policies or procedures

- Discriminatory, threatening or harassing language towards patients, clients and others with whom an employee interacts. See PPGNY's non-discrimination, anti-harassment and workplace violence policies for additional information.

- Use or possession of intoxicants or illicit drugs on or off the premises during working time or reporting to work while "under the influence" of intoxicants or drugs. (The legal use of prescribed drugs is permitted on the job, provided it does not

Policy #: HR-008
Page 1 of 3

Planned Parenthood of Greater New York
Policy & Procedure Manual
Human Resources

impair an employee's ability to perform the essential functions of the job effectively and in a safe manner).

- Sleeping on the job
- Fighting or the threat of harm to another while on the job
- Misuse of or damage to materials or equipment or other property belonging to PPGNY or others
- Use of computers, the Internet or e-mail in violation of PPGNY's policies and procedures
- Accessing e-health records without a legitimate need to do so and/or falsifying any e-health records
- Unauthorized use or removal of PPGNY property or the property of others
- Negligence or endangering the safety or welfare of oneself or others
- Repeated unauthorized tardiness or absenteeism not protected by law
- Falsifying records, including payroll and expense reports
- Disclosure or misuse of confidential information, as further described in PPGNY's Confidentiality Policy
- Unauthorized possession, use, copying or accessing of records
- Carrying or possessing weapons of any kind on PPGNY property
- Theft
- Gambling during working time or on PPGNY property
- Acceptance of gifts in violation of PPGNY's Gifts policy
- Any form of discrimination, harassment, including sexual harassment or retaliation
- Failure to cooperate in a Company investigation regarding discrimination, harassment, ethical violations or other similar investigations
- Any illegal conduct.

Policy #: **HR-008**
Page 2 of 3

Planned Parenthood of Greater New York
Policy & Procedure Manual
Human Resources

**PROCEDURE**

1. Unacceptable conduct may result in disciplinary action, up to and including termination of employment.

2. Regardless of the action taken, unacceptable behavior will be noted in your personnel file by your supervisor and/or Human Resources, and you will receive a copy of the record.

**REVISION HISTORY**
New policy

59.     PPGNY's HR-007 Fair Treatment process was not followed while managing Plaintiff's complaints.  For example, PPGNY's executive committee directed Ms. McLary and Lori Lahn, Vice President of Compliance, not to take action on Mr. Mitchell's complaints.

Policy Name: **Fair Treatment**
Policy Number: **HR-007**

| Date Issued | March 6, 2020 |
|---|---|
| Most Recent Review | December 6, 2021 |
| Responsible Office | Human Resources |
| Responsible Officer | Chief People Officer |
| Policy Owner | Chief People Officer |
| Scope | This policy applies to all staff including, employees, contractors, volunteers, residents, interns, and students. |

**PURPOSE**

To establish expectations towards maintaining a working environment based upon mutual respect and professionalism, free from discrimination in any and all aspects of the operation of PPGNY.

**POLICY**

Our goal at PPGNY is to maintain a working environment based upon mutual respect and cooperation. PPGNY expects each employee to communicate and act in a professional manner at all times.

This policy applies to all persons involved in the operations of PPGNY, including but not limited to, employees, managers, supervisors, interns, officers, volunteers, clients, patients, vendors and members of the Board of Directors. This policy extends to any work-related conduct, including actions outside of the workplace or Company property as well as online or electronic interactions that affect the workplace.

A. **OPEN COMMUNICATION**

PPGNY believes that a policy of open communication is best for all concerned. We also believe that each employee should have the opportunity to make problems or complaints known. Therefore, when an employee wishes to express problems, concerns, opinions, or suggestions, the organization should provide an open door and an attentive ear. We encourage all PPGNY employees to be open and responsive to the comments or suggestions of other employees.

It is the intention of this policy to handle employee concerns as efficiently as possible. An employee experiencing a problem is encouraged to first discuss the matter directly with the co-worker(s) and/or supervisor(s) involved with the problem. If, however, the employee is not satisfied with the response from these individuals, or feels uncomfortable speaking directly with them, the employee should follow the Reporting and Complaint Procedure.

B. **EQUAL EMPLOYMENT OPPORTUNITY**

PPGNY is an equal employment opportunity employer. It is the policy of PPGNY to base all employment-related decisions on principles of equal employment opportunity. In particular, it is the policy of PPGNY:

- to comply with all applicable federal, state, and local laws governing nondiscrimination in employment.

- to ensure the fair treatment of all employees, applicants for employment, interns and volunteers without regard to race, creed, color, religion, national origin, alienage, ancestry, gender (including gender identity and expression), sex, age, physical or mental disability, pregnancy, childbirth or pregnancy related conditions, genetic information or predisposition, protected military or veteran status, marital status, partnership status, familial status, caregiver status, sexual orientation, citizenship status, status as a victim of domestic violence, sex crime or stalking, unemployment status, or any other basis protected by applicable law (collectively "Protected Characteristics") in all employment-related decisions, including but not limited to recruitment, hiring, compensation, benefits, training and apprenticeship, PPGNY-sponsored training and education, social and recreational programs, promotion, demotion, reclassification, transfer, discipline, layoff and termination, and all other terms and conditions of employment.

- to provide reasonable accommodation, where necessary, that does not create an undue hardship on PPGNY, and otherwise treat equally, qualified individuals with disabilities.

- to provide reasonable accommodations to employees for pregnancy, childbirth, or a related medical condition, for bona fide religious observance and for employees who are victims of domestic violence, sex offense or stalking.

- to provide a workplace free of unlawful harassment, including sexual harassment.

- to weigh all factors set forth by New York Corrections Law Article 23-A concerning an applicant's or employee's previous criminal conviction(s) when making employment- related decisions.

All PPGNY employees, interns and volunteers must comply with this policy and comply with all applicable laws prohibiting unlawful discrimination, harassment and retaliation in employment.

C. **ANTI-HARASSMENT**

PPGNY is committed to providing a work environment free of unlawful harassment. PPGNY maintains a strict policy prohibiting sexual harassment and harassment based on any Protected Characteristics. **All such harassment is prohibited.**

**D. SEXUAL HARASSMENT DEFINED**

Sexual harassment includes unwanted sexual advances, requests for sexual favors, or verbal, non- verbal or physical conduct of a sexual nature when:

- submission to such conduct is made a term or condition of employment; or
- submission to or rejection of such conduct is used as a basis for employment decisions affecting the individual; or
- such conduct has the purpose or effect of unreasonably interfering with an employee's work performance or creating an intimidating, hostile or offensive working environment.

Sexual harassment refers to behavior that is not welcome, has the purpose or effect of unreasonably interfering with an employee's work performance or creates an intimidating, hostile, or offensive working environment. Sexual harassment may take different forms and may involve members of the same sex. Sexual harassment includes harassment on the basis of an individual's sexual orientation, gender identity, perceived gender or transgender status. One specific form is the demand for sexual favors. Other forms of harassment include, but are not limited to:

- Verbal: Sexual innuendoes, suggestive comments, jokes of a sexual nature, sexual proposition, or threats of reprisal for making harassment reports.
- Non-Verbal: Dissemination or viewing of sexually suggestive objects or pictures, graphic commentaries, suggestive or insulting sounds, obscene gestures, leering or whistling.
- Physical: Unwanted physical contact, blocking or impeding normal movement, touching, pinching, brushing the body, assault or sexual activity.

**E. OTHER TYPES OF HARASSMENT**

Prohibited harassment based on any Protected Characteristics includes behavior similar to sexual harassment such as:

- Verbal conduct such as threats, epithets, derogatory comments, derogatory jokes or slurs;
- Non-verbal conduct such as derogatory posters, photography, cartoons, drawings or gestures;
- Physical conduct such as assault, unwanted touching or blocking normal movement;

- Hostile actions that are taken against an individual because of that individual's Protected Characteristic(s), such as interfering with or sabotaging an individual's work or ability to perform work and bullying, yelling or name-calling.
- Retaliation for making harassment reports or threatening to report harassment.

**Prohibited harassment based on any Protected Characteristics is prohibited.**

Whatever form it takes, harassment is insulting and demeaning to the recipient and will not be tolerated. All employees, managers and non-supervisors alike, must comply with PPGNY's anti- harassment policy and take appropriate measures to ensure that such conduct does not occur.

Individuals who observe any conduct directed at others that may violate this policy are encouraged to take reasonable action to defuse such behavior if possible, such as intervening directly, alerting a supervisor or manager or making a complaint under this policy as described below.

All supervisors and managers who receive a complaint or information about suspected harassment (including sexual harassment), observe what may be harassing behavior or for any reason suspect that harassment is occurring, are required to report such suspected harassment. In addition to being subject to discipline if they have engaged in harassing conduct themselves, supervisors and managers will be subject to discipline for failing to report suspected harassment or otherwise knowingly allowing harassment to continue. Supervisors and managers will also be subject to discipline for engaging in any retaliation.

Violations of this policy may result in disciplinary action up to and including termination.

**F. REPORTING AND COMPLAINT PROCEDURE**

PPGNY's reporting and complaint procedure provides for a prompt, thorough and objective investigation of any claim of discriminatory treatment, harassment and/or retaliation. If PPGNY determines that prohibited discrimination or harassment has occurred, PPGNY will take appropriate remedial action against a person found to have engaged in prohibited discriminatory or harassing behavior. The discipline will be commensurate with the severity of the offense, up to and including termination of employment. Appropriate action will also be taken to deter any future prohibited behavior.

- Employees who believe they have been the subject of discrimination or harassment of any type should immediately report the matter to their supervisor, another supervisor or Human Resources. If any further incident(s) of discrimination or harassment occur, the incident(s) should be immediately reported.

Planned Parenthood of Greater New York
Policy & Procedure Manual
Human Resources

- Employees who witness or otherwise become aware of discrimination or harassment by or against any other employee should immediately report that information to their supervisor, another supervisor or Human Resources.

- Any supervisor or manager who receives a report of discrimination or harassment must immediately inform Human Resources of the complaint.

- Employees who are uncomfortable addressing an issue with their manager or they feel that their concerns were not adequately addressed by the supervisor, must inform Human Resources.

Reports under this policy may be made verbally or in writing. Attached is a complaint form that may be used to report violations of this policy. However, complaints do not have to be made using the form. Complaints may also be made anonymously using the Compliance line at 1-800-346-1870. *(see also Process for Responding to Complaints of Bias)*

Complaints made under this policy will be promptly investigated. PPGNY will, to the extent feasible, maintain the confidentiality of such complaints. However, investigation of such complaints may require disclosure to the accused party and other witnesses in order to gather pertinent facts. Both the person(s) raising the complaint and the person(s) about whom the complaint was made will be permitted to provide information that may be relevant to the investigation, and PPGNY will gather additional information and speak with witnesses, as applicable. When the investigation is complete, a determination regarding the allegations will be made and information will be communicated to the person who raised the complaint as soon as practical. The person about whom the complaint was made also will be informed of the outcome. PPGNY will also take such action as it believes is appropriate under the circumstances and commensurate with the offense, including, but not limited to, training, referral to counseling, warning, reassignment, compensation adjustment or termination.

## G. NO RETALIATION

PPGNY employees are prohibited from engaging in retaliation against another employee, contractor, or volunteer, for using PPGNY's **Reporting and Complaint Procedure**, or for filing, testifying, assisting or participating in any manner in any investigation, proceeding or hearing.

Retaliation occurs when an employer takes adverse action against an employee, contractor, or volunteer because they made a good faith report of a concern of discrimination or harassment. Prohibited retaliation and intimidation includes, but is not limited to the following adverse actions:

- Termination

Planned Parenthood of Greater New York
Policy & Procedure Manual
Human Resources

- Suspension
- Demotion
- Failure to consider for promotion or hire
- Harassment
- Reduction in compensation
- Adverse change in working conditions
- Behavior or conduct that could constitute a hostile work environment

Individuals who feel that they have experienced prohibited retaliation, or who are aware of any prohibited retaliation by any person, should immediately report the matter by following the **Reporting and Complaint Procedure** above. As with complaints of discrimination or harassment, PPGNY will investigate any complaint and will take appropriate action to prevent or rectify any retaliation, including but not limited to terminating the employment of the person who engaged in retaliation.

## H. LEGAL PROTECTIONS AND EXTERNAL REMEDIES

Discrimination, harassment and retaliation are not only prohibited by PPGNY but are also prohibited by state, federal and local law. Aside from PPGNY's internal Reporting and Complaint procedure described above, employees may also choose to pursue legal remedies with the following governmental entities:

**New York State Division of Human Rights (DHR):**

The Human Rights Law (HRL) applies to all employers in New York State and protects employees, paid or unpaid interns and non-employees regardless of immigration status from discrimination, harassment or retaliation. A complaint alleging violation of the Human Rights Law may be filed either with DHR or in New York State Supreme Court. If discrimination is found after a hearing, DHR has the power to award relief, may include an order requiring action be taken to stop the harassment or discrimination, or redress the damage caused, including paying monetary damages, attorney's fees and civil fines. DHR's main office contact information is: NYS Division of Human Rights, One Fordham Plaza, Fourth Floor, Bronx, New York 10458, (718) 741-8400, www.dhr.ny.gov. Contact DHR by phone or visit dhr.ny.gov/complaint for more information about filing a complaint, including the rules, time limits and processes that are used to handle such complaints.

**United States Equal Employment Opportunity Commission (EEOC):**

The EEOC enforces federal anti-discrimination laws, including but not limited to Title VII of the 1964 federal Civil Rights Act. The EEOC does not hold hearings or award relief,

Planned Parenthood of Greater New York
Policy & Procedure Manual
Human Resources

but may take other action including pursuing cases in federal court on behalf of complaining parties. Federal courts may award remedies if discrimination is found to have occurred. If an employee believes that they have been harassed or discriminated against at work, they can file a "Charge of Discrimination." The EEOC has district, area, and field offices where complaints can be filed. Contact the EEOC by calling 1-800-669-4000 (1-800-669-6820 (TTY)), visiting their website at www.eeoc.gov or via email at info@eeoc.gov.

The Human Rights Law (HRL), codified as N.Y. Executive Law, art. 15, § 290 et seq., applies to employers in New York State with regard to sexual harassment, and protects employees, paid or unpaid interns and non-employees regardless of immigration status. A complaint alleging violation of the Human Rights Law may be filed either with DHR or in New York State Supreme Court.

Complaints with DHR may be filed any time within one year of the harassment. If an individual did not file at DHR, they can sue directly in state court under the HRL, within three years of the alleged discrimination. An individual may not file with DHR if they have already filed a HRL complaint in state court.

Complaining internally to PPGNY does not extend your time to file with DHR or in court. The one year or three years is counted from date of the most recent incident of harassment.

You do not need an attorney to file a complaint with DHR, and there is no cost to file with DHR.

DHR will investigate your complaint and determine whether there is probable cause to believe that discrimination has occurred. Probable cause cases are forwarded to a public hearing before an administrative law judge. If discrimination is found after a hearing, DHR has the power to award relief, which varies but may include requiring your employer to take action to stop the harassment, or redress the damage caused, including paying monetary damages, attorney's fees and civil fines.

DHR's main office contact information is: NYS Division of Human Rights, One Fordham Plaza, Fourth Floor, Bronx, New York 10458, (718) 741-8400 www.dhr.ny.gov

**New York City Commission on Human Rights**

The New York City Human Rights Law also protects individuals from discrimination, harassment and retaliation. Employees who work in New York City may file complaints with the New York City Commission on Human Rights. Contact their main office at Law Enforcement Bureau of the NYC Commission on Human Rights, 40 Rector Street, 10th Floor, New York, New York; call 718-722-7131; or visit NYC.gov/HumanRights.

Policy #: **HR-007**
Page 7 of 10

**60.** PPGNY's HR-005 Performance Management process was not followed while managing Plaintiff's complaints during his employment.

Policy Name: **Performance Management**
Policy Number: **HR-005**

| Date Issued | May 22, 2020 |
| --- | --- |
| Most Recent Review | May 22, 2020 |
| Responsible Office | Human Resources |
| Responsible Officer | Chief People Officer |
| Policy Owner | Chief People Officer |
| Scope | This policy applies to all employees and contractors |

**PURPOSE**

To establish a management policy and process for achieving and maintaining maximum employee performance, appropriate employee conduct, and compliance with all federal, state, and other regulatory requirements.

**POLICY**

PPGNY strives to foster a culture of high performance. To that end, it is the policy of PPGNY to provide all staff with clear performance objectives and the ongoing feedback and coaching necessary to be successful in meeting them. In turn, PPGNY expects employees to be accountable for making and sustaining necessary improvements in their performance and for adhering to organizational, legal, and regulatory mandates. The performance management process is used both when an employee's performance falls short of expectations and where an employee fails to adhere to company policy, procedure or legal or regulatory requirements. (*See also General Rules of Conduct*).

The performance management process should be responsive to the severity and frequency of the issues they are designed to address. PPGNY endorses the principles of progressive discipline and supports a flexible process that allows for gradual improvements in performance and that also respects PPGNY's values and the business environment in which it operates. Nothing in this policy alters an employee's at-will employment status. PPGNY reserves the right to implement discipline at any level it deems necessary or appropriate, up to and including termination of employment, to encourage the desired conduct or improvement in performance.

PPGNY takes active steps to ensure that its performance management process is administered fairly, without regard to Protected Characteristics as defined in PPGNY's Fair Treatment policy, and consistent with the organization's commitment to (race*) equity. Human Resources, in partnership with Equity and Learning, will review and

evaluate actions taken under this policy to confirm that performance management is implemented equitably and without bias.

**PROCEDURE**

**Types of Interventions**

The performance management process may include, but is not limited to:

- **Informal oral coaching/counseling** – Most minor performance issues can be resolved at this level, without formal disciplinary action. Informal coaching/counseling is not documented in an employee's personnel file.

- **Documented oral coaching/counseling** – A discussion regarding repeated minor performance issues or a single more serious lapse in performance. The discussion is documented in the employee's personnel file.

- **First written warning** – Written documentation that an employee has failed to adhere to policy or meet performance expectations along with notice that failure to improve will result in subsequent discipline.

- **Subsequent written warnings** – A second, or in rare cases, a third written warning may follow an initial written warning.

- **Performance Improvement Plan (PIP)** – PIPs generally last at least 30 days and not longer than 90 days. They set forth specific performance expectations along with detailed guidance about how an employee is expected to meet them.

- **Suspension without pay** – Suspensions are considered a serious form of discipline in response to significant misconduct or performance issues. Suspension without pay may only be done in consultation with the Chief People Officer.

- **Termination of employment** – Termination of employment should be reserved for cases of egregious conduct, significant violations or organizational policy or legal or regulatory requirements, or in situations where other strategies for improving performance have proven ineffective.

An employee may also be required to meet other conditions that may help the employee improve their performance, such as attending additional training, signing off on policies, meeting interim performance goals, and participating in check-in meetings with their immediate supervisor.

Planned Parenthood of Greater New York
Policy & Procedure Manual
Human Resources

**The Performance Management Process**

Discipline may start at any level deemed appropriate and elements may be combined (e.g. a first written warning along with a Performance Improvement Plan includes a time period for demonstrating improvement). While supervisors are encouraged to provide adequate opportunities for improvement, there is no guarantee that all of the steps will be imposed or that they will be imposed in any particular order.

There is rarely a situation in which there is only one correct way to address an issue; in most cases, there is a range of reasonable responses to an issue of poor performance or inappropriate conduct. Nevertheless, performance management strategies, including discipline, should be proportional and appropriate to the situation and should discourage repeated occurrences of unacceptable performance or behavior.

The approach selected depends upon the particular facts of each situation as confirmed through a fair and objective investigation. Relevant facts include (1) whether the employee has been involved in previous incidents; (2) whether the conduct was intentional; (3) the impact of the conduct on others; or (4) whether the employee has violated, or put PPGNY in jeopardy of violating, federal, state or local laws or regulations, or related policies, including but not limited to those regarding the prevention, detection, and reporting of fraud, waste, and abuse, HIPAA, HITECH, or other regulations, governing patient privacy; or other legal or regulatory policy violations.

In the typical case, an employee's immediate supervisor, in consultation with their next level supervisor and Human Resources, has the initial responsibility for managing employee performance. However, there may be circumstances in which managers higher up or outside of an employee's chain of command participate in performance management decisions. For example, the Compliance Officer may participate in the decision to discipline an employee for violation of the organization's compliance policy.

**Feedback**

Frequent feedback and informal coaching and counseling are expected as part of an ongoing employment relationship in order to support high performance. Most minor performance lapses can be corrected with minimal intervention and supervisors are expected to discuss these types of concerns with employees in a timely manner. Where informal feedback, coaching, or counseling has been ineffective or is deemed not to be appropriate to address a concern, a more formal performance management strategy will be used. Formal actions will be documented in the employee's personnel file.

If a supervisor has an issue regarding the performance of an employee who is still within their introductory period, the supervisor should consult Human Resources and may consider extending the introductory period.

Policy #: HR-005
Page 3 of 4

Planned Parenthood of Greater New York
Policy & Procedure Manual
Human Resources

**Documentation**

It is not expected that every conversation or point of feedback is formally documented or recorded in an employee's personnel file. However, supervisors may choose to keep personal notes regarding their informal discussions with employees.

Other than informal feedback, coaching, and counseling, it is expected that all parts of the performance management process are documented in writing. Employees will be provided with a copy of the documentation at the time the action is taken, and a copy will be placed in the employee's personnel file.

Policy #: HR-005
Page 1 of 1

**61.** PPGNY's HR-003 Confirmation of Employment process was not followed for Plaintiff.

Planned Parenthood of Greater New York
Policy & Procedure Manual
Human Resources

Policy Name: **Confirmation of Employment**
Policy Number: **HR-003**

| | |
|---|---|
| Date Issued | May 15, 2020 |
| Most Recent Review | May 15, 2020 |
| Responsible Office | Human Resources |
| Responsible Officer | Chief People Officer |
| Policy Owner | Chief People Officer |
| Scope | This policy applies to all PPGNY employees. |

**PURPOSE**
To establish protocol for confirming employment with new employees of PPGNY.

**POLICY**
Only designated members of the Human Resources are authorized to prepare and send a letter confirming employment. No other employees may make offers of employment, written or verbal.

**PROCEDURE**

1. No candidate may be hired until references and background checks (excluding criminal background checks which are performed after a conditional offer of employment is made) are completed and reviewed by Human Resources staff.

2. Only Human Resources staff is authorized to send a letter of confirmation to approved candidates; no other individual may make offers of employment or send letters confirming employment. No verbal offers of employment may be made by the Human Resources Staff until the references and background checks are completed and reviewed.

3. A letter of confirmation of employment will be sent to all prospective employees.

4. The letter will include the prospective employee's date of hire, title, reporting relationship, rate of pay and other information as required by Section 195 of New York State Labor Law.

5. The letter will include details concerning additional information needed by PPGNY to complete the new hire process including, successful completion of a criminal background check, credentialing information, licenses, and proof of identity and eligibility to work.

6. The confirmation letter must be signed by the employee and returned to Human Resources within five (5) days of receipt.

7. A copy of the letter will be placed in the new employee's file.

Policy #: **HR-003**
Page 1 of 1

**62.** PPGNY's HR-025 Remote Work process was not followed for the Plaintiff.

Planned Parenthood of Greater New York
Policy & Procedure Manual
Human Resources

Policy Name: **Remote Work**
Policy Number: **HR-025**

| Date Issued | August 25, 2021 |
|---|---|
| Most Recent Review | August 25, 2021 |
| Responsible Office | Human Resources |
| Responsible Officer | Chief People Officer |
| Policy Owner | Chief People Officer |
| Scope | This policy applies to all staff. |

**STATEMENT OF POLICY**

PPGNY recognizes that flexible work arrangements, including the ability to work remotely, may be mutually beneficial for both staff and for the organization and may contribute to employee satisfaction and engagement. This policy describes the requirements and guidelines for eligible employees to perform some or all of their job duties remotely.

**DEFINITIONS**

Remote Work – The performance of job duties from a location other than a PPGNY administrative or clinical office space or other location in the community where services are regularly delivered.

Eligible Job Title – Job titles that are eligible for remote work accompanied by the maximum amount of remote work permitted in each job title are set forth in *Appendix A*. A job title is considered eligible for remote work if the maximum remote opportunity is greater than 0%.

Maximum Remote Work Opportunity – The greatest amount of time that an employee in an Eligible Job Title may be permitted to work remotely. For example:

> *Employee A has an Eligible Job Title and is scheduled to work five (5) days per week (7.5 hours per day). The Maximum Remote Opportunity for Employee A's job title is 60%. Employee A may request and be approved to work a maximum of three (3) days per week remotely;*

**POLICY**

PPGNY provides opportunities for Remote Work consistent with business and operational need. Employees in an Eligible Job Title may request to work remotely up to the Maximum Remote Opportunity for their role. An employee may be permitted to work remotely on an

Policy #: **HR-025**
Page 1 of 4

Planned Parenthood of Greater New York
Policy & Procedure Manual
Human Resources

informal or short-term basis, such as for a specific project or assignment, or on a formal or long-term basis in accordance with a schedule approved by their manager. Approval for a Remote Work arrangement may be withdrawn if the arrangement no longer meets PPGNY's business needs or the employee is no longer eligible for Remote Work.

Employees with a Remote Work arrangement must be available during working hours for meetings and telephone calls, email correspondence, and communication via messaging application to the same extent as if they were working onsite. Employees must be able to provide an appropriate remote work environment, including privacy, where required, reliable internet access, and telephone service. Employees may request, and PPGNY may provide, laptops and web cameras to support remote work where such equipment is available. If such equipment is not available, employees may use their own equipment. It is expected that all employees working remotely have a web camera for participation in meetings, although the need to come on camera in any particular meeting will be decided by the meeting host, moderator, or facilitator. The inability to provide an appropriate remote work environment or lack of appropriate equipment, may result in delay, modification or termination of the remote work arrangement.

Regardless of whether an employee's job title is deemed eligible for remote work, any individual employee may be required to report for onsite work temporarily and/or periodically as business needs require.

All PPGNY policies and procedures, including those related to HIPAA, fraud, waste, and abuse, non-discrimination or harassment, and time and attendance apply during a Remote Work arrangement to the same extent as onsite work performed offsite in the community. Employees who require modified work arrangements, including Remote Work, because of a medical condition must contact their supervisor or Human Resources to discuss initiating a request for an accommodation under the Americans with Disabilities Act.

**PROCEDURES**

Eligibility

To be considered for a remote work arrangement, an employee must meet all of the following criteria:

1. The employee must be working in an Eligible Job Title.
2. The employee must have successfully completed their introductory period, unless the employee was approved for a remote work arrangement at the time of hire.
3. The employee must not have been issued discipline in the previous 90 days or currently be on a performance improvement plan at the time of their remote work request.

Policy #: **HR-025**
Page 2 of 4

4.  The employee must be able to demonstrate the ability to meet attendance, productivity, and quality expectations with adequate independence.

Although employees must meet all eligibility requirements to be considered for a formal remote work arrangement, not all eligible employees will necessarily have their requests approved. Business needs at the time of the request will determine whether and to what extent an eligible employee's request for remote work is approved.

Requesting a Remote Work Arrangement

Requests for Remote Work should be made to the employee's direct supervisor. The request should be made using the HR-000A Remote Work Request Form and transmitted through a PPGNY system. For example, email is an acceptable way to submit a request for remote work. A text message would not be considered acceptable.

Employees who require modified work arrangements, including Remote Work, because of a medical condition should contact their supervisor or Human Resources directly. Requests to work remotely because of a medical condition will be analyzed as requests for accommodation under the Americans with Disabilities Act. Requests for accommodation must be supported by medical documentation and will be approved or denied in accordance with applicable law.

Approving a Remote Work Arrangement

Upon receiving a request for remote work, an employee's direct supervisor should consider the following factors:

- Whether the employee meets all of the eligibility requirements
- The business needs of the department, including:
  - Available staffing, including short and long term vacancies;
  - The need to perform in-office functions or provide in person support to other staff;
  - Ongoing or upcoming deadlines or special projects; and
  - If the employee has technology or equipment needs, the employee's or PPGNY's ability to provide the technology or equipment.

If the direct supervisor approves a Remote Work arrangement, the supervisor should ensure that the Request for Remote Work form is fully completed, then sign it, and submit it to Human Resources for inclusion in the employee's personnel file. Managers are responsible for ensuring that employees who are approved for Remote Work arrangements adhere to their approved schedules.

A request for Remote Work may be denied or delayed if appropriate technology or equipment, including a laptop or web camera, is unavailable through PPGNY and the employee is unable to provide such equipment or technology.

Ending A Remote Work Arrangement

Remote Work arrangements are subject to staffing and business needs and may be modified or terminated if business needs, staffing, or job duties change, if the employee no longer demonstrates acceptable job performance, or if, for another business-related reason, a remote work arrangement cannot reasonably be sustained.

Supervisors should provide as much advance notice as possible when remote work arrangement will be modified or terminated. In general, it is expected that supervisors will provide a minimum of two weeks' notice, unless circumstances require a shorter notice period. In cases where an employee fails to abide by the terms of the remote work arrangement, approval for remote work may be withdrawn immediately.

Employee Relocation

Employees with approved Remote Work arrangements are required to keep their supervisors and Human Resources updated with changes in contact information, including changes to their home address. Because of the potential implications for taxes, employment law, data privacy regulations, and international laws, where applicable, PPGNY may not be able to continue to employ a staff member who moves to a different state or jurisdiction. Employees with approved Remote Work arrangements who intend to relocate or are thinking about relocating must contact their supervisor or Human Resources prior to moving to ensure that they will be able to work for PPGNY after the move and to complete any documentation that may be required because of the employee's relocation. Given that business circumstances may change and Remote Work arrangements may be modified at any time, employees who are thinking about relocating are advised to consider whether they will be able to return from their new location to work onsite with two weeks' notice.

Modifying the Maximum Remote Opportunity for a Job Title

Changes in business circumstances may create the need for further review of whether and to what extent a particular job may be performed remotely. In some cases, the Maximum Remote Work Opportunity may be increased to allow for more remote work. In other cases, the remote opportunity may decrease.

Managers who wish to review or modify the Maximum Remote Work Opportunity for a job title in their department should contact Human Resources to discuss the reason for change and potential impact on staff. All changes must be reviewed and approved by the applicable Senior Leadership Team lead.

**63.**   PPGNY's HR-025 Remote work process was not followed for Plaintiff. For example, all executive-level employees, none of whom were black men, were permitted to work remotely 40%

to 100% of the time, while Mr. Mitchell, the only black male executive was required to work 100% in the office and provided zero remote work opportunity.

**APPENDIX A**
Maximum Remote Work Opportunity
By Department and Job Title

**Community & Engagement**

| Job Title Description | Home Department Description | Remote Opportunity |
|---|---|---|
| Adult Sexuality Educator | Community & Engagement | 0% to 60% |
| Associate VP, Community Engagement | Community & Engagement | 0% to 60% |
| Campus VAS | Community & Engagement | 0% to 60% |
| Community Educator | Community & Engagement | 0% to 60% |
| Community Health Promoter | Community & Engagement | 0% to 60% |
| Community Health Promoter Team Leader | Community & Engagement | 0% to 60% |
| Coordinator of Community Engagement | Community & Engagement | 0% to 60% |
| Counselor/Advocate | Community & Engagement | 0% to 60% |
| Director, Community Engagement | Community & Engagement | 0% to 60% |
| Director, Specialty Training & Programs | Community & Engagement | 0% to 60% |
| Director, Survivor Support Services | Community & Engagement | 0% to 60% |
| LGBTQ Community Health Promoter | Community & Engagement | 0% to 60% |
| LGBTQ Navigator | Community & Engagement | 0% to 60% |
| Manager, LGBT Outreach & Engagement | Community & Engagement | 0% to 60% |
| Manager, Survivor Support Services | Community & Engagement | 0% to 60% |
| Prison Rape Elimination Act Specialist | Community & Engagement | 0% to 60% |
| Promotores de Salud | Community & Engagement | 0% to 60% |
| Rape Crisis Counselor Advocate | Community & Engagement | 0% to 60% |
| Regional PREP Trainer | Community & Engagement | 0% to 60% |
| RPE Regional Coordinator | Community & Engagement | 0% to 60% |
| Senior Adult Sexuality Educator | Community & Engagement | 0% to 60% |
| Senior Director, Community Engagement | Community & Engagement | 0% to 60% |
| Survivor Support Services Coordinator | Community & Engagement | 0% to 60% |
| Survivor Support Services Data Specialist | Community & Engagement | 0% to 60% |
| Vice President, Community Engagement | Community & Engagement | 0% to 60% |
| Victim Services Specialist | Community & Engagement | 0% to 60% |

**APPENDIX A**
Maximum Remote Work Opportunity
By Department and Job Title

**Development**

| Job Title Description | Home Department Description | Remote Opportunity |
|---|---|---|
| Annual Fund Manager | Development | 0% to 60% |
| AVP of Development | Development | 0% to 60% |
| Chief Development Officer | Development | 0% to 60% |
| Development & Events Associate | Development | 0% to 60% |
| Development Associate | Development | 0% to 60% |
| Director, Individual Giving | Development | 0% to 60% |
| Director, Institutional Funding | Development | 0% to 60% |
| Director, Special Events | Development | 0% to 60% |
| Director, Strategic Partnerships | Development | 0% to 60% |
| Institutional Funding Manager | Development | 0% to 60% |
| Manager, Operations | Development | 0% to 60% |
| Operations Associate | Development | 0% to 60% |
| Prospect Research Manager | Development | 0% to 60% |
| Special Events Associate | Development | 0% to 60% |
| Special Events Manager | Development | 0% to 60% |
| Vice President, Individual Giving & Events | Development | 0% to 60% |
| VP, Institutional Giving & Operations | Development | 0% to 60% |

**Compliance & Risk**

| Job Title Description | Home Department Description | Remote Opportunity |
|---|---|---|
| Director of Clinical Risk | Compliance | 0% to 60% |
| Vice President, Compliance & Risk | Compliance | 0% to 60% |

**APPENDIX A**
Maximum Remote Work Opportunity
By Department and Job Title

**Education (rev 12/2/2021)**

| Job Title Description | Home Department Description | Remote Opportunity |
|---|---|---|
| Administrative & Program Manager | Education | 0% to 60% |
| Administrative Associate | Education | 0% to 60% |
| Administrative Manager | Education | 0% to 60% |
| Adult Role Model (ARM) | Education | up to 80% |
| Adult Role Models Program Coordinator | Education | 0% to 60% |
| Associate VP, Education & Training | Education | 0% to 60% |
| CAPP Coordinator | Education | 0% to 60% |
| CAPP Director | Education | 0% to 60% |
| CAPP Manager | Education | 0% to 60% |
| Director Education Programs | Education | 0% to 60% |
| Director of Accessible Programming | Education | 0% to 60% |
| Education Manager | Education | 0% to 60% |
| Educational Youth Initiative Coordinator | Education | 0% to 20% |
| Health Educator | Education | 0% to 80% |
| Professional Programs Manager | Education | 0% to 60% |
| Project Manager, Innovation & Impact | Education | 0% to 60% |
| Project Manager, Project STIQ | Education | 0% to 60% |
| Project Manager, Youth Programs | Education | 0% to 60% |
| Senior Director, Education | Education | 0% to 60% |
| Senior Sexuality Educator | Education | 0% to 80% |
| Sexuality Educator | Education | 0% to 80% |
| Sexuality Educator Trainer | Education | 0% to 80% |
| Signature Program Coordinator | Education | 0% to 80% |
| Strategic Initiatives Manager | Education | 0% to 80% |
| Teen Council Educator | Education | 0% to 60% |
| Training Institute Coordinator | Education | 0% to 80% |
| Vice President, Education & Training | Education | 0% to 80% |
| Youth Health Promoters Program Coordinator | Education | 0% to 20% |
| Health Educator/Youth Advisor | Education | 0% to 80% |

27

APPENDIX A

Maximum Remote Work Opportunity
By Department and Job Title

**Equity & Learning**

| Job Title Description | Home Department Description | Remote Opportunity |
|---|---|---|
| Associate Director, Equitable Systems | Equity & Learning | 0% to 40% |
| Associate Vice President, Equity & Learning | Equity & Learning | 0% to 40% |
| Chief Equity & Learning Officer | Equity & Learning | 0% to 40% |
| Director, Equitable Systems | Equity & Learning | 0% to 40% |
| Director, Equity & Learning | Equity & Learning | 0% to 40% |
| Training Manager, Equity & Learning | Equity & Learning | 0% to 60% |

**Executive**

| Job Title Description | Home Department Description | Remote Opportunity |
|---|---|---|
| Board Affairs Manager | Executive | 0% to 40% |
| Chief Executive Officer | Executive | 0% to 40% |
| Chief of Staff | Executive | 0% to 40% |
| Chief Operating Officer | Executive | 0% to 40% |
| Chief Transformation Officer | Executive | up to 100% |

APPENDIX A

Maximum Remote Work Opportunity
By Department and Job Title

**Facilities**

| Job Title Description | Home Department Description | Remote Opportunity |
|---|---|---|
| Administrative Associate | Facilities | 0% to 20% |
| Director, Facilities & Security Projects | Facilities | 0% to 20% |
| Director, Security | Facilities | 0% to 20% |
| Facilities Assistant | Facilities | 0% |
| Facilities Coordinator | Facilities | 0% |
| Maintenance Associate | Facilities | 0% |
| Manager, Facilities | Facilities | 0% |
| Manager, Facilities & Security | Facilities | 0% to 20% |
| VP, Facilities & Security | Facilities | 0% to 20% |

**Finance**

| Job Title Description | Home Department Description | Remote Opportunity |
|---|---|---|
| Accounts Payable Supervisor | Finance | 0% to 60% |
| Associate Vice President, Material Management | Finance | 0% to 60% |
| Director, Accounting & Grants | Finance | 0% to 60% |
| Director, Grants | Finance | 0% to 60% |
| Grants Specialist | Finance | 0% to 60% |
| Manager, Materials Management | Finance | 0% to 60% |
| Materials Management Buyer | Finance | 0% to 100% |
| Materials Management Specialist | Finance | 0% |
| Senior Accountant | Finance | 0% to 60% |
| Sr. Grants Manager | Finance | 0% to 60% |
| Staff Accountant | Finance | 0% to 60% |
| Treasury Specialist | Finance | 0% to 60% |
| Treasury Supervisor | Finance | 0% to 60% |

APPENDIX A

Maximum Remote Work Opportunity
By Department and Job Title

**Health Center & Administration**

| Job Title Description | Home Department Description | Remote Opportunity |
|---|---|---|
| Advanced Practice Clinician | Health CTR FP | 0% to 20% |
| Administrative Coordinator | Health Services Admin | 0% to 40% |
| Advanced Practice Clinician Clinical Trainer | Health Services Admin | 0% |
| Associate Chief Medical Officer | Health Services Admin | 0% to 20% |
| Associate Medical Director | Health Services Admin | 0% to 20% |
| Associate VP, Clinical Implementation | Health Services Admin | 0% to 20% |
| Business Associate | Health CTR FP | 0% |
| Center Director | Health CTR FP | 0% |
| Center Manager | Health CTR FP | 0% |
| Chief Medical Officer | Health Services Admin | 0% to 20% |
| Client Service Representative | Health Services Admin | 0% |
| Clinical Director | Health CTR FP | 0% |
| Clinical Nurse Manager | Health CTR FP | 0% |
| Clinical RN - Charge Nurse | Health CTR FP | 0% |
| Clinical Staff Scheduler | Health Services Admin | 0% to 40% |
| Clinical Training Coordinator | Health Services Admin | 0% |
| Counselor | Health CTR FP | 0% |
| Customer Service Manager | Health CTR FP | 0% |
| Director, Clinical Quality Management | Health Services Admin | 0% to 20% |
| Director, Clinical Services | Health CTR FP | 0% |
| Director, Health Center | Health CTR FP | 0% |
| Director, Health Center Operations | Health CTR FP | 0% |
| Director, Laboratory | Health CTR FP | 0% |
| Director, Patient Care Coordination | Health CTR FP | 0% to 20% |
| Director, Patient Safety & Quality Management | Health Services Admin | 0% to 20% |
| Director, Quality Management | Health CTR FP | 0% to 20% |
| Director, Surgical Abortion Services | Health CTR FP | 0% |
| Engagement & Enrollment Specialist | Health CTR FP | 0% to 20% |
| Flow Coordinator | Health CTR FP | 0% |
| Follow-up Coordinator | Health CTR FP | 0% |
| HCA Trainer | Health CTR FP | 0% |
| Health Care Associate | Health CTR FP | 0% |
| Health Care Associate Supervisor | Health CTR FP | 0% |
| Health Center Manager | Health CTR FP | 0% |
| Health Center Manager | Health CTR FP | 0% |
| Health Information Manager | Health CTR FP | 0% |
| Interim Associate Medical Director | Health CTR FP | 0% to 20% |
| Lab Quality Manager | Health Services Admin | 0% to 20% |
| Laboratory Coordinator | Health CTR FP | 0% |

APPENDIX A
Maximum Remote Work Opportunity
By Department and Job Title

| Laboratory Supervisor | Health CTR FP | 0% |
|---|---|---|
| Laboratory Technologist | Health CTR FP | 0% |
| Lead Customer Service Representative | Health Services Admin | 0% |
| Licensed Practical Nurse | Health CTR FP | 0% |
| Medical Director, Primary Care | Health CTR FP | 0% |
| Medical Records & Centralized Follow Up | Health CTR FP | 0% |
| Medical Records Associate I | Health CTR FP | 0% |
| Medical Records Coordinator | Health CTR FP | 0% |
| Mobile Health Center Supervisor | Health CTR FP | 0% |
| Patient Care Associate | Health CTR FP | 0% |
| Patient Flow Coordinator | Health CTR FP | 0% |
| Patient Follow-Up Advanced Practice Clinician | Health CTR FP | 0% |
| Patient Follow-Up Coordinator | Health CTR FP | 0% to 60% |
| Patient Follow-Up Nurse | Health CTR FP | 0% to 60% |
| Patient Referral Coordinator | Health CTR FP | 0% to 60% |
| Registered Nurse | Health CTR FP | 0% |
| Registered Nurse - Charge Nurse | Health CTR FP | 0% |
| Registered Nurse Coordinator | Health CTR FP | 0% |
| Senior Business Associate | Health CTR FP | 0% |
| Senior Director, Health Center | Health CTR FP | 0% to 20% |
| Senior Patient Care Associate | Health CTR FP | 0% |
| Senior Patient Referral Coordinator | Health CTR FP | 0% |
| Session Physician | Health CTR FP | 0% |
| Social Worker | Health CTR FP | 0% |
| Sonographer | Health CTR FP | 0% |
| Sonographer/Trainer | Health CTR FP | 0% |
| Sr. Administrative and Operations Specialist | Health Services Admin | 0% to 20% |
| Telehealth Advanced Practice Clinician | Health CTR FP | up to 100% |
| Transgender/Non-Binary Patient Navigator | Health CTR FP | 0% |
| Vice President, Health Center Operations | Health Services Admin | 0% to 20% |
| VP, Patient Safety & Quality Management | Health Services Admin | 0% to 20% |

APPENDIX A
Maximum Remote Work Opportunity
By Department and Job Title

**Human Resources**

| Job Title Description | Home Department Description | Remote Opportunity |
|---|---|---|
| Chief People Officer | Human Resources | 0% to 60% |
| Director, Human Resources | Human Resources | 0% to 40% |
| HRIS Manager | Human Resources | 0% to 40% |
| Human Resource Initiatives Coordinator | Human Resources | 0% to 40% |
| Manager, Human Resources | Human Resources | 0% to 40% |
| Manager, Talent Acquisition | Human Resources | up to 100% |
| Payroll Supervisor | Human Resources | up to 100% |
| Senior Director, Benefits Administration | Human Resources | 0% to 40% |
| Talent Acquisition Specialist | Human Resources | up to 100% |

**Information Technology**

| Job Title Description | Home Department Description | Remote Opportunity |
|---|---|---|
| AVP of Clinical Informatics | Information Technology | up to 100% |
| Chief Information Officer | Information Technology | 0% to 60% |
| Clinical Analyst | Information Technology | up to 100% |
| Desktop Support Services Coordinator | Information Technology | 0% to 40% |
| Director, Data & Analytics Strategy | Information Technology | up to 100% |
| Director, IT Infrastructure | Information Technology | 0% to 60% |
| Financial Analyst | Information Technology | up to 100% |
| Informatics Analyst | Information Technology | up to 100% |

APPENDIX A
Maximum Remote Work Opportunity
By Department and Job Title

**Project Street Beat**

| Job Title Description | Home Department Description | Remote Opportunity |
|---|---|---|
| Administrative Assistant, Project Street Beat | Project Street Beat | 0% to 40% |
| Care Manager Coordinator | Project Street Beat | 0% to 40% |
| Care Navigator | Project Street Beat | 0% to 20% |
| Care Navigator | Project Street Beat | 0% to 20% |
| Case Management Coordinator | Project Street Beat | 0% to 40% |
| Case Manager | Project Street Beat | 0% to 20% |
| Community HIV Tester | Project Street Beat | 0% to 20% |
| Data Systems Manager | Project Street Beat | 0% to 40% |
| Data Systems Specialist | Project Street Beat | 0% to 40% |
| Director, Care Management | Project Street Beat | 0% to 40% |
| Driver | Project Street Beat | 0% |
| Engagement & Enrollment Specialist | Project Street Beat | 0% to 20% |
| Engagement Specialist | Project Street Beat | 0% to 20% |
| HIV Prevention Specialist | Project Street Beat | 0% to 20% |
| Lead Navigator | Project Street Beat | 0% to 20% |
| Manager, HIV Prevention Programs | Project Street Beat | 0% to 40% |
| Manager, HIV Prevention Services | Project Street Beat | 0% to 40% |
| Mobile Health Center Clinical Manager | Project Street Beat | 0% to 20% |
| Mobile Health Center Manager | Project Street Beat | 0% to 40% |
| Peer Educator | Project Street Beat | 0% |
| Senior Driver | Project Street Beat | 0% |
| Senior Engagement Specialist | Project Street Beat | 0% to 20% |
| Vice President, Project Street Beat | Project Street Beat | 0% to 40% |

APPENDIX A
Maximum Remote Work Opportunity
By Department and Job Title

**Public Affairs**

| Job Title Description | Home Department Description | Remote Opportunity |
|---|---|---|
| Associate Director, Data & Political Training | Public Affairs | 0% to 60% |
| Community Organizer | Public Affairs | 0% to 60% |
| Data Coordinator | Public Affairs | 0% to 60% |
| Director, Community Organizing | Public Affairs | 0% to 60% |
| Director, Media Relations | Public Affairs | 0% to 60% |
| Government Relations Associate | Public Affairs | 0% to 60% |
| Manager, Community Organizing | Public Affairs | 0% to 60% |
| Senior Director, Communications, Marketing & | Public Affairs | 0% to 60% |
| Senior Manager, User Experience & Design | Public Affairs | 0% to 60% |
| Sr. Director, Government Relations | Public Affairs | 0% to 60% |
| VP, Community Organizing & Political Affairs | Public Affairs | 0% to 60% |

**Research & Evaluation**

| Job Title Description | Home Department Description | Remote Opportunity |
|---|---|---|
| Associate VP, Research & Evaluation | Research and Evaluation | 0% to 60% |
| Clinical Research Manager | Research and Evaluation | 0% to 40% |
| Community Programs Evaluator | Research and Evaluation | 0% to 60% |
| Data Manager | Research and Evaluation | 0% to 60% |
| Research & Evaluation Coordinator | Research and Evaluation | 0% to 60% |
| Vice President, Research & Evaluation | Research and Evaluation | 0% to 60% |

**Revenue Cycle**

| Job Title Description | Home Department Description | Remote Opportunity |
|---|---|---|
| Billing Manager | Revenue Cycle | 0% to 20% |
| Billing Specialist | Revenue Cycle | 0% to 20% |
| Director, Billing | Revenue Cycle | 0% to 20% |
| Director, Financial Counseling | Revenue Cycle | 0% to 20% |
| Financial Counselor | Revenue Cycle | 0% |
| Insurance Verification Specialist | Revenue Cycle | 0% to 20% |
| Patient Care Accts Receivable Coordinator | Revenue Cycle | 0% to 20% |
| Reimbursement & Claims Specialist | Revenue Cycle | 0% to 20% |
| Revenue Integrity Manager | Revenue Cycle | 0% to 20% |
| Site Financial Counseling Coordinator | Revenue Cycle | 0% |
| Sr. Patient Care Accts Receivable Coordinator | Revenue Cycle | 0% to 20% |
| Vice President, Revenue Cycle | Revenue Cycle | 0% to 20% |

64. **PPGNY** and **PPGNY**'s board members including Defendant **HAGAN** forced Plaintiff to constantly defend himself against personal attacks by themselves and their employees relating to his character, experience, capabilities, and skillsets.

65. **PPGNY** and/or **PPGNY**'s board members do not treat similarly situated white, non-disabled, Caucasian, or female employees in this manner.

66. From around or about September 27, 2021 through to around or about October 14, 2021, Plaintiff was subjected to tortious attacks requiring Plaintiff to respond to several questions daily defending his background all stemming/originating from the Board of whom the Plaintiff did not report to.

67. In or around October 2021 **PPGNY** and/or **PPGNY**'s board members, including Defendant **HAGAN** discovered that Plaintiff is an ordained Pastor.

68. Almost immediately following their discovery, Plaintiff was subjected to religious discrimination in the form of comments made by several **PPGNY** board members insinuating that Christians and pastors, like Plaintiff, were not welcome to work for **PPGNY**.

69. These comments had the purpose and effect of negatively altering Plaintiff's work environment.

70. Plaintiff was shunned by board members who made these comments. Non-African American, non-disabled, non-Christian ministers were not treated in a similar fashion.

71. Plaintiff was forced to work in a hostile work environment as he endured these offensive comments and the cold shoulder that he received from **PPGNY** board members including Defendant **HAGAN**. Non-African American, non-disabled, non-Christian ministers were not treated in a similar fashion.

72. Additionally, members of the **PPGNY** board conspired to force former **PPGNY** CEO to interrogate Plaintiff's pastor pursuant to obtaining a statement on Plaintiff's church's stance on

abortion, in the hopes that they could paint Plaintiff and/or Plaintiff's church as "pro-life" in a particularly invasive attempt to terminate Plaintiff's employment.

73.    Non-African American, non- Christian, non-disabled employees were not subjected to similar harassment.

74.    Further, throughout Plaintiff's employment he was subjected to a humiliating, defamatory, insulting, disrespectful, harassing, and demoralizing campaign of discrimination, in an effort to undermine Plaintiff's supervisory responsibilities, his ability to carry out his other job responsibilities, and his impeccable background and experience. The purpose of this discriminatory and hostile treatment was to subject Plaintiff to intimidation and humiliation in the workplace and negatively impact his ability to do his job.

75.    During Plaintiff's employment, Plaintiff witnessed other black, African American, older male executives terminated by Defendants without cause, and were subjected to physical, mental, or emotional distress. Women were favored for positions and were awarded more money, and more authority than the black, African American, older male executives in similar roles.

76.    The conduct alleged above was spearheaded and orchestrated by **PPGNY** executive board member, **HAGAN** and encouraged by the participation of **PPGNY** Chief Medical Officer, **DEAN** and **PPGNY** Associate Chief Medical Officer, **DAVIS**.

77.    On or about October 14, 2021, Plaintiff formally complained to the then-CEO of **PPGNY**, Ms. Joy Calloway and to board member Ms. Leslie Lindenbaum about the offensive and illegal race, color, and gender discrimination as well as the intimidating and humiliating, hostile work environment he was being subjected to by **PPGNY** executive board members, including specifically **HAGAN**.

78.    This email was Plaintiff's first request for help and highlighted being discriminated against,

including a hostile work environment; nothing was done but an acknowledgement of Plaintiffs email. Per the above-referenced Policy - HR-007 Fair Treatment and HR-008 General Rules of Conduct, and HR-012 Mandatory Reporting Policy were not used/followed for Plaintiff.

79.  However, despite Plaintiff's complaint, **PPGNY** failed and/or refused to take any immediate or appropriate corrective action in response, and at no point did they reprimand the **PPGNY** employees and/or **PPGNY** executive board members responsible for the discrimination and harassment.

80.  The failure to adequately address Plaintiff's complaints emboldened **HAGAN, DEAN** and **DAVIS** to continue discriminating and retaliating against Plaintiff.

81.  Non-African American, Non-Christian, Non-disabled employees were not treated in the same fashion when they engaged in protected activity at **PPGNY**.

82.  Instead of following the policies in place for addressing complaints of discriminatory treatment which called for an internal investigation, **PPGNY** began a targeted campaign against Plaintiff in retaliation for his protected conduct.

83.  This retaliation was also prohibited by **PPGNY**'s employment policies.

84.  By way of example, almost immediately following Plaintiff's complaint, **HAGAN** began disproportionately and excessively monitoring and micromanaging Plaintiff, in direct retaliation against Plaintiff for having engaged in protected conduct by complaining about unlawful discrimination, and because Plaintiff was the only black, African American and an older male employee on **PPGNY**'s executive leadership team.

85.  **HAGAN** did not hold other non-black, older, non-African American or female members of **PPGNY**'s executive team to the same standard with respect to monitoring or micromanagement.

86.  **HAGAN**'s holding of Plaintiff to a different standard than the other team members is stained with

racist overtones which play into her preferred negative stereotypes about black and African American men in the workplace and beyond, and the connecting evidence to **HAGAN**'s comments to Plaintiff's race, color, sex, religion, age, and disability was in fact curated and incited throughout Plaintiff's employment through the unlawful termination.

87.    Although Plaintiff solely reported to the President & CEO and did not report to or answer to the Board, **HAGAN** always operated outside the scope of her responsibility as a Board Member with the Plaintiff.

88.    Further, following Plaintiff's complaint, **PPGNY**'s discriminatory misconduct expanded and intensified.

89.    By way of another example, in November 2021, during a Teams meeting attended by several of Plaintiff's colleagues, **CORSO** rudely, and abrasively, mocked Plaintiff's southern drawl and pronunciation.

90.    **CORSO** in front of several white employees, including Plaintiff's white staff, aggressively mocked the Plaintiff's Southern drawl and Plaintiff's inability to pronounce and articulate a white woman's name correctly due to his disabling condition. This continued as the Plaintiff met with **CORSO**, as **CORSO** suggested that Plaintiff was ill fit for his duties due to his disability and suggested that Plaintiff had difficulty working with homosexuals due to what **CORSO** called homosexual "dramatics."

91.    **CORSO** yelled at Plaintiff while on the call and in a snarky manner pronounced each syllable of a name Plaintiff had been having trouble pronouncing, as if Plaintiff was illiterate or dumb and repeated it several times in front of others in an active effort to intimidate, diminish and humiliate Plaintiff in front of his peers and subordinates.

92.    In or around November 2021, Plaintiff complained to the former **PPGNY** Interim President & CEO,

Ms. Joy Calloway, about the hostile work environment to which he was being subjected as a result of **CORSO**'s discriminatory misconduct.

93. However, despite Plaintiff's complaint, **PPGNY** failed and/or refused to take appropriate corrective action.

94. As a result, **CORSO**'s discriminatory misconduct continued unabated.

95. By way of example, shortly after Plaintiff's complaint, **CORSO** confronted Plaintiff with unjustified and unreasonable, nasty, and condescending statements like "**WHAT'S WRONG SAMUEL, HAVE YOU NEVER WORKED WITH GAY MEN BEFORE? WE ARE VERY DRAMATIC AND IT'S CLEAR YOU ARE NOT CUT OUT FOR THIS JOB!**"

96. **CORSO**'s comments were clearly discriminatory, implying that Plaintiff was not welcome to work at **PPGNY** if Plaintiff was not a gay male, or female, or another gender other than male.

97. **PPGNY**'s failure to address the discriminatory misconduct emboldened more of its employees.

98. By way of example, starting in or around December 2021, **DEAN** and **DAVIS** both began subjecting Plaintiff to discriminatory comments based on Plaintiff's age, race, color, and gender, including referring to him with racist terms like "**ANGRY**," "**OFFENSIVE**," "**OUT OF CONTROL**," "**HARSH**," and "**AGGRESSIVE**." The tone and context of these words were always delivered in a condescending manner designed to "other" Mr. Mitchell and ensure that he was made to feel that he didn't belong at PPGNY. This racist, sexist and ageist othering is often used by discriminators to inflict harm, as it did on Plaintiff.

99. In or around January 2022, **DAVIS** informed Plaintiff that his choice of red text via email was "aggressive."

100. Plaintiff indicated to **DAVIS** that the red text was used to highlight or provide commentary on one's prior communications, a differentiation of sorts.

101.    **DAVIS** told Plaintiff a blue or green color was "more fitting."

102.    **DAVIS'** actions in this regard were discriminatory, given that around or about a month later **DEAN** and **DAVIS** both used red text in their communications. Plaintiff called out their discriminatory and hypocritical usage of "aggressive" red text, as DEAN and DAVIS found it appropriate for use as white women, but not for Mr. Mitchell as a black male.

103.    **DAVIS** and **DEAN**'s usage of microaggressions towards the Plaintiff was an aggressive and pervasive plot to cripple Plaintiff's character and credibility throughout the organization, especially with the Clinical/Medical teams. These words would be uttered to Plaintiff's direct reports, to the Board, to **DAVIS** and **DEAN**'s direct reports, and in certain community settings; they were always false and untrue at all times.

104.    Each of these comments by **DEAN** and **DAVIS**, who are both older, white, Caucasian females, played into cruelly racist stereotypes about black, African American men in the workplace and beyond.[5]

105.    Additionally, in or around February 2022, **DEAN** made offensive racially discriminatory comments regarding other black, African American employees, including "**SHE WAS A LOUD BLACK WOMAN,**" in reference to Ms. Merle McGee, a black, African American **PPGNY** Chief Equity & Engagement Officer. McGee reported directly to the Plaintiff, much like the Plaintiff, McGee helped to build the framework, systems, and mechanisms to protect black and brown women from harm – Dean and Davis intentionally tried to undermine Plaintiff's office and his black and brown employees who sought to hold them accountable for their discriminatory conduct. They were resistant to accountability and had a disdain for black and brown people having agency

---

[5] Brea Love, "*NAACP explains the 'Angry Black Person' bias*", available at https://www.abc10.com/article/news/local/naacp-explains-angry-black-person-bias/103-dce57751-10bd-403e-81fd-4e7cec058671, accessed September 22, 2022 **BLACK WOMAN,**" in reference to Merle McGee, a black, African American **PPGNY** Chief Equity & Engagement Officer.

or who were in positions of power.

106. These comments by **DEAN** and **DAVIS** are stained with racist overtones which play into their preferred negative stereotypes about black and African American men in the workplace and beyond.

107. Plaintiff was offended by these discriminatory comments, and always objected to them being uttered about him.

108. These comments caused Plaintiff to feel emotional distress and negatively altered his conditions of employment by affecting his ability to concentrate and by undermining his authority within the organization.

109. Non-African American employees were not treated in this fashion.

110. Plaintiff complained to Defendants **DEAN** and **DAVIS** about their racist comments and asked them not to refer to him or other non-white, non-Caucasian minority employees in this manner.

111. Additionally, on or about February 22, 2022, Plaintiff emailed Defendant Dean, Chief Medical Officer, having received several complaints throughout the organization from other senior leaders regarding their concerns for harm being done to black and brown women during the delivery of patient care. As the COO, Plaintiff challenged DEAN and DAVIS' blatant disregard for the welfare of black and brown women's care under their and their team's management; as they ignored the pain and suffering being caused daily at the hands of the providers to black and brown women, while they coddled and protected the interests of the medical providers. By way of example, a  patient came in for an abortion and left with a full hysterectomy due to a provider's negligence. Plaintiff's email complaint to DEAN and DAVIS emphasized the blatant disregard and unnecessary conflict DEAN presented the Plaintiff's office, work, and decisions on a day-to-day basis – solely based on her disdain for the Plaintiff as being a black male – a black male in

holding her and her teams accountable for the delivery of quality patient care and to limit the harm done to black and brown women.

112. On or about February 23, 2022, as a result of Plaintiff's previous six (6) months' excellent work performance as Interim COO, **PPGNY** hired Plaintiff as a full-time Chief Operating Officer (hereinafter referred to as "COO") based at the Manhattan location.

113. At all times material, Plaintiff was, and still is, qualified for this position as a full-time **PPGNY** COO.

114. For example, Plaintiff, understanding that **PPGNY** had been and still is operating outside the scope of its Article 28 license for years, has tried to get the organization to change its practices without success.

115. By way of another example, plaintiff attempted to stop **PPGNY**'s practice of sedating patients when it was *not* medically necessary for them to be sedated.

116. **PPGNY** solicits and encourages every patient from 0 weeks to 24+ weeks of gestation to undergo deep sedation without regard to medical necessity and thereby increases the risk of harm to the patients.

117. By way of another example, Plaintiff attempted to stop **PPGNY**'s consent practices from running afoul of mandated regulations. Specifically, for In Clinic Abortions ("ICAs"), **PPGNY**'s consenting process is placed on lower-level staff in violation of Department of Health regulations which require that the treating provider must obtain the consent from the patient.

118. By way of another example, Plaintiff attempted to stop **PPGNY**'s substandard practice related to Urinary Tract Infection ("UTI") testing. For years **PPGNY** provided unsuitable, non-industry standard, and out of compliance UTI tests - oftentimes resulting in invalidated tests and **PPGNY** failed to properly inform patients for years.

119. By way of another example, Plaintiff attempted to shed light on the concerning practice of Hospital transfers which increased exponentially under **DAVIS**' and **DEAN**'s administration, resulting in patients experiencing full/partial hysterectomies.

120. Despite Plaintiff's outstanding performance in this regard and many others, **DEAN** and **DAVIS** continued their discriminatory and retaliatory onslaught.

121. On or about March 3, 2022, Plaintiff engaged in further protected conduct by emailing Joy D. Calloway, Interim President & CEO and Lisa Williams, Chief of Staff. The email was forwarded to Defendant Wendy Stark, President & CEO, on November 4, 2022. In Plaintiff's email, he questioned and challenged the practices of providing deep sedation to those patients seeking abortions. Plaintiff had discovered and reported throughout the agency that patients were subjected to and being forced to undergo deep sedation regardless of their gestational age.

122. Plaintiff discovered and alerted the agency that between the years of 2020 – 2021, **PPGNY** had performed 23,153 Surgical Abortions (SABs). Plaintiff pulled out the number of surgical abortions performed in Manhattan alone that used any form of sedation. Please note that 80% of the abortions performed in Manhattan used deep sedation. Of the 23,153 SABs, the Manhattan Health Center performed 9,625 SABs of those 7,702 patients were forced to elect Deep Sedation, 1,233 were forced to elect Moderate Sedation, and 690 were forced to elect Minimal Sedation.

123. Plaintiff also looked at gestational age for deep sedation and discovered that most of the deep sedation (77%) was being used for people with a gestational age up to 12 weeks, 6 days. Of those, 47% are less than 7 weeks, and only 5% were 20+ weeks.

124. Upon information and belief, it is medically unnecessary for patients less than 12 weeks to be put into deep sedation; and anything from 13 - 16 weeks should be determined on a case-by-case basis. Deep sedation brings on additional risks for the patient up to and including death. Dean and Davis

were fully aware that when a patient is deeply sedated, they are unable to hear conversations -- much like the reported situation when a black female patient overheard, while being mildly sedated, the provider discussing their large house, fancy cars, and making disparaging comments that certain patients shouldn't be able to have babies. While being deeply sedated the provider can cover up negligent practices which cause great harm to patients; ultimately sending them to the hospital. Plaintiff's email complaint emphasized the blatant disregard and unnecessary conflict Defendant Dean presented the Plaintiff's office, work, and decisions on a day-to-day basis – solely based on her disdain for the Plaintiff as being a black male – a black male in holding her and her teams accountable for the delivery of quality patient care and to limit the harm done to black and brown women.

125.    On or about March 28, 2022, Plaintiff formally complained via email about the offensive and illegal race and gender discrimination he was being subjected to by **DEAN** and **DAVIS**, to Joy D. Calloway, Interim President & CEO, and Lisa Williams, Chief of Staff. This email emphasized the blatant disregard and unnecessary conflict Gillian presented the Plaintiff's office, work, and decisions on a day-to-day basis – solely based on her disdain for the Plaintiff as being a black male – a black male in holding her and her teams accountable for the delivery of quality patient care and to limit the harm done to black and brown women.

126.    However, despite Plaintiff's complaint, **PPGNY** failed and/or refused to take any immediate or appropriate corrective action in response, and at no point did they reprimand **DEAN** or **DAVIS**.

127.    As a result of **PPGNY**'s failure and/or refusal to investigate Plaintiff's complaint, the discriminatory and retaliatory campaign by **DEAN**, **DAVIS** and **HAGAN** continued unabated.

128.    On or about April 22, 2022, Plaintiff emailed Joy D. Calloway, Interim President & CEO, and copied Lori Lahn, VP of Compliance, Lisa Colarossi, VP of Research & Evaluation, Dawn

McClary, General Counsel & Chief Compliance Officer, and Lisa Williams, Chief of Staff. This email emphasized the blatant disregard and unnecessary conflict Defendant Dean presented the Plaintiff's office, work, and decisions on a day-to-day basis – solely based on her disdain for the Plaintiff as being a black male – a black male in holding her and her teams accountable for the delivery of quality patient care and to limit the harm done to black and brown women. This email exemplified DEAN's quest to dismantle the protections the organization had in place to protect the interests of patients, who are predominately black and brown women.

129. **PPGNY** continued to subject Plaintiff to **DAVIS**, **DEAN** and **HAGAN**'s discriminatory comments on a consistent basis which created a hostile work environment.

130. These comments and discriminatory actions were made openly in front of others including Plaintiff's subordinates and has marginalized Plaintiff and undermined his ability to effectively carry out his supervisory and other work responsibilities.

131. By way of example, in or around July 2022, **DEAN** and **DAVIS** deliberately and unreasonably refuted, debated, and refused Plaintiff's plan to engage world-renowned African American thought leader Dr. Ronald Wyatt as a consultant for **PPGNY**. Dr. Wyatt is a leading voice and foremost authority in creating frameworks, systems and workflows to protect black and brown people from clinical and medical harm in healthcare settings.

132. On or about July 20, 2022, an email was sent to DEAN and copied several members on the medical and operational leadership teams. This email highlighted and emphasized DEAN and DAVIS' encouraging and inciting a rebellion amongst the registered nursing staff against the Plaintiff's operational staff. This email emphasized the blatant disregard and unnecessary conflict DEAN presented the Plaintiff's office, work, and decisions on a day-to-day basis – solely based on her disdain for the Plaintiff as being a black male – a black male in holding her and her teams

accountable for the delivery of quality patient care and to limit the harm done to black and brown women.

133.    On or about 29, 2022, Plaintiff yet again formally complained to **PPGNY** via email.  This email was sent to Toi Eaton, Vice President of Human Resources, and detailed the race and age discrimination Mr. Mitchell was subjected to by **DEAN** and **DAVIS**, and was copied to Dawn McClary, Lori Lahn, Lisa Colarossi, and Joy Calloway. The email emphasized the blatant disregard and unnecessary conflict **DEAN** presented the Plaintiff's office, work, and decisions on a day-to-day basis – solely based on her disdain for the Plaintiff as being a black male – a black male in holding her and her teams accountable for the delivery of quality patient care and to limit the harm done to black and brown women.

134.    However, despite Plaintiff's complaint, **PPGNY** failed and/or refused to take any immediate or appropriate corrective action in response, and at no point did they reprimand **DEAN** or **DAVIS**.

135.    As a result of **PPGNY**'s failure and/or refusal to investigate Plaintiff's complaint, the discriminatory and retaliatory campaign by **PPGNY**, **DEAN**, **DAVIS** and **HAGAN** continued unabated.

136.    Shortly following Plaintiff's complaint, and despite Plaintiff being the second in command as **PPGNY** COO, **PPGNY** announced that Plaintiff's white, Caucasian female peer, Rosalba Messina would assume the duties of acting **PPGNY** interim CEO.

137.    Plaintiff, as COO, was the second in command and under long standing policy and custom he should have been elevated to the position of interim CEO.

138.    **PPGNY**'s decision to appoint Plaintiff's white, Caucasian female peer to the position of interim CEO is clearly discriminatory against Plaintiff due to his age, race, color, disability, and gender, and because Plaintiff engaged in protected activity by complaining about **PPGNY**'s unlawful

misconduct.

139.   Plaintiff was qualified for the position and should have been promoted to the interim title of CEO.

140.   **MESSINA** reached out to Plaintiff personally and shared that Norris Kirby, Aimee Furdyna, and Karen Seltzer - all officers of the Board - reached out to her directly to offer her the Acting CEO role; confirming it was *not* a posted role and that the Plaintiff could apply for the promotion.

141.   **PPGNY** does not similarly withhold customary career advancement opportunities from white, Caucasian female, non-disabled employees and employees who have not engaged in protected conduct.

142.   As a result of being passed over for, the interim CEO position, Plaintiff was denied payment of a thirteen-thousand-dollar ($13,000.00) bonus.

143.   **PPGNY** paid this bonus to MESSINA and deliberately withheld it from Plaintiff, despite the fact that he is better qualified, more experienced, and was better positioned to succeed in the interim CEO position as he already managed the day-to-day operations of the entire affiliate, with 75% of the workforce reporting to his office. Messina's selection violated PPGNY's HR016A Recommendation for Promotion process.

144.   The interim CEO position and the attendant cash bonus were discriminatorily withheld from Plaintiff due to his age, race, color, disabling condition, religion, and gender, and because Plaintiff engaged in protected activity by complaining about **PPGNY**'s unlawful misconduct.

145.   The hostile work environment at PPGNY continued unabated. By way of example, on or about August 15, 2022, Dawn McClary, General Counsel & Chief Compliance Officer emailed Lisa Williams, Chief of Staff, Keith Corso, Chief Development Officer, Gillian Dean, Chief Medical Officer, Plaintiff, and Rosalba Messina, Chief Financial Officer. The communication was a compilation of emails submitted to McClary's office from employees throughout the agency and

was originally emailed from McClary to Karen Seltzer, **PPGNY** Chair of the Board of Directors, Norris Kirby, **PPGNY** Secretary of the Board of Directors, and Aimee Furdyna, **PPGNY** Vice Chair of the Board of Directors. The emails highlighted the organization's staff's frustration with the Board of Directors for their selection of both the permanent and Acting CEO appointments, citing that the employees felt:

- That the systemic racial undertones and overtones are explicit; they feel this was a disingenuous process;

- That the selection of Rosalba Messina, a white woman, as the acting CEO was not well thought out; and that she was far removed from the day-to-day operations, that Messina was unresponsive and never in the office; and that Mr. Mitchell as the COO, and second in command was the more appropriate selection for the role;

- Betrayed by the broken promise of having a black woman as permanent CEO; something the board committed to doing, but did not do;

- That people were fatigued by having a third CEO in 1.8 years, and the fourth CEO in 5 years;

- That equitable processes were not followed or transparent;

- Major disappointments surrounding equity; that a white woman gets to reap the benefits of Joy Calloway's (former Interim President & CEO, who hired Plaintiff) labor; and

- The Board encourages systemic racism and bigotry; nothing has changed and will ever change - they were seeing the true nature of the Board.

**146.** This email explicitly outlined the feelings of the staff in general, since the announcement of the new President & CEO announcement. Plaintiff's white female peer, Rosalba Messina, CFO, was chosen by the board to be the Acting CEO from September 1st - October 10th, 2022, until the new

permanent CEO would start. There was absolutely no vetting process, no application to apply through, and no requisition.

147.   During Plaintiff's employment, the agency adopted a remote working policy; the COO was entitled to working 40% remotely on its face. Messina, the CFO and once Acting CEO, a white, Caucasian, lesbian, Jewish woman, and a peer to Plaintiff lived out of state working 95% remotely and was not mandated to work onsite. During the time of being fulltime CFO and once Acting CEO, she was permitted to work from Italy. Despite Plaintiff and Messina being similarly situated, including being chief-level executives with the same reporting lines, headcount responsibilities, they were treated differently by PPGNY with regard to remote work opportunities and in violation of the HR-025 Remote Work policy.

148.   Similarly, PPGNY employees Zoee Davidson and Virginia Morin both had critical supervisory jobs in Human Resources and the Equity & Learning Departments requiring them to be onsite, yet they were permitted to work 100% remotely without reprimand, in violation of the HR-025 policy for their roles.

149.   **PPGNY** further discriminated by allowing its Executive Board to forego a residency requirement that permitted MESSINA to not have to relocate from her Connecticut residency to New York City, something that Plaintiff was required to do despite having an out of state residency from New York City.

150.   Plaintiff was forced by Defendant **PPGNY** to have a New York City residency despite the fact that he had a home in Florida.  MESSINA (Connecticut), DAVIDSON (Caucasian Female – Illinois) and MORIN (Caucasian – Female – Utah), were allowed to work for **PPGNY** without having to change residency to New York.

151.   The disparate treatment related to residency requirements has caused Plaintiff to bear living

expenses, travel costs and time away from family that his similarly situated **PPGNY** colleagues who do not have residency requirements do not have to bear.

152. By way of another example of discriminatory and retaliatory treatment, on or about September 14, 2022, while attending an executive level Planned Parenthood Clinical Health Network for Transformation (hereinafter referred to as "CHN") meeting, **HAGAN** singled out and ridiculed Plaintiff with an onslaught of disparaging comments deliberately made in front of another **PPGNY** Board chairperson, Karen Seltzer.

153. Further, during the CHN meeting, **HAGAN** made attempts to professionally sabotage Plaintiff with defamatory remarks to CHN employees, CHN Board of Directors, **PPGNY** Board of Directors, and CHN Membership peers and business partners.

154. Specifically, **HAGAN** approached Franklin Rosado, former CHN Chief Information Officer, and proceeded to maliciously and falsely accuse Plaintiff of not being a good partner to CHN and encouraged him to report out in front of the entire membership, in an effort to defame, censor, restrict, constrain, and retaliate against Plaintiff.

155. **HAGAN** subjected Plaintiff to this retaliatory onslaught of public ridicule because he engaged in protected activity and because he is the only black, African American male employee on **PPGNY**'s executive leadership team and because **HAGAN** is a Board Director for both **PPGNY** and CHN.

156. **HAGAN** intended to, and did, ridicule and humiliate Plaintiff, and by doing so diminished Plaintiff's professional reputation amongst his peers and business partners.

157. **HAGAN**'s humiliating comments had the purpose and effect of altering Plaintiff's work environment for the worse as his reputation and ability to lead were undermined.

158. **HAGAN**'s comments and conduct are clearly discriminatory because she does not subject white, Caucasian, and female employees to similarly humiliating, defamatory comments in the presence

of their colleagues.

159. Plaintiff immediately complained about **HAGAN**'s discriminatory, defamatory, comments.

160. Despite Plaintiff's complaint, **HAGAN**'s discriminatory, retaliatory campaign against Plaintiff continued unabated.

161. Additionally, following the revelation of Plaintiff's perceived disability, **PPGNY** has allowed Plaintiff's co-workers to subject him to discriminatory conduct regarding his disabling condition.

162. By way of example, in or around September 2022, Plaintiff's white, female subordinate presented a report authored by Plaintiff during an executive committee meeting. Plaintiff was meant to present the report himself but was unable to do so due to the effects of Plaintiff's disabling condition.

163. Upon information and belief, **PPGNY** board chairperson, SELTZER and other executive board committee members told Plaintiff's Chief Financial Officer that they believe that Plaintiff's white female subordinate employee is a much better communicator than Plaintiff.

164. These comments were in direct, discriminatory reference to the symptoms of Plaintiff's disabling condition.

165. On or about September 15, 2022, Plaintiff formally complained to **PPGNY** about being racially discriminated against "as the sole black male on the [**PPGNY**] Executive Leadership Team" and subjected to a hostile work environment by **HAGAN**. This communication was emailed to Dawn McClary, General Counsel & Chief Compliance Officer, Lori Lahn, VP of Compliance, and Toi Eaton, VP of Human Resources. The email expounded upon the Plaintiff's lived experiences of being discriminated against throughout his employment. It highlighted that Plaintiff felt unsafe, devalued, discredited, disrespected, and concerned; and described the hostile atmosphere and work environment. It highlighted Andrea Hagan's commingled Board Management obligations to both

PPGNY and CHN, to whom she has both donated substantial amounts of monies to – crippling her ability to be a true operational and unbiased fiduciary – challenging and crippling Plaintiff's ability to fully function as COO for **PPGNY**; being forced and silenced to suffer the critical and unnecessary/avoidable operational challenges the CHN transition demanded.

166.  At all times Plaintiff managed and triaged in concert with Dawn McClary & Lori Lahn's offices to investigate other pupils' complaints throughout the agency, which included white women, whose matters and complaints were addressed timely at all times

167.  When the Plaintiff inquired of his complaint, he was informed by Dawn McClary that the Board informed her and Lori Lahn not to act upon or investigate; it was further discovered that the Board instructed Dawn McClary to keep Lori Lahn out of managing the complaint.

168.  However, despite Plaintiff's complaint, **PPGNY** failed and/or refused to take any immediate or appropriate corrective action in response, and at no point did they reprimand **HAGAN**.

169.  Due to Defendants' inaction, Plaintiff engaged in further protected conduct, on or about October 2022 complaining directly to Dawn McClary, General Counsel & Chief Compliance Officer, and Toi Eaton, VP of Human Resources. The email highlighted a verbal complaint the Plaintiff previously submitted to both parties earlier in the year regarding DEAN and DAVIS' request that Plaintiff refrain from using red color to highlight or contrast conversations in an email – as they were trying to paint the Plaintiff as being upset, angry, and/or hostile. As Dean used red color to highlight or contrast conversations in an email, it was evident that those requirements were restricted to black, African American, disabled, Christians, and heterosexual males only.

170.  Plaintiff also complained and informed both parties that DEAN denigrated him using a racist trope by saying in a condescending and facetious manner: "it's so nice to work with you not being so upset, angry, or having the feeling of being slapped down." Plaintiff found this to be extremely

offensive and it was a further example of DEAN purposely disregarding Plaintiff's request that she cease and desist from using/practicing microaggressions towards him.

171. Plaintiff asserts that it has been a long standing battle within **PPGNY** as the organization grappled with correcting its behaviors rooted in white supremacy and systemic racism – this "rites of passage" was coddled and practiced throughout the medical and clinical services teams, led by Dean, Chief Medical Officer, and Davis, Associate Chief Medical Officer – both who had prior histories with Planned Parenthood and questionable pasts inciting, inflicting, or practicing medical negligence to black and brown people; while not holding themselves or their teams accountable for the safety and welfare of the organizations patients.  This communication highlighted and exposed Dean and Davis' blatant disregard for people of color, their unwillingness (both covert and overt) to partner with other people of color and their use of derogatory terms regarding people of color or people without a certain credential.

172. Rather, in response to Plaintiff's protected conduct, **PPGNY** intensified its campaign of retaliatory adverse employment actions.

173. By way of example, on or about September 21, 2022, during a full executive board meeting, a white, Caucasian male **PPGNY** executive board member suggested that Plaintiff should hold off from replacing/backfilling three (3) critical operational positions until the new permanent white, Caucasian, female hire assumed the role of CEO.

174. This direct order to hold off on filling these critical roles removed responsibilities that were directly associated with Plaintiff's success and the operational effectiveness of the organization and thereby negatively impacted Plaintiff's ability to do his job.

175. This adverse employment action was both retaliatory, given its temporal proximity to Plaintiff's protected conduct less than a week prior, but also discriminatory given that **PPGNY** and **PPGNY**'s

executive board members do not similarly interfere with the job functions of younger, non-disabled, Caucasian, and female board members.

176. This adverse employment action was both retaliatory, given its temporal proximity to Plaintiff's protected conduct, but also discriminatory given that **PPGNY** and **PPGNY**'s executive board members do not similarly yell at and publicly humiliate white, Caucasian, and female board members.

177. In fact, **PPGNY** and **PPGNY**'s board members engaged in a pattern and practice of discrimination against black employees, African American male employees, disabled employees, and those African American and disabled employees who take protected activity like Mr. Mitchell.

178. On or about September 30, 2022, communication was emailed to Dawn McClary, General Counsel & Chief Compliance Officer, and Toi Eaton, VP of HR. This communication cemented Andrea's best practices of shunning and utterly disrespecting the Plaintiff in audiences of other white Board Members, including the Plaintiff's peer. This was another complaint which landed on deaf ears.

179. The retaliation and discrimination only intensified once Defendant **STARK** was appointed permanent CEO.

180. By way of example, in or around November 2022, during **STARK**'s inaugural tour of the health centers, she had **PPGNY**, Chief of Staff, Ms. Lisa Williams, and Plaintiff's direct report, **PPGNY** Senior Vice President of Health Center Operations, Ms. Lori Trzop, accompany her to the Region 2 sites.

181. While commuting, Ms. Williams informed Ms. Trzop that **MESSINA** was "a bitch" in front of **STARK**, and nothing was done, signaling that women at **PPGNY** could do and say anything without recourse or correction.

182. Following the announcement of STARK as the new **PPGNY** President & CEO, MESSINA

informed Plaintiff that she and **STARK** had previously dated.

183.  Plaintiff asserts this is a direct conflict of interest which allowed Ms. Williams the bandwidth to disparage **MESSINA**.

184.  By way of another example, during a December 2022, Executive Leadership Team meeting, **STARK** rudely, condescendingly and with utter disdain, chastised Plaintiff by responding to a point he raised as follows: "**SAMUEL, I DON'T CARE AND I DON'T AGREE WITH YOU!**" The tone and context of Stark's remark, made in front of a large audience of executives, demeaned and diminished Mr. Mitchell in front of his peers. Ms. Stark did not dismiss comments by any other employees present. As the sole, black, Christian, older heterosexual male, Plaintiff felt that Stark was continuing and contributing to the hostile work environment that he had endured throughout his tenure.

185.  **STARK** repeated this statement multiple times in the presence of **CORSO**, Messina, McClary, Mr. Dipal Shah (chief external affairs officer), **DEAN**, and **PPGNY** Chief of Staff, Ms. Lisa Williams.

186.  **STARK** challenged the Plaintiff's questioning of the Board's poor judgement regarding the operational deficiencies they were creating by allowing CHN to further restrict and constrain **PPGNY**'s ability to operate; directly impacting the Plaintiff's office.

187.  Plaintiff was merely suggesting, recommending, thinking broadly, and sought collaboration to remedy a nuanced problem, known largely throughout the agency – but when **CORSO**, a white, homosexual male, directly brought fault against the Board, suggesting that the Board made a terrible decision of merging five (5) affiliates to create **PPGNY** and should consider severing certain parts of the merger, **STARK** agreed, despite having only been in her role just a few weeks.

188.  As **STARK**, **MESSINA**, and **CORSO** are all members of the LGBTQ+ community, STARK's

conduct made it clear that since Plaintiff was not white, or a homosexual, then his thoughts were worthless, and he would be diminished and dismissed based on his protected characteristics.

189. **STARK**'s comments at this meeting constituted an adverse employment action because it had the effect of belittling plaintiff in front of the executive leaders of the organization and undermining his authority as COO. **STARK** signaled to the others that Plaintiff's opinions, position in the Organization and authority should be ignored.

190. These adverse employment actions were both retaliatory, given its temporal proximity to Plaintiff's protected conduct, but also discriminatory given that **STARK** does not treat white, Caucasian, and female employees in a similar fashion.

191. **STARK** has also allowed her female Chief of Staff, Lisa Williams to proudly wear a shirt stating "***WOMAN RUN SHIT***" while at work so that others including Plaintiff can see.

192. **STARK**'s and **PPGNY**'s failure to address these discriminatory practices and complaints raised by Plaintiff allowed the hostile work environment based on illegal discrimination to thrive.

193. For example, on or about February 27, 2023, white, Caucasian male **PPGNY** Board member, Mr. Andy Herz asked a black, African American female employee who wore her hair in twists, "Hey Dawn, how do you get your hair all on one side, I can't do that?"

194. Plaintiff, who witnessed this humiliating and racist comment, was emotionally sickened at the racially hostile work environment that was allowed to exist within **PPGNY**'s upper management. Plaintiff engaged in further protected conduct by filing a complaint regarding this discriminatory act and like his other complaints, it was ignored and not remedied.

195. At all times Plaintiff called out the wrongdoing and was retaliated against because he became a whistleblower standing against racism and discrimination of any and all forms in the workplace.

196. On or about March 7, 2023, as a result of **PPGNY**'s refusal and/or failure to resolve the ongoing

discriminatory treatment to which Plaintiff was being subjected, and due to Plaintiff's numerous unresolved complaints regarding same, Plaintiff engaged in further protected conduct by filing this lawsuit against Defendants.

197.    In response to Plaintiff's protected conduct, **PPGNY**'s retaliatory and discriminatory misconduct intensified dramatically after March 7, 2023. Plaintiff was subjected to a campaign of discrimination including, *inter alia*, the following:

- rampant incivility;
- being excommunicated from key operational and fiscal stakeholder meetings;
- having several key responsibilities transitioned to female **PPGNY** employees;
- recording of meetings without Plaintiff's knowledge or consent;
- defendants meeting with Plaintiff's direct reports without his consent in order to undermine his leadership and authority.

198.    On or about March 16, 2023,  communication was emailed to Wendy Stark, President & CEO, and copied Dawn McClary, General Counsel & Chief Compliance Officer, Lori Trzop, SVP of Operations, Lori Lahn, VP of Compliance, Kathryn Colson, VP of Patient Safety & Quality, Toi Eaton, VP of Human Resources emphasizing the blatant disregard and unnecessary conflict DEAN presented the Plaintiff's office, work, and decisions on a day-to-day basis – solely based on her disdain for the Plaintiff as being a black male – a black male in holding her and her teams accountable for the delivery of quality patient care and to limit the harm done to black and brown women. This email detailed DEAN's intent of sabotaging Plaintiff's work and attempting to pit Plaintiff's direct reports against Plaintiff by sowing seeds of discord and discourse.

199.    On or about March 23, 2023, Plaintiff was informed by two of his newest members on the HR Team, Christopher Castro-Gonzalez, HR Director, and Melissa Dorado, HR Assistant, unsolicited, that they had also been victim to and experienced environmental hostilities, acts of discrimination, and witnessed outward expressions of not wanting to participate in equity commitments, by

DEAN. These hostilities aligned with Plaintiff's lived experiences with Dean throughout Plaintiff's tenure at **PPGNY**.

200.   On or about March 28, 2023, Plaintiff engaged in further protected conduct by forwarding a complaint on behalf of two (2) new members of the **PPGNY** Human Resources team. The details of this complaint corroborated Plaintiff's own complaint of discrimination against **DEAN**.

201.   Specifically, as per Compliance CALs -- a set a of trainings all PPGNY staff and Board Members were required to take – Plaintiff and his coworkers were required to report and notify leadership of environmental hostility, sexual harassment, and discrimination of any kind. Plaintiff submitted several complaints to Defendants' attention over several weeks, and they were ignored and/or unacknowledged. Plaintiff and his coworkers were also required to report when civility is not practiced in the workplace, *i.e.,* providing common courtesy and respect when cancelling a 1:1 meeting and notifying the participants, as Plaintiff's 1:1 meeting with STARK the preceding week was cancelled without notification.

202.   As the key operational stakeholder for the organization, Plaintiff had not been welcomed to any budgetary conversations pertinent to the organization with STARK and Messina. Furthermore, Plaintiff was excluded from the process while Messina and McClary crafted the framework for the new vendor workflow/process – a key accreditation indicator which falls under InfoSec, reportable to Plaintiff as the COO.

203.   Plaintiff sent this corroborating email to **STARK**, McClary, Ms. Lahn, Ms. Eaton at 10:20 AM on March 28, 2023.

204.   Approximately six (6) hours later, at or about 4:23 PM EST, **PPGNY** terminated Plaintiff's employment. Upon information and belief, the decision to terminate Plaintiff's employment was

made by CEO Stark, the only person to whom he reported and who had the authority to terminate his employment.

205.    The termination was without justification and was purely retaliatory and discriminatory.

206.    In addition to the temporal proximity between Plaintiff's protected conduct and **PPGNY**'s adverse employment action in the form of unlawful wrongful termination, during Plaintiff's twenty (20) months of employment with **PPGNY**, Plaintiff's work performance had not been questioned. Any allegations regarding Plaintiff's performance did not occur until **_after_** Plaintiff initiated the present lawsuit.

207.    **PPGNY**'s actions in this regard are clearly discriminatory, given non-black, non-African American, non-Christian male employees are not treated in this manner.

208.    While Plaintiff's employment with **PPGNY** was a harrowing, traumatic experience, the events complained of herein do not reflect a unique incident, as rudimentary internet research paints a similarly distressing picture of discriminatory abuse and misconduct by **PPGNY** and those occupying the most powerful positions within **PPGNY**[6].

209.    The totality of these acts demonstrates a pattern of **PPGNY** failing to prevent or address incidents of discrimination, failing to implement antidiscrimination policies, and failing to adequately train staff concerning civil rights issues, intentionally perpetrated by the **PPGNY** management and staff.

---

[6]Ema O'Connor, '*Employees Are Calling Out Major Reproductive Rights Organizations For Racism And Hypocrisy*' available at https://www.buzzfeednews.com/article/emaoconnor/employees-calling-out-reproductive-rights-groups, accessed September 22, 2022 Esther Wang, "*How an Ousted CEO Built a Culture of 'Covert Racism' and Fear at Planned Parenthood's Largest Affiliate*", available at https://jezebel.com/how-an-ousted-ceo-built-a-culture-of-covert-racism-and-1844118541, accessed July 1, 2022
Carole Novielli, "More Former Planned Parenthood Employees Come Forward With Accusations of Racism", available at, https://www.liveaction.org/news/former-planned-parenthood-employees-accuse-racism/, accessed September 22, 2022 Dani McClain, " The Racial Reckoning Inside Planned Parenthood", available at, https://Www.Harpersbazaar.Com/Culture/Features/A34742021/Racial -Reckoning-Planned-Parenthood/ , accessed September 22
, 2022 ¦ Save PPGNY, "*Current and Former Planned Parenthood Great Plains Staff Statement On Laura Mcquade. Signatures Are Still Being Collected and The List of Signers Will Be Updated Periodically*" available at https://saveppgny.wordpress.com/ppgp-statement/l, accessed September 22, 2022.

210. **PPGNY** and the individually named defendants, including Defendant **STARK** have devised, implemented, and executed a scheme through which they give disparate, preferential treatment and superior benefits to female and white, Caucasian employees, while knowingly and intentionally denying equal treatment and benefits to male and black, African American employees, including Plaintiff.

211. Defendants repeatedly discriminated against Plaintiff on the basis of his age, race, color, disabling condition, gender and because Plaintiff complained or opposed the unlawful conduct of Defendants related to the above protected classes. Defendants retaliated against Plaintiff for engaging in protected activity.

212. The above are just some examples of **PPGNY**'s unlawful discrimination of and retaliation against Plaintiff.

213. As a result of **PPGNY**'s unlawful and discriminatory actions, Plaintiff has endured unlawful humiliation resulting in extreme emotional distress, severe depression, extreme anxiety, physical ailments, and financial loss.

214. As a result of **PPGNY**'s actions, Plaintiff has been and continues to feel extremely humiliated, degraded, victimized, marginalized, embarrassed, and emotionally distressed.

215. As a result of **PPGNY**'s unlawful and discriminatory actions, Plaintiff has endured financial hardships and irreparable damage to his professional reputation.

216. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits, and other compensation, which such employment entails. Plaintiff has also suffered pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff further claims aggravation, activation, and/or exacerbation of any preexisting condition.

217.    Plaintiff claims a continuous practice of discrimination and makes all claims herein under the continuing violations doctrine.

218.    Although Plaintiff solely reported to the President & CEO and did not report to or answer to the Board, Andrea Hagan always operated outside the scope of her responsibility as a Board Member with the Plaintiff.

219.    **HAGAN**, **STARK**, **CORSO**, **DAVIS**, and **DEAN** conspired and co-conspired and worked together to terminate Plaintiff's employment due to his challenging of the permeated systemic racism throughout **PPGNY**, and for calling out the medical/clinical negligence of care provided to black and brown women in which **DAVIS** and **DEAN** had direct control over.

220.    In addition to alerting the agency to the clinical/medical negligence of the medical team, as it pertains to the Deep Sedation and abortion care, Plaintiff alerted the agency that **PPGNY**'s Manhattan Health Center has been operating outside the scope of its Article 28 license for years, issued by the New York Department of Health.

221.    Plaintiff also alerted the agency to mismanagement of In Clinic Abortion consenting standards and obligations throughout the agency. **DAVIS** and **DEAN** were staunch proponents of dismantling and deconstructing compliant frameworks put in place by black and brown employees to hold them accountable and to limit harm to black and brown women. They required non licensed staff and staff far less experienced to consent with the patients; while the Department of Health's (DOH) statue stipulates and requires the treating provider to complete the consent with the patient.

222.    Additionally, Plaintiff alerted the agency that - for years **PPGNY** provided unsuitable and out of compliance Urinary Tract Infection (UTI) tests and did not properly inform patients.

**AS A FIRST CAUSE OF ACTION**
**FOR DISCRIMINATION**
**UNDER 42 U.S. CODE § 1981**

<u>**(AGAINST ALL DEFENDANTS)**</u>

223.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this

Complaint.

224.    42 U.S. Code § 1981 - Equal rights under the law states provides:

> (a) **All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law**.

225.    Defendants constantly enforced a purposefully discriminatory pattern and practice of depriving African American individuals of the equal rights described therein, in further violation of 42 U.S.C. §1981.

226.    But for Plaintiff's race as a black, African American, he would not have suffered the loss of his legally protected rights, including the right to be free to perform his job without being subjected to racist conduct toward him and the right to be free from termination of employment due to the discriminatory actions of Defendants due to his race.

227.    As a result of Defendants' discrimination in violation of Section 1981, Plaintiff has been denied the enjoyment of all benefits, privileges, terms, and conditions of Plaintiff's contractual relationship which provided substantial compensation and benefits, thereby entitling him to injunctive and equitable monetary relief; and having suffered such anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of **Defendants'** actions, thereby entitling

57

Plaintiff to compensatory damages.

228. As alleged above, **Defendants** acted with malice or reckless indifference to the rights of the Plaintiff and other individuals named herein, thereby entitling Plaintiff to an award of punitive damages.

229. **Defendants** unlawfully discriminated against Plaintiff and unlawfully retaliated against Plaintiff in violation of 42 US.C. § 1981 and is entitled to damages as a result.

<u>**AS A SECOND CAUSE OF ACTION**</u>
<u>**FOR AGE, RACE, GENDER/SEX, SEXUAL ORIENTATION, AND DISABILITY**</u>
<u>**DISCRIMINATION**</u>
<u>**IN VIOLATION OF THE NY STATE AND THE NY CITY HUMAN RIGHTS LAWS**</u>
<u>**(AGAINST ALL DEFENDANTS)**</u>

230. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of the complaint.

231. New York State Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

232. Similarly, New York City's Human Rights Law prohibits the same and or similar discriminatory practices under the Administrative Code of the City of NY, section 8-107, et. seq.

233. **Defendants** engaged in and are still engaging in unlawful discriminatory practices by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy discrimination of Plaintiff thereby discriminating against the Plaintiff because of Plaintiff's age, race, gender, and disability as well as creating a hostile work environment based on Plaintiff's membership in the

aforementioned protected classes.

234.    As a direct and proximate result of **Defendants'** unlawful and discriminatory conduct in violation of the New York State Executive Law § 296, and New York City's Human Rights Law Plaintiff suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which Plaintiff is entitled to an award of monetary damages and other relief.

235.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, in violation of the New York State Executive Law § 296 and the Administrative Code of the City of New York section 8-107 et. seq., Plaintiff suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

236.    Plaintiff hereby makes claims against Defendants under all applicable paragraphs of New York State Executive Law Section 296 and the Administrative Code of the City of New York section 8-107 et. seq.

<u>**AS A THIRD CAUSE OF ACTION**</u>
<u>**FOR AGE, RACE, GENDER/SEX, SEXUAL ORIENTATION, AND DISABILITY**</u>
<u>**HARASSMENT**</u>
<u>**IN VIOLATION OF STATE AND NYC LAW**</u>
<u>**(AGAINST ALL DEFENDANTS)**</u>

237.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

238.    New York State Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: (h) For an employer, licensing agency, employment agency or labor organization to subject any individual to harassment because of an individual's age, race, creed, color, national

origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, domestic violence victim status, or because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint, testified or assisted in any proceeding under this article, regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims."

239.  Similarly, the New York City Human Rights law prohibits discriminatory conduct against employees by their employers.

240.  **Defendants** engaged in an unlawful discriminatory practice by subjecting Plaintiff to inferior terms, conditions, and privileges of employment because of Plaintiff's age, race, disability, sex, and gender.

241.  As a direct and proximate result of **Defendants'** unlawful and discriminatory conduct in violation of the New York State Executive Law § 296, and New York City Human Rights Law Plaintiff suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which Plaintiff is entitled to an award of monetary damages and other relief.

242.  As a direct and proximate result of **Defendants'** unlawful and discriminatory conduct, in violation of the New York State Executive Law § 296, and New York City Human Rights Law, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

243.  Plaintiff hereby makes a claim against Defendants under all applicable paragraphs of New York

State Executive Law Section 296 and the Administrative Code of the City of New York section 8-107 et. seq.

**AS A FOURTH CAUSE OF ACTION**
**FOR RETALIATION**
**IN VIOLATION OF STATE, CITY AND FEDERAL LAW**
**(AGAINST ALL DEFENDANTS)**

244. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

245. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

246. Similarly, 42 USC § 1981 and New York City's Human Rights Law prohibit retaliation against those who engage in protected activity.

247. **Defendants** engaged in an unlawful discriminatory practice by, *inter alia*, harassing, threatening, humiliating, undermining and otherwise discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of Plaintiff's opposition to **Defendants'** discriminatory practices towards Plaintiff and other older, Christian, male employees and employees of color and/or Plaintiff's participation in criticizing and lodging complaints about Defendants' discriminatory practices towards Plaintiff and other employees.

248. As a direct and proximate result of **Defendants'** unlawful and retaliatory conduct, in violation of the New York State Executive Law §296(7), New York City's Human Rights Law and 42 USC § 1981, Plaintiff suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, and a wrongful termination for which Plaintiff is entitled to an award of monetary damages and other relief.

249.    As a direct and proximate result of **Defendants'** unlawful and retaliatory conduct, in violation of the New York State Executive Law §296(7), the Administrative Code of the City of New York section 8-107 et. seq., and 42 U.S.C. § 1981Plaintiff, suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

250.    Plaintiff hereby makes a claim against **Defendants** under all applicable paragraphs of New York State Executive Law Section 296, New York City's Human Rights Law and 42 USC § 1981 for retaliation.

## AS A FIFTH CAUSE OF ACTION
## FOR HOSTILE WORK ENVIRONMENT
## IN VIOLATION OF NEW YORK STATE AND CITY HUMAN RIGHTS LAWS
## (AGAINST ALL DEFENDANTS)

251.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

252.    A work environment is "hostile" in violation of the NYSHRL when it is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014).

253.    New York City's Human Rights Law, Administrative Code City of New York, section 8-107, et. seq. prohibits hostile work environments as well.

254.    Defendants created, maintained, and subjected Plaintiff to an unlawful hostile work environment in violation of New York State and New York City laws.

## AS A SIXTH CAUSE OF ACTION
## FOR DISCRIMINATION
## IN VIOLATION OF TITLE VII
## (AGAINST THE CORPORATE DEFENDANTS)

255.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

256.    Title VII states in relevant part as follows:

(a)    Employer practices: It shall be an unlawful employment practice for an employer:

(1)    to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's **race**, **color**, **religion**, sex, or national origin.

257.    This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e *et seq*., as amended, for relief based upon the unlawful employment practices of the above-named Defendants. Plaintiff complains of Defendants' violations of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's race, religion, sex, and color.

258.    **PPGNY** engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e *et seq.*, by subjecting Plaintiff to discrimination on the basis of Plaintiff's race, religion, sex, and color.

259.    **PPGNY** engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e *et seq*., by harassing and otherwise discriminating against Plaintiff as set forth herein.

260.    **PPGNY** violated the above and Plaintiff suffered numerous damages as a result.

**AS A SEVENTH CAUSE OF ACTION**
**FOR RETALIATION**
**IN VIOLATION OF TITLE VII**
**(AGAINST THE CORPORATE DEFENDANTS)**

261.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

262.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e-3(a) provides that it shall be unlawful employment practice for an employer: "(1) to . . . discriminate against any of his employees . . . because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

263.    **PPGNY** engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e *et seq.* by discriminating against Plaintiff with respect to the terms, conditions, or privileges of employment because of Plaintiff's opposition to the unlawful employment practices of **PPGNY**.

264.    **PPGNY** violated the above and Plaintiff suffered numerous damages as a result.

**AS AN EIGHTH CAUSE OF ACTION**
**FOR DISCRIMINATION**
**IN VIOLATION OF THE ADA**
**(AGAINST THE CORPORATE DEFENDANTS)**

265.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

266.    Section 102 of the Americans With Disabilities Act provides in pertinent part: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . [the] advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.

267.    Throughout the course of Plaintiff's employment with Defendants, on numerous occasions, Defendants refused to reasonably accommodate Plaintiff's disability, and otherwise discriminated

against him on the basis of his disability as alleged above.

268.    **PPGNY** thereby violated the Americans With Disabilities Act and Plaintiff suffered numerous damages as a result.

**AS A NINTH CAUSE OF ACTION**
**FOR RETALIATION**
**IN VIOLATION OF THE ADA**
**(AGAINST THE CORPORATE DEFENDANTS)**

269.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

270.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

271.    Section 503 of the Americans With Disabilities Act states: "(a) Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203.

272.    Defendants engaged in an unlawful retaliation against Plaintiff in the manner described above, because of his requests for reasonable accommodation of her disabilities, and his opposition to Defendants' unlawful employment practices as also described above.

**AS A TENTH CAUSE OF ACTION**
**FOR HOSTILE WORK ENVIRONMENT**
**IN VIOLATION OF THE ADA**
**(AGAINST THE CORPORATE DEFENDANTS)**

273.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

274.    Section 503 of the Americans With Disabilities Act states: "(a) Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made

unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203.

275.   **PPGNY** engaged in an unlawful retaliation against Plaintiff in the manner described above, because of his disabilities, and his opposition to Defendants' unlawful employment practices as also described above.

<u>**AS AN ELEVENTH CAUSE OF ACTION**</u>
<u>**FOR DISCRIMINATION**</u>
<u>**IN VIOLATION OF THE ADEA**</u>
<u>**(AGAINST THE CORPORATE DEFENDANTS)**</u>

276.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

277.   Plaintiff has been discriminated against by **PPGNY** on the basis of his age in violation of the Age Discrimination in Employment Act (29 U.S.C.A. § 621, et seq.) in the manner described above because of his age.

278.   As a proximate result of the foregoing, Plaintiff has been denied employment; has lost wages, benefits, promotional opportunities and bonuses; and has incurred damages thereby.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.   A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate Federal Law, the laws of the State of New York, and the City of New York;

B.   An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.  An award of damages in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, seniority, and other benefits of employment;

D.  An award of damages in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for his severe mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, emotional pain and suffering and other physical and mental injuries;

E.  An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus prejudgment interest;

F.  An award of punitive damages, in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter;

G.  An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

H.  Such other and further relief as the Court may deem just and proper.

**WHEREFORE, THE ABOVE BEING CONSIDERED,** Plaintiff respectfully prays for the judgment against all Defendants, including compensatory damages, punitive damages against individual Defendants, any and all damages allowed by state, local and federal law including pre-judgment interest, post-judgment interest, and attorney's fees in an aggregate amount well above the jurisdictional amount needed to bring this case to this Court.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages.

Dated:

September 13, 2024
New York, New York

                             Respectfully submitted,


                             THE COCHRAN FIRM

                             DEREK S. SELLS
                             TRACEY L. BROWN
                             Counsel for Plaintiff
                             One Exchange Plaza
                             55 Broadway, 23rd Floor
                             New York, New York 10279
                             (Tel No.)  (212) 553-9215
                             (Facsimile) (212) 227-8763