UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SAMUEL RICARLOS MITCHELL, JR.,

                               Case No.: 1:23-cv-01932-JLR

              Plaintiff,

      - against -

PLANNED PARENTHOOD OF GREATER NEW
YORK, INC., WENDY STARK, ANDREA
HAGAN, GILLIAN DEAN, ANNE DAVIS, and
KEITH CORSO,

              Defendants.
-------------------------------------------------------------X

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Charles B. Bergin
Melissa C. Cartaya
John E. Mancebo
Kaufman Dolowich LLP
*Attorneys for Defendants*
245 Main Street, Suite 330
White Plains, New York 10601

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 4

STANDARD OF REVIEW ...................................................................................................... 9

LEGAL ARGUMENT .............................................................................................................. 9

Point I

Judgment Should Be Granted As Plaintiff Cannot Establish Retaliation .................................. 9

    a.    Plaintiff Fails To Meet His *Prima Facie* Burden ......................................................... 9

    b.    Plaintiff's Employment was Terminated for a Legitimate, Nondiscriminatory Reason ......................................................................................................................... 11

    c.    Plaintiff Cannot Establish That The Basis for His Termination Was Pretextual ......... 16

Point II

Judgment Should Be Granted To Hagan As She Had No Role In The Termination ................ 17

Point III

Plaintiff Committed Fraud (Counterclaim) .............................................................................. 19

Point IV

Plaintiff Breached His Contract By Failing To Secure, Or Even Seek, NY Residency (Counterclaim) ........................................................................................................................ 23

Point V

In the alternative, Plaintiff's Damages Are Curtailed By PPGNY's March 2023 Discovery Of His Fraud .......................................................................................................................... 25

CONCLUSION ....................................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) ............................................................................................. 9

*Asiedu v. Broadreach Medical Resources,*
    2022 WL 4237077 (S.D.N.Y. Sept. 13, 2022) ................................................... 14

*Baker v. Dorfman*,
    239 F.3d 415 (2d Cir. 2000) ....................................................................... 19, 20

*Bentley v. AutoZoners, LLC*,
    935 F.3d 76 (2d Cir. 2019) ............................................................................... 17

*Bind v. City of New York,*
    2011 WL 4542897 (S.D.N.Y. Sept. 30, 2011) ................................................ 15

*Castle Rock Ent, Inc. v. Carol Publ'g Grp., Inc.*,
    150 F.3d 132 (2d Cir. 1998) ............................................................................... 9

*Crawford Rehab Servs, Inc. v. Weissman*,
    938 P.2d 540 (Colo., 1997) .............................................................................. 16

*Davis v. New York,*
    316 F.3d 93 (2d Cir. 2002) ................................................................................. 9

*Ferraro v. Kellwood Co.*,
    440 F.3d 96 (2d Cir. 2006) ............................................................................... 10

*Fin. Guar. Ins. Co. v. Putnam Advisory Co, LLC*,
    783 F.3d 395 (2d Cir. 2015) ............................................................................. 19

*Fox v. Costco Wholesale Corp.*,
    918 F.3d 65 (2d Cir. 2019) ............................................................................... 10

*Friederick v. Passfeed, Inc.*,
    2022 WL 992798 (March 21, 2022, S.D.N.Y) ................................................ 18

*Ghirardelli v. McAvey Sales & Serv., Inc.*,
    287 F.Supp.2d 379 (S.D.N.Y. 2003) ............................................................... 15

*Graham v. New York State Office of Mental Health*,
    154 A.D.3d 1214 (3d Dep't, 2017) .................................................................. 15

*Greene v. Coach, Inc.*,
    218 F.Supp.2d 404 (S.D.N.Y. 2002) ............................................................... 25

*Gubitosi v. Kapica*,
    154 F.3d 30 (2d Cir. 1998) ............................................................................... 11

*Gurry v. Merck & Co., Inc.*, No. 01-Civ-5659,
   2003 WL 1878414 (S.D.N.Y. Apr. 14, 2003) ............................................................ 15

*Hardy v. Pepsi Bottling Company of New York, Inc.*,
   2016 WL 1301181 (Mar. 31, 2016, S.D.N.Y.) ......................................................... 11

*Henny v. New York State*,
   842 F. Supp.2d 530 (S.D.N.Y. 2012) ...................................................................... 16

*Joseph v. Marco Polo Network, Inc.*, No. 09-Civ.-1597,
   2010 WL 4513298 (S.D.N.Y. Nov. 10, 2010) ......................................................... 11

*Jute v. Hamilton Sundstrand Corp.*,
   420 F.3d 166 (2d Cir. 2005) .................................................................................... 16

*Knox v. CRC Management Co., LLC*,
   134 F.4th 39 (2d Cir. 2025) .................................................................................... 10

*Lavat v. Fruin Colnon Corp.*,
   597 N.E.3d 888 (Ill. App. Ct. 1992) ....................................................................... 16

*Lobato v. New Mexico Environment Dep't*,
   733 F.3d 1283 (10th Cir. 2018) ............................................................................. 16

*Malena v. Victoria's Secret Direct, LLC*,
   886 F. Supp. 2d 349 (S.D.N.Y. 2012) ..................................................................... 18

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ................................................................................ 3, 10, 14, 17

*McKennon v. Nashville Banner Pub'g Co.*,
   513 U.S. 352 (1995) ................................................................................................ 26

*Montana v. First Fed. Sav. & Loan Ass'n*,
   869 F.2d 100 (2d Cir. 1989) .................................................................................... 14

*Pasquarello v. Crothall Healthcare, Inc.*,
   2023 WL 5714165 (S.D.N.Y. Sep't 5, 2023) .......................................................... 17

*Paulsen v. CSC Holdings, LLC*,
   2016 WL 951535 (E.D.N.Y. Mar. 8, 2016) .............................................................. 16

*Peters v. Mount Sinai Hosp.*,
   2010 WL 1372686 (S.D.N.Y. Mar. 30) ................................................................... 14

*Piasecki v. Shinseki*,
   555 Fed.Appx. 88 (2d Cir. 2014) ............................................................................ 17

*Robinson v. MSG Entertainment Group, LLC*,
   2025 WL 1883597 (S.D.N.Y. July 8, 2025) ............................................................ 19

*Robinson v. NYC Health Dept*,
   2001 WL 863418 ................................................................................................ 15

*Roge v. NYP Holdings, Inc.*,
   257 F.3d 164 (2d Cir. 2009) .............................................................................. 16

*Rumsey v. Northeast Health, Inc.*,
   89 F.Supp.3d 316 (N.D.N.Y. 2015) ..................................................... 10, 11, 17

*Stinson v. Morningstar Credit Ratings, LLC*,
   2024 WL 3848515 (S.D.N.Y. Aug 16, 2024) ..................................................... 10

*Tassy v. Buttigieg*,
   2024 WL 20647 (2d Cir. Jan 2, 2024) ................................................................ 17

*Tolbert v. Smith*,
   790 F.3d 427 (2d Cir. 2015) ................................................................................ 9

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338, 360 (2013) .................................................................................... 17

*Wong v. New York*,
   2024 WL 3936762 (N.D.N.Y Aug 26, 2024) ...................................................... 17

*Woodell v. United Way of Dutchess Cnty*,
   357 F.Supp.2d 761 (S.D.N.Y. 2016) ................................................................... 15

*Zann Kwan v. Andalex Grp. LLC*,
   737 F.3d 834 (2d Cir. 2013) ................................................................................ 17

*Ziparo v. CSX*,
   160 F.4th 314 (2d Cir. 2025) .............................................................................. 11

## Rules & Statutes                                                    Page No.

Fed. R. Civ. R. 56 ........................................................................................................ 9

42 U.S.C § 1981 ...................................................................................................... 1, 8

Defendants Planned Parenthood of Greater New York, Inc. ("PPGNY"), Wendy Stark ("Mr. Stark") and Andrea Hagan ("Ms. Hagan", together with PPGNY and Ms. Stark, "Defendants") respectfully move for summary judgment dismissing the remaining claims in the Third Amended Complaint ("TAC") of Plaintiff Samuel Mitchell, Jr. ("Plaintiff" or "Mr. Mitchell") for retaliation in violation of the New York State and City Human Rights Law (all Defendants) as well as Title VII and 42 U.S.C § 1981 (PPGNY only). PPGNY also moves for summary judgment on its counterclaims for breach of contract and fraud (the "Counterclaims").

## PRELIMINARY STATEMENT

On March 7, 2023, Plaintiff Samuel Ricarlos Mitchell, Jr., then Chief Operating Officer ("COO") of PPGNY, held a press conference along with counsel, ostensibly to publicize the complaint they had filed against his employer earlier that day. During that press conference, Plaintiff and counsel made inflammatory statements beyond the allegations in the complaint, including comparing PPGNY to Harvey Weinstein, the Ku Klux Klan, and Confederate generals. The press conference generated the intended media attention, resulting in numerous articles. The intended publicity also resulted in an unintended consequence: it led directly to the exposure of misrepresentations Mr. Mitchell had made to PPGNY during his hiring process.

On March 9, 2023, a PPGNY employee forwarded to senior leadership an article she had discovered discussing Plaintiff's prior employment as Chief Operating Officer at an entity named Healthcare Express ("HCE"), a healthcare organization based in Texarkana, Texas. This article raised immediate concern, because PPGNY leadership was unaware that Plaintiff had ever worked for HCE, had lived in Texas, or (most importantly) had held an identically-titled executive level position at HCE immediately prior to joining PPGNY.

PPGNY's lack of knowledge regarding Plaintiff's immediately preceding employment was the result of Plaintiff's own intentional conduct. Plaintiff falsified his resume. Plaintiff omitted HCE from his self-penned "Executive Biography". Plaintiff misrepresented his employment history to the recruitment agency, during the interview process, and to the PPGNY Board. Furthermore, Plaintiff admits that these omissions and misrepresentations were deliberate.

When Mr. Mitchell later sought appointment to the permanent COO position, then-Interim Chief Executive Officer Joy Calloway (at the time Mr. Mitchell's biggest advocate for the role), faced questions from the PPGNY Board concerning Mr. Mitchell's background and qualifications (unrelated to HCE). Ms. Calloway asked Plaintiff directly in a face-to-face meeting whether his resume and his represented employment history were truthful, accurate, and complete. Plaintiff represented that they were. Relying on Plaintiff's representations and assurances, Ms. Calloway continued to advocate for Plaintiff, and she appointed him to the permanent COO position.

In March 2023, the discovery of Plaintiff's misrepresentations required newly-appointed CEO Wendy Stark to address conduct that constituted a terminable offense both under New York law, and as standard business practice. Plaintiff had omitted significant executive level employment information that was not disclosed to PPGNY's leadership or Human Resources, thereby depriving the organization of the ability to make an informed hiring decision. When Ms. Stark became aware of Plaintiff's misrepresentations, she concluded that: (1) Mr. Mitchell's conduct was particularly serious, given his executive level role; and (2) Plaintiff's dishonesty constituted not only lies, but potential fraud.

Ms. Stark concluded that her obligations to the organization required the termination of Mr. Mitchell's employment with PPGNY. On March 28, 2023, PPGNY terminated Mr. Mitchell's

employment based upon his dishonesty; his fraudulent misrepresentations; the falsification of his resume; the deceit over his professional background; and related misrepresentations.

All of the claims from Mr. Mitchell's initial March 7, 2023 complaint have long since been dismissed. Plaintiff's sole remaining claim (added in his First Amended Complaint) alleges that his termination was in retaliation for the filing of his initial (now dismissed) complaint, rather than as a result of his admitted misrepresentations. Defendants now move for summary judgment to dismiss this remaining claim.

Plaintiff's claim of retaliation will be judged under the McDonnell-Douglas burden shifting framework. To satisfy his *prima facie* burden, Plaintiff must first establish that the alleged adverse action (here, the termination of Mr. Mitchell's employment) was caused by his protected activity (here, filing his initial federal complaint and holding his press conference). Plaintiff cannot meet this burden. Plaintiff's only alleged, indirect, evidence of retaliation is temporal proximity. However temporal proximity fails where, as here, a legitimate intervening factor (in this case, the well-documented and undisputed discovery of Plaintiff's fraud, dishonesty and misrepresentations) occurred between the filing of the complaint/press conference on March 7, 2023, and the termination of Mr. Mitchell's employment on March 28, 2023.

However, even if Plaintiff could overcome the fatal intervening factor, and satisfy his *prima facie* burden, Defendants meet the second prong of the burden-shifting analysis, *i.e.* articulating a legitimate, nondiscriminatory reason for the termination of Mr. Mitchell's employment. It is well-settled New York law that lying, falsification of a resume, and/or fraud are all legitimate, nondiscriminatory reasons for termination. Plaintiff can offer no evidence that this reason was pretextual, and it is a matter of well-settled law that temporal proximity cannot satisfy this burden.

Individual Defendant Andrea Hagan separately moves for dismissal of the claim against her. The record, and Plaintiff's own pleadings, establish that Ms. Hagan had no role in the termination of Plaintiff's employment, and was neither consulted in, nor even aware of, the process leading up to the decision.

PPGNY also moves for judgment on its counterclaims. For all the reasons set forth above, Mr. Mitchell committed fraud against PPGNY. However, he also breached his employment contract, which required him to establish residency in New York within the first ninety days of his permanent employment, *i.e.* by May 31, 2022. He did not. Indeed, he did not even try. He did not apply for a lease; meet with a realtor; or bring his family up from Florida to look at houses or schools. Based upon his own representations, Mr. Mitchell extended his stay in the temporary housing provided by PPGNY in Room 312 at Mint House until September 1, 2022. Thereafter, across the remaining seven months of his PPGNY employment, he spent a total of just seventeen nights in New York, consisting of 12 scattered days in different rooms at Mint House and 5 nights in a hotel in Brooklyn. He did not rent, buy or in any way reside in New York as his contract required, and he is therefore in breach.

## FACTUAL BACKGROUND

### Factual Background

In August 2021, Mr. Mitchell applied for the Interim COO position with PPGNY. (Exhibit D). He applied through a recruitment firm named HealthTechS3. (Exhibit A, p. 4; Exhibit D). As part of his application, he submitted a resume, as well as a self-penned 'Executive Biography', complete with color portraits. (Exhibit A, p. 5; Exhibit C, p. 15-22). The recruitment agency questioned Mr. Mitchell about issues they had confirming the dates of his alleged prior employer, Global Institute for Addictions ("GIA"). Mr. Mitchell responded with a story purportedly

4

addressing his GIA timeline, claiming the recruiters report contained errors, but that he "was officially employed as a W2 employee in 2019…". (Exhibit E). Unbeknownst to the recruiter, Mr. Mitchell was not, in fact, paid to work for GIA in 2019. (Exhibit A, p. 9-10).

Ultimately, Mr. Mitchell was offered the Interim COO position, which he began in September, 2021. (Exhibit B, ¶ 36). Under the terms of Mr. Mitchell's employment contract as Interim COO, PPGNY began paying Mr. Mitchell's $5220/month costs for temporary housing in Room 312 at The Mint House, in New York City. (Exhibit G, p. 4-9). Mr. Mitchell, who lived in Florida at the time with his family, was chosen over a local candidate based in Brooklyn, New York. (Exhibit C, p. 20; Exhibit F).

Subsequently, Mr. Mitchell sought the permanent COO position at PPGNY. (Exhibit H, p. 9-11). Then Interim-CEO Joy Calloway supported his application. (Exhibit H, p. 9-11). According to Ms. Calloway, her support was based upon a desire for continuation, rather than based upon Mr. Mitchell's performance. (Exhibit H, p. 10-11). During Mr. Mitchell's application, the PPGNY Board of Directors raised concerns. Specifically, the Board (who had not been involved in Mr. Mitchell's hiring to the Interim COO position) had questions about his background and experience, as well as apparent inconsistencies in his alleged employment timeline. (Exhibit H, p. 8; Exhibit I, p. 2-6).

In response to the Board's questioning "*about my background and experience*", Mr. Mitchell wrote a scathing email to Board member Leslie Lindenbaum, claiming that he was "*insulted, disrespected"* and "*disgusted*"*; and calling the Board's inquiries* "*an all-out witch hunt*", "*harassing*", "*unprofessional*" and "*discrimination*", as well as "*a continued effort to defame, demoralize and deconstruct my impeccable background and experience*". (Exhibit J). He asked her: "*how can we frown upon those who are anti-abortion, while the Board is projecting an all out*

*anti-Samuel campaign behind the scenes?*" (Exhibit J). He told Calloway he was "*this shit is ridiculous*", and called it "*discrimination at the highest level*". (Exhibit H, p. 12; Exhibit K).

Ms. Calloway scheduled a face-to-face meeting with Mr. Mitchell. (Exhibit H, p. 14-16). She asked him directly whether there was anything in his experience, or background, or on his resume, that was inaccurate or that she did not know about. (Exhibit H, p. 14-16).He looked her in the eye and insisted there was not. (Exhibit H, p. 16-17).Based upon that representation, Ms. Calloway pushed for Mr. Mitchell to be offered the permanent COO job and the Board consented to her decision. (Exhibit H, p. 9-10, 14-16; Exhibit I, p. 6-7; Exhibit L).

The Board, however, had been correct to have concerns about Mr. Mitchell's background and resume. For example, his resume states that he was "CEO/COO" of a company called Rennova. (Exhibit C, p. 15-22). Much of his 'Executive Biography' boasts of Rennova's accomplishments during the time period he claimed to have been CEO/COO, such as managing a $200M budget for a NASDAQ-listed company. (Exhibit C, p. 15-22; Exhibit A, p. 13-18). In fact, he was never CEO or COO of Rennova: he had been their head of IT; was fired a week after the company was floated on NASDAQ; and thereafter, according to Mr. Mitchell, had been CEO of a subsidiary named Health Technology Solutions, and another subsidiary entity named Medytox, and a different company called Medivance that, according to Mr. Mitchell, Rennova was considering acquiring but ultimately did not. (Exhibit A, p. 19; Exhibit Z). Neither Health Technology Solutions, nor Medytox, appear on Mr. Mitchell's resume. (Exhibit A, p. 19-20).

Having been offered the permanent COO position, Mr. Mitchell signed an employment contract with PPGNY (the "Employment Contract") . (Exhibit M). Under the terms of the Employment Contract, PPGNY agreed to pay for temporary housing for Mr. Mitchell at Mint House. (Exhibit M.; Exhibit N, p. 4). PPGNY fulfilled its obligation. (Exhibit O). Under the terms

of the Employment Contract, Mr. Mitchell was required to seek and secure permanent housing in New York State by May 31, 2022. (Exhibit M.; Exhibit N, p. 4). He did neither. He did not secure, or even seek, to rent or purchase a home at any point. Instead, he extended his stay at Mint House until September 1, 2022. (Exhibit A, p. 32-34; Exhibit P, p. 2-7). Thereafter, across the remaining seven months of his employment at PPGNY, there were only 17 nights in which he had accommodations in New York State, consisting of 12 scattered nights of different rooms at Mint House when he was required to be in New York for conferences and the like, as well as 5 nights at a hotel in Brooklyn[1]. (Exhibit P).

On March 7, 2023, Mr. Mitchell filed the instant lawsuit. (Exhibit S). The same day, March 7, 2023, Mr. Mitchell gave a press conference with his attorneys for anti-abortion media in which they compared PPGNY to Harvey Weinstein, the Ku Klux Klan and confederate generals. (Exhibit A, p. 37-38). On March 9, 2023, a PPGNY employee forwarded to PPGNY leadership an online article about Mr. Mitchell's employment with Healthcare Express Inc, based in Texarkana Texas. (Exhibit V).

HCE was Mr. Mitchell's employer immediately preceding his employment at PPGNY. (Exhibit A, p. 2). Mr. Mitchell had held the same title (COO) that he did at PPGNY. (Exhibit A, p. 3). HCE, like PPGNY, was an entity that provided healthcare. (Exhibit W). In fact, Mr. Mitchell had moved his whole family to Texas to work there. (Exhibit W, ¶ 20). He hid all of this from PPGNY. (Exhibit A, p. 8).

Mr. Mitchell had omitted HCE from his resume, and from his 'Executive Biography'. (Exhibit C. p. 15-22; Exhibit A, p. 8). His resume stated that he had worked at GIA for

---

[1] Mr. Mitchell also spent a few nights in Albany, for which he was reimbursed by PPGNY. Mr. Mitchell submitted his hotel bill for reimbursement as a "business trip". (Exhibit Q; Exhibit R).

approximately three years; in fact, he had been COO at GIA for only eight months. (Exhibit A, p. 9-10). This doctoring of his resume covered up the time period he worked at HCE. (Exhibit A, p. 9-10). He lied to the recruitment agency during his background checks. (Exhibit A, p. 11-12). He lied to Joy Calloway when she asked him face-to-face. (Exhibit H p. 9-10, 14-16; Exhibit A, p. 29).

Faced with Mr. Mitchell having extensively lied and potentially committed fraud, new PPGNY CEO Wendy Stark investigated the issue, and confirmed the fraud and lies. She consulted with counsel, and decided to terminate Mr. Mitchell. (Exhibit T, p. 5-6). On March 28, 2023, Mr. Mitchell was terminated for his lies, resume falsification and fraud. (Exhibit W). Board member Andrea Hagan played no role in the decision at all, nor was she consulted in any way. (Exhibit B, p. 53-54; Exhibit I, p. 3-9).

### Procedural Posture

By Decision and Order dated June 25, 2025 (ECF No. 62), the Court dismissed all of the claims asserted in Mr. Mitchell's Third Amended Complaint (ECF No. 49), with the exception of those premised on his allegation that his termination constituted retaliation for filing the initial Complaint (ECF No. 1). The only remaining causes of action are: Count IV, in part, of the TAC, for violations of the NYSHRL and NYCHRL against PPGNY, Ms. Hagan and Ms. Stark; a claim under 42 U.S.C § 1981 against PPGNY only; and Count VII of the TAC, asserting a violation of Title VII against PPGNY alone. All remaining claims turn on the question of whether Mr. Mitchell's termination was retaliatory or legitimate. All claims in Mr. Mitchell's original complaint have been dismissed.

PPGNY asserted Counterclaims, which Mr. Mitchell moved to dismiss. By Order dated January 2, 2026, the Court granted Mr. Mitchell's motion in part, and denied it in part. The

Counterclaims that remain are for fraud (stemming from Mr. Mitchell's misrepresentations and falsification of his employment history) and for breach of contract (based on Mr. Mitchell's failure to seek or establish residency in New York State as required by his Contract).

On January 20, 2026, the Court held a conference to address Defendants' December 31, 2025, letter motion. At that conference, the Court authorized all parties to proceed with summary judgment motion practice, setting a filing deadline of February 10, 2026, and directing that briefing be completed by March 3, 2026.

## STANDARD OF REVIEW

Pursuant to Rule 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. R. 56(a); Tolbert v. Smith, 790 F.3d 427, 434 (2d Cir. 2015). When deciding a motion for summary judgment, the "court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party." Castle Rock Ent, Inc. v. Carol Publ'g Grp., Inc., 150 F.3d 132, 137 (2d Cir. 1998) (citation modified). To defeat such a motion, the non-movant must provide "evidence…such that a reasonable jury could return a verdict" in their favor. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). If the movant meets the initial burden, the non-moving party must present specific facts that demonstrate there is a genuine issue that should be left for the fact-finder to decide. Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002).

## LEGAL ARGUMENT

### Point I
### Judgment Should Be Granted As Plaintiff Cannot Establish Retaliation

a.   Plaintiff Fails To Meet His *Prima Facie* Burden

Plaintiff's retaliation claims are governed by the framework articulated in McDonnell Douglas, which applies equally to federal and state law claims. McDonnell Douglas Corp. v. Green, 411

U.S. 792 (1973); see, e.g., <u>Knox v. CRC Management Co., LLC</u>, 134 F.4th 39, 49 (2d Cir. 2025) ("Federal and state-law retaliation claims are subject to the same standards…" (citation modified)). Under the <u>McDonnell Douglas</u> framework, a plaintiff bears the initial burden of establishing their *prima facie* case, which requires a showing of a causal connection between the alleged protected activity (here, the filing of Plaintiff's initial federal complaint and his holding of a press conference) and the alleged adverse employment action (namely, Plaintiff's termination). <u>Fox v. Costco Wholesale Corp.,</u> 918 F.3d 65, 71-72 (2d Cir. 2019); <u>Stinson v. Morningstar Credit Ratings, LLC,</u> No. 22-cv-06164, 2024 WL 3848515, at *23 (S.D.N.Y. Aug 16, 2024). Only if that burden is satisfied does the burden then shift to the employer to "articulate some legitimate, nondiscriminatory reason" for the alleged conduct. <u>McDonnell Douglas</u>, at 802. At the third step, the burden shifts back to the plaintiff to demonstrate that "the proffered legitimate reason [is] merely a pretext for discrimination." <u>Ferraro v. Kellwood Co.,</u> 440 F.3d 96, 100 (2d Cir. 2006).

In this case, Plaintiff fails at the first hurdle. Plaintiff's only proffered, indirect evidence of any causal connection is "temporal proximity" – *i.e.* the short time period between the filing of his complaint on March 7, 2023, and his termination on March 28, 2023.

However, a plaintiff relying on temporal proximity to meet his *prima facie* burden has a notoriously "weak case". <u>Rumsey v. Northeast Health, Inc.,</u> 89 F.Supp.3d 316, 338 (N.D.N.Y. 2015). Moreover, temporal proximity as an inference of causation may be defeated where, as here, there is a legitimate "intervening event between the protected activity and the adverse employment action". <u>Joseph v. Marco Polo Network, Inc.,</u> No. 09-Civ.-1597, 2010 WL 4513298, at *18 (S.D.N.Y. Nov. 10, 2010); <u>see, e.g., Gubitosi v. Kapica,</u> 154 F.3d 30, 33 (2d Cir. 1998) (declining to draw an inference of causation from temporal proximity, even where there was a "short period of time between" the protected activity and the termination, given "the significant intervening

events between these two dates", namely that the plaintiff engaged in misconduct in the intervening period); Ziparo v. CSX, 160 F.4th 314, 336 (2d Cir. 2025) (temporal proximity may be severed by "some legitimate intervening event"); Rumsey v. Northeast Health, Inc., at 356 ("any inference of causation was defeated by the significant intervening event")[2].

In this case, there is no dispute that a legitimate intervening event occurred between the filing of Plaintiff's complaint and his press conference, and his termination – *i.e.* PPGNY's discovery of Mr. Mitchell's dishonesty and fraud during the hiring process. Plaintiff filed his initial federal complaint, and gave his press conference, on March 7, 2023. In the wake of the attendant (and sought after) media coverage, on March 9, 2023, PPGNY employee Kelley Krutz forwarded to PPGNY leadership an article about Mr. Mitchell's prior employment as COO of HCE. (Exhibit V). Because PPGNY leadership had been unaware of Mr. Mitchell's employment at HCE, that disclosure exposed his dishonesty and deceit during both the application process for the Interim COO job, and his subsequent application for the permanent position.  This discovery, in turn, resulted in the termination of Mr. Mitchell's employment. In light of these intervening events Plaintiff cannot rely on temporal proximity to satisfy his *prima face* burden.

　　b.　Plaintiff's Employment was Terminated for a Legitimate, Nondiscriminatory Reason

To the extent that the Court were to conclude that Plaintiff has satisfied his initial burden, the evidentiary record nevertheless established, without genuine dispute, that Defendants have met their burden of articulating a legitimate, nondiscriminatory reason for Plaintiff's termination.

---

[2] See, also, e.g. Hardy v. Pepsi Bottling Company of New York, Inc., No. 14-cv-4007,2016 WL 1301181, at *10 (S.D.N.Y. Mar. 31, 2016) (holding that that a court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases" and that while "a one month gap between protected activity and adverse action may well be sufficient to infer causation in certain cases", that is not the case where the employer "if it were truly motivated to retaliate" would not have waited a month, and where, as here, the employee's own actions during the time period at issue "present a far more persuasive inference of causation.")

Specifically, the undisputed record demonstrates that PPGNY terminated Mr. Mitchell following the discovery in March 2023 that he had lied during his successful application for the Interim COO position, falsified his resume, and repeated those misrepresentations when, again successfully, applying for the permanent COO role.

Mr. Mitchell now admits that his employer immediately prior to PPGNY "was Healthcare Express", located in "Texarkana, Texas". (Exhibit A, p. 2-3). As Mr. Mitchell conceded, HCE, like PPGNY, is a healthcare provider, and, like the position he obtained at PPGNY, Mr. Mitchell served as HCE's Chief Operating Officer. (Exhibit A, p. 3).

Mr. Mitchell also admits that when he applied for the Interim COO job at PPGNY, he omitted HCE from his resume entirely. (Exhibit A, p. 8). Specifically, Mr. Mitchell testified as follows:

> **Q. Can you show me where on your resume – Healthcare Express, the Texas entity you mentioned, where is that found on the resume?**
>
> A. **It's not listed.**

Mr. Mitchell also admits that he omitted his employment at HCE from the multi-page, self-penned "Executive Biography" he provided both the recruitment agency and PPGNY. When asked to identify, across the extensive documents he submitted in his application process, "where you reference your time as COO of Healthcare Express at all?", Mr. Mitchell conceded: "I didn't". (Exhibit A, p. 8).

Mr. Mitchell further concedes that he intentionally concealed this omission, by falsely claiming on his resume that he had been COO of an entity called GIA for more than three years, including the period during which he was, in fact, employed by HCE.  In reality, Mr. Mitchell was only an employee of GIA for approximately eight months. As he conceded, although his "resume states that [he was] the COO of GIA from June 2018 to April 2021 [in fact] from July 2018 until March

of 2019 [he was] actually the COO at Healthcare Express whilst providing unpaid services to GIA". (Exhibit A, p. 9-10).

These undisputed facts alone constitute a sufficient and legitimate basis for the termination of his employment. But there is more. The record establishes that Mr. Mitchell's conduct was not inadvertent. Mr. Mitchell admits the omissions and misrepresentations were deliberate, rather than the product of oversight. (Exhibit A, p. 8).

Moreover, Mr. Mitchell's misconduct was not limited to omissions. He engaged in repeated and direct misrepresentations. After lying to the recruitment agent to secure the Interim COO position[3], he sought and applied to the permanent COO job. The PPGNY Board (who had been uninvolved in his appointment to the interim position) raised concerns about his professional background and experience.[4]

As Interim CEO Ms. Calloway, then Mr. Mitchell's principal advocate, explained:

> "*[M]uch of those concerns and allegations [] I fought them on and supported him on; because he looked me in my face when I asked him directly, "Is there anything in your background or in your resume, in your experience, is there anything in your – anything I need to know before I continue to put my career on the line with this organization [for you]?" In a face to face ask in my office on Bleeker Street at PPGNY; and he told me, "No.""*.

(Exhibit H, p. 14-15).

---

[3] (Exhibit A, p.. 11-12).

[4] The Board was right to have concerns. Even beyond the HCE fraud, over the course of this litigation Defendants have come to learn that Mr. Mitchell's resume is full of falsification. For example, much of his resume and "Executive Biography" tout his achievements as "CEO/COO" of an entity called Rennova, such as his managing of a $200M budget for a NASDAQ-listed company. In reality, Mr. Mitchell was briefly head of IT at Rennova, was fired within nine days of Rennova becoming NASDAQ-listed. As per Mr. Mitchell's modus operandi, during the time he claimed to be Rennova CEO/COO, he in fact worked for two companies not listed on his resume, and another company Mr. Mitchell claims Rennova was thinking about purchasing but did not (Exhibit A, p. 14-20).

13

Ms. Calloway further elaborated that it was this face-to-face lie:

> "*[T]hat gave me the additional what I needed to say I'm gonna continue to support…ride, support, coach, develop…I'm going to stand by this hire that I have made to elevate this person in his career in this huge, nationwide organization…So, for months, I supported someone who lied to me, who left information out that would have helped me better go through that period …I asked Sam was there anything out there that I needed to know before I continued to put my tail on the line; and he looked me in my face and told me, "No, nothing." And so, I continued to support him*."

(Exhibit H, p. 15-16).

Courts "have consistently held that they may not second-guess an employer's non-discriminatory business decisions, regardless of their wisdom, unless there is actual evidence that they were motivated by discrimination. Federal courts do not hold a roving commission to review business judgments." Peters v. Mount Sinai Hosp., No. 08 Civ. 7250, 2010 WL 1372686, at *9 (S.D.N.Y. Mar. 30, 2010) (citing to Montana v. First Fed. Sav. & Loan Ass'n, 869 F.2d 100, 106 (2d Cir. 1989).

Furthermore, it is beyond dispute that lying and dishonesty in any context, the falsification of a resume and committing fraud, are all legitimate, nondiscriminatory reasons for termination that more than meets the employer's burden on the second prong of the McDonnell Douglas analysis, regardless of the plaintiff's purported explanations. E.g., Asiedu v. Broadreach Medical Resources, No. 19-Civ-11825, 2022 WL 4237077, at *17 (S.D.N.Y. Sept. 13, 2022) ("lying to a supervisor is a legitimate basis for termination"); Bind v. City of New York, No. 08-Civ-11105, 2011 WL 4542897, at *11 (S.D.N.Y. Sept. 30, 2011) (holding that "dishonesty is a legitimate, non-discriminatory reason for terminating an employee"); Gurry v. Merck & Co., Inc., No. 01-Civ-5659, 2003 WL 1878414, at *7 & n.9 (S.D.N.Y. Apr. 14, 2003) ("the misrepresentation on her employment application" was a legitimate, non-retaliatory reason for employee's termination, and

employee's "subjective belief that she did not misrepresent her employment history is insufficient to rebut defendants' legitimate nondiscriminatory reason"); Graham v. New York State Office of Mental Health, 154 A.D.3d 1214, 1221-22 (3d Dep't, 2017) (employer's discovery that employee had omitted a similar prior employer from employee's resume during application process was a "legitimate, independent and nondiscriminatory reason" for termination of employment); Woodell v. United Way of Dutchess Cnty, 357 F.Supp.2d 761, 772 (S.D.N.Y. 2016) (an employer's discovery of an employee's "knowing misrepresentations during the employment application process…constitutes a legitimate, nondiscriminatory reason for plaintiff's termination"); Ghirardelli v. McAvey Sales & Serv., Inc., 287 F.Supp.2d 379, 389 (S.D.N.Y. 2003) (employer's discovery of employee's misrepresentations of her background and experience in job application materials, and misleading resume, "constitute legitimate business reasons" for termination); Robinson v. NYC Health Dept, 2001 WL 863418, No. 00-cv-8969, at *6 (S.D.N.Y. July 30, 2001) (termination of plaintiff who "misrepresented her employment history" by omitting prior employers on resume and during interview process was "justified", and, "while plaintiff may proffer explanations for her omissions" her representation that - as in this case – a preceding employer was her most recent employer when that was not in fact the case "is indisputably a false statement"); Paulsen v. CSC Holdings, LLC, No. 15-cv-7054, 2016 WL 951535, at *11 (E.D.N.Y. Mar. 8, 2016) ("An employer may rightfully…terminate an employee who lies on an employment application no matter the nature of the untruth.").

Indeed, courts from across jurisdictions recognize that falsifying a resume, employment background or prior work experience is legitimate grounds for termination. See, e.g. Lobato v. New Mexico Environment Dep't, 733 F.3d 1283, 1291 (10th Cir. 2018); Lavat v. Fruin Colnon

Corp., 597 N.E.3d 888, 897 (Ill. App. Ct. 1992); Crawford Rehab Servs, Inc.v . Weissman, 938 P.2d 540, 548 (Colo., 1997)[5].

These principles apply with full force to any employer, and to any employee. They are particularly compelling where, as here, the employee is a senior executive who engaged in repeated and extensive dishonesty, including direct misrepresentations to the CEO, while employed by a healthcare provider subject to stringent legal, compliance and reporting obligations, and operating with a national profile, significant media attention, and heightened socio-political sensitivities.

   c.   Plaintiff Cannot Establish That The Basis for His Termination Was Pretextual

Defendants having fulfilled their burden, the "presumption of retaliation dissipates" (Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)) and the burden then lies with Plaintiff to establish that the proffered reason was pretextual. This is a "higher burden" than Plaintiff's initial burden, that cannot be met by "conclusory and speculative allegations." Henny v. New York State, 842 F. Supp.2d 530, 553 (S.D.N.Y. 2012). It is a burden Plaintiff cannot meet. *First*, as both the CEO who terminated Mr. Mitchell, Wendy Stark, and also the interim CEO who hired Mr. Mitchell,, Joy Calloway, confirm, Mr. Mitchell's conduct was so egregious that it is inconceivable that PPGNY would not have fired him upon its discovery. *Second*, the basis for his termination has been consistent and well-documented throughout. *Third*, and perhaps most importantly, Plaintiff's only alleged evidence of discrimination is temporal proximity (see, above), however it is well-settled law that temporal proximity cannot meet the third burden in the McDonnell Douglas analysis. See, e.g., Tassy v. Buttigieg, No. 23-1622024 WL 20647, at *3 (2d

---

[5] Indeed, in this District, an employer has a legitimate, nondiscriminatory basis for termination, and fulfills its burden, when it terminates an employee for workplace fraud "whether or not the fraud actually occurred." Roge v. NYP Holdings, Inc., 257 F.3d 164, 169 (2d Cir. 2009). In this case there is no such question over the fraud committed by Mr. Mitchell.

Cir. Jan 2, 2024) (where a plaintiff "has advanced no other viable evidence of pretext….he cannot carry his burden at step three based solely on temporal proximity"); <u>Bentley v. AutoZoners, LLC,</u> 935 F.3d 76, 90 (2d Cir. 2019) ("temporal proximity…can only satisfy [the] prima facie burden. It cannot demonstrate pretext."); <u>Piasecki v. Shinseki</u>, 555 Fed.Appx. 88 (2d Cir. 2014); <u>Zann Kwan v. Andalex Grp. LLC,</u> 737 F.3d 834, 847 (2d Cir. 2013); <u>Pasquarello v. Crothall Healthcare, Inc., No. 21-cv-08732,</u> 2023 WL 5714165 (S.D.N.Y. Sep't 5, 2023); <u>Wong v. New York,</u> No. 21-cv-1338, 2024 WL 3936762 (N.D.N.Y Aug 26, 2024).[6]

Plaintiff cannot meet either the first, or third, burdens under the <u>McDonnell Douglas</u> framework. By contrast, Defendants establish their legitimate, nondiscriminatory reason for terminating Mr. Mitchell. As such, Defendants respectfully submit they are entitled to summary judgment in their favor dismissing Plaintiff's remaining causes of action.

**Point II**
**Judgment Should Be Granted To Hagan As She Had No Role In The Termination**

Separately, Individually Named Defendant Andrea Hagan moves for summary judgment as she had no role in Plaintiff's termination. Under "both the NYSHRL and the NYCHRL individual liability…is limited to cases where an individual defendant…actually participates in the conduct giving rise to plaintiff's retaliation claim", here Mr. Mitchell's termination in March 2023. <u>Friederick v. Passfeed, Inc.,</u> No. 21-cv-2066, 2022 WL 992798 (March 21, 2022, S.D.N.Y)

---

[6] Plaintiff also cannot meet his burden under Title VII of showing that "but for" his protected activity he would not have been fired. <u>See, e.g. Rumsey v. Northeast,</u> 89 F. Supp. 3d 316, at 337-38; <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar,</u> 570 U.S. 338, 360  (2013) (a plaintiff alleging retaliation in violation of Title VII must show that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of his employer"). In other words, Mr. Mitchell would have to show that, had he not filed this lawsuit, PPGNY would not have fired him for his fraud and his lies, a burden he cannot possibly meet on its face.

17

(alteration in original), (quoting <u>Malena v. Victoria's Secret Direct, LLC,</u> 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012)).

The undisputed record establishes that Ms. Hagan did not participate in Mr. Mitchell's termination. Indeed, Ms. Hagan did not even know that Mr. Mitchell was to be terminated until the Board received an email informing them that the termination had already occurred. (Exhibit I, p. 9-11) ("I didn't know he was to be terminated; I learned that he was terminated"). Ms. Hagan had no discussions with Ms. Stark regarding Mr. Mitchell's termination (Exhibit I, p. 12); nor any discussions with the Board regarding Mr. Mitchell's termination (Exhibit I, p. 12). Indeed, PPGNY Board members in 2023 played no role in employee terminations (Exhibit I, p. 14); nor was the Board involved in any such discussions (Exhibit I, p. 15). In fact, Ms. Hagan was "not aware" of who made the decision to terminate Mr. Mitchell, although she "presume[d] Wendy Stark made the decision". (Exhibit I, p. 12).[7]

Plaintiff's own pleadings confirm these facts. The Third Amended Complaint openly concedes that Ms. Hagan did not have the power to hire or fire Mr. Mitchell. (Exhibit B, ¶52) ("the COO does not report to the Board, the COO reports directly to the President & CEO"); (Exhibit B, p. ¶87) ("Plaintiff solely reported to the President & CEO and did not report to or answer to the Board"). In fact, the Third Amended Complaint openly concedes that "the decision to terminate Plaintiff's employment was made by CEO Stark, the only person to whom he reported and who had the authority to terminate his employment." (Exhibit B, ¶204). In sum, there is no evidence in the record that Ms. Hagan spoke to, or about, Mr. Mitchell with anyone at PPGNY between March 7, 2023, and March 28, 2023, beyond being informed that she had been named a defendant in this

---

[7] Ms. Stark also confirmed that Ms. Hagan had no role in deciding to terminate Mr. Mitchell's employment. (Exhibit T, p. 6).

action. Ms. Hagan did not have the authority to terminate Mr. Mitchell, she was not involved in any discussions concerning his termination, did not terminate Mr. Mitchell, nor did she in any way "participate" in the decision to terminate him. Accordingly, Ms. Hagan respectfully submits that the claims against her should be dismissed.

**Point III**
**Plaintiff Committed Fraud (Counterclaim)**

It is well-settled in this jurisdiction that "a defendant's lying about his background on his resume...constitute[s] fraud." Robinson v. MSG Entertainment Group, LLC, No. 23-cv-9366, 2025 WL 1883597, at *4 (S.D.N.Y. July 8, 2025), citing Baker v. Dorfman, 239 F.3d 415, 423-35 (2d Cir. 2000). That is precisely the circumstance presented here, and Mr. Mitchell is liable for the fraud he committed.

In the Court's January 2, 2026 Decision and Order, the Court set forth the elements that PPGNY needed to prove in order to establish that Mr. Mitchell committed fraud:(1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff. See, Jan 2, 2026 Decision and Order pages 18-20; see, also, Fin. Guar.Ins. Co. v. Putnam Advisory Co, LLC, 783 F.3d 395, 402 (2d Cir. 2015). The evidentiary record establishes that each is met here.

As set forth above, Mr. Mitchell concedes the first three elements. He admits that he made material misrepresentations that he knew to be false (including that he doctored his resume to omit any mention of HCE, that he deceived the recruitment agency, and that he lied to Joy Calloway when she asked him if there was anything in his resume that was inaccurate). He further admits that he fraudulently misrepresented that his employment history was truthful, when in fact he knew it was not. He also admits that he acted deliberately. (See, e.g. Baker, 239 F.3d at 423-24 (affirming

the district court's finding that a defendant's false statements about his qualifications and accomplishments on a resume meet the requirement for knowledge that the statements were fraudulent)).

Moreover, PPGNY relied upon Mr. Mitchell's misrepresentations: not only the "omission" (in Mr. Mitchell's words) itself, but Mr. Mitchell's lying *about* the omission. As Joy Calloway, who advocated for Mr. Mitchell's initial hiring to the interim position and then, in the face of Board pushback, successfully fought for Mr. Mitchell to secure the permanent COO position, stated, Mr. Mitchell lied about:

> "*[A] whole bunch of stuff including leaving off the year and a half or whatever the time period it was of a position that he held at a very senior level that I didn't know about. My HR Department didn't know about…it was not made available to me or my HR team at PPGNY so that we could make wise decisions about who we bring into the organization or how we bring them in…had I known that he omitted time on his resume, it would have given me time to pursue that to understand why he did that, to go down perhaps another level of investigation and understanding in the vetting of someone that's coming into my employ at a C-suite level at a multimillion organization*".

(Exhibit H, p. 16-17)

The PPGNY Board had serious concerns about hiring Mr. Mitchell as the permanent COO. Specifically, Ms. Hagan, along with "two or three" other Board members, raised concerns about Mr. Mitchell's employment history and background (unrelated to those that ultimately resulted in the termination)., However, then-Interim CEO Joy Calloway "*trusted what the search firm gave me; so I did not agree at that time.*" Exhibit H, p. 2). Ms. Calloway had to take the unusual step of justifying her support for the hiring of Mr. Mitchell with a Power Point presentation to the Board. (Exhibit H, p. 3-5). Throughout Ms. Calloway's advocacy for the permanent hiring of Mr. Mitchell she believed that the Board was "*questioning [] the process, my judgment*", which lead

her to speak with Mr. Mitchell to "***find out what, if anything, we could have possibly missed in this situation***." (Exhibit H, p. 8). Mr. Mitchell not only lied to Ms. Calloway, he went on the offensive: emailing the Board himself to accuse them of "*an all-out witch hunt*" and various forms of discrimination; telling Ms. Calloway that "this shit is ridiculous. I'm literally sick to my stomach, disgusted." (Exhibit K)[8]. He apologized to Ms. Calloway for reaching out directly to the Board, but claimed "I've never had to go through this level of disrespect…I hate that you are in this position having to defend me." Id. Ms. Calloway responded, "I believe you to be worth defending." Id. And defend him she did. Ms. Calloway did not require Board approval to hire Mr. Mitchell to the permanent position, and so she offered Mr. Mitchell the permanent role. (Exhibit H, p. 9-10). Indeed, as Ms. Calloway put it, part of the reason she did so was in "defiance" of the Board's concerns:

> "***I completely supported Sam. <u>I believed what Sam told me; and because of that, I presented that to the Board</u>. I trusted my judgment in believing the search firm that they did a complete and thorough job of presenting this candidate to us; <u>and so I hired him as a permanent</u> [employee].***"

(Exhibit H, p. 10) (emphasis added).

As she explained:

> "***I fought them [the Board] and supported him [Mr. Mitchell] because he looked me in the face when I asked him directly, 'Is there anything in your background or in your resume, in your experience, is there anything in your – anything in need to know before I continue to put my career on the line with this organization?' In a face-to-face ask in my office on Bleeker Street at PPGNY; and he told me, 'No.' And that gave me the additional***

---

[8] He would also describe the Board's concerns about his resume and background as "*discrimination at the highest level…embarrassing, defaming, discriminatory, insulting, disrespectful, harassing and demoralizing campaigns in an effort to deconstruct and question my impeccable background and experience.*" (Exhibit J). At the time of the Board's concerns, as well as when writing this email, Mr. Mitchell knew that he had lied, and was lying, about his "*impeccable background and experience.*"

> *what I needed to say I'm gonna continue to support [Mr. Mitchell*
> *to be offered the permanent COO position].*"

(Exhibit H, p. 14-15).

The record also establishes that PPGNY suffered damages as a result of Mr. Mitchell's fraud. As the Court already ruled, damages such as "the costs of the temporary housing, of investigating the scope of the fraud conducted by one of its senior executives, and of recruiting hiring and training a replacement Chief Operating Officer" are "a reasonably foreseeable consequence of Mitchell's alleged misstatements regarding his employment history that he presented to PPGNY as part of the hiring process and that resulted in his hiring by PPGNY." (Exhibit N, p. 21).

PPGNY unquestionably incurred the costs of temporary housing (see, Exhibit O above)[9], damages all the more tangible because Mr. Mitchell's final rival candidate for the position was local to New York City. (Exhibit F). As Ms. Stark confirmed, PPGNY further incurred time and expense, including working with outside counsel, to investigate the scope of Mr. Mitchell's fraud[10]. Indeed, as Ms. Calloway confirms, PPGNY expended significant time and resources of its Board and Interim CEO in meetings and presentations addressing whether there were issues with Mr. Mitchell's background and resume (as the Board feared), or not (as Mr. Mitchell insisted to Ms. Calloway).

Accordingly, PPGNY respectfully submits it is entitled to judgment as a matter of law on its Counterclaim for fraud.

---

[9] See, Exhibit O.

[10] Exhibit T, pages 6-9.

**Point IV**
**Plaintiff Breached His Contract By Failing To Secure, Or Even Seek, NY Residency**
**(Counterclaim)**

As this Court has already ruled, Mr. Mitchell is liable to PPGNY for breach of contract if the following three conditions are satisfied: (1) PPGNY "complied with the terms of [Mr. Mitchell's employment] contract [by having] paid for the first 90 days of temporary housing"; (2) Mr. Mitchell "never intended to establish residency in New York State, and, in fact, at no point did he ever establish residency in New York State; (3) PPGNY suffered damages for the costs of providing Mr. Mitchell temporary housing while he falsely claimed to be seeking a permanent home in New York. (*See*, Exhibit N, p. 9).

The first and third elements of this analysis are indisputable. Attached as Exhibit O are PPGNY's reimbursement payments to Mr. Mitchell for his temporary housing at Mint House, funded in full by PPGNY.

PPGNY respectfully submits that the second element is similarly satisfied. As the Court ruled, "the terms of the Offer Letter with respect to residency are clear and unambiguous". Mr. Mitchell "expressly" contracted for a "deadline for Mitchell to rent or buy a residence in New York." (Exhibit N, p. 10). Mr. Mitchell did not. Mr. Mitchell does not dispute that he did not "rent or buy a residence in New York" at all, let alone by the contractual deadline. In fact, Mr. Mitchell did not even try. Although Mr. Mitchell initiated this litigation almost three years ago, he has produced neither a lease, nor any document suggesting he purchased a home in New York State. Moreover, he has not produced so much as a document to even suggested he ever tried to buy or rent a home in New York State; no bringing his family to New York to look at properties or schools; no emails with realtors, or with brokers; no applications; no apartment or house viewings; not even a property search or a listing saved from StreetEasy or Zillow. (Exhibit A, p. 32-35)

In fact, Mr. Mitchell was required to produce any evidence that he had spent any time in New York after his PPGNY-funded stay at Mint House. According to the documents provided by Mr. Mitchell, he ended his stay in Room 312 at Mint House on September 1, 2022. Thereafter, across the remaining ***seven months*** of his PPGNY employment, he spent a total of just ***17*** nights in New York at all, consisting of 12 scattered days in different rooms at Mint House[11] and 5 nights at a hotel in Brooklyn[12]. In other words, after May 31, 2022 (when PPGNY's contractual obligation to pay for Mr. Mitchell's temporary housing at Mint House ended), Mr. Mitchell worked for PPGNY for another 10 months: for 3 months he extended his stay at Mint House; for 17 days he stayed either in a different room at Mint House, or in a hotel in Brooklyn; and for almost 6 and a half months he was not even spending the night in New York. Notably, Mr. Mitchell provided no evidence that in 2023 he spent a single night in New York aside from his reimbursed work trip to Albany, prior to his filing his lawsuit, a fact that tracks with his coworkers' perception that "***starting at the beginning of the year he – he like stopped coming to New York City***" whereas before he had at least been "***occasionally present in the New York City office…once, sometimes twice a month***" (Exhibit X).

Mr. Mitchell entered into a contract with PPGNY, the terms of which he himself negotiated. (Exhibit A, p. 30). Under the terms of that contract, PPGNY was to fund temporary

---

[11] According to Mr. Mitchell's expense submissions, these were on days when there was a "conference" in New York that physically required his presence. See, e.g. Exhibit Z, in which Mr. Mitchell sought reimbursement for multiple cab fares over 9/2/22 and 9/3/22 which he marked as "conference" travel – these two nights are two of the 12 extra nights at Mint House that he booked. Far from being "residing", the nights Mr. Mitchell spent in New York appear to be exclusively hotel stays for those nights when a PPGNY special event required his presence in New York City.

[12] Mr. Mitchell's submissions also show 5 nights at a hotel in Albany, New York. However, those nights were submitted to PPGNY for reimbursement as a "business trip", and PPGNY did reimburse him. (Exhibit Q; Exhibit R).

housing for its out-of-state-hire for a defined period of time, an obligation PPGNY fulfilled. In turn, Mr. Mitchell was to rent or purchase a home in New York. He did not do so. Indeed, he did not attempt to do so, and over the final seven months of his employment at PPGNY there were less than three weeks total in which he even had a place to stay overnight in New York; in 2023 there was not a single such night. Under the framework already articulated by this Court, and pursuant to the plain terms of Mr. Mitchell's employment agreement, Mr. Mitchell is liable for breach of contract.

Accordingly, Defendants respectfully submit that Defendants set forth entitlement to an order granting Defendant PPGNY's motion for summary judgment on its breach of contract counterclaim against Mr. Mitchell.

### Point V
### In the alternative, Plaintiff's Damages Are Curtailed By PPGNY's March 2023 Discovery Of His Fraud

In the alternative, to the extent that the Court does not grant Defendants' motions on the foregoing bases, it is well-settled law that a defendant employer is entitled to summary judgment that where, as here, an employee has "misrepresented information on her employment application", that the "plaintiff's claims for reinstatement and front-pay [should be] dismissed and plaintiff's claim for back-pay limited to the period between her termination and [the employer's] discovery of her misrepresentation". Greene v. Coach, Inc., 218 F.Supp.2d 404, 414 (S.D.N.Y. 2002); see McKennon v. Nashville Banner Pub'g Co., 513 U.S. 352, 362 (1995). Defendants thus, in the alternative to the foregoing relief, respectfully submit they are entitled to judgment that Plaintiff's claims for reinstatement, front pay and back pay be dismissed.

25

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants respectfully request that their Motion be granted, along with whatsoever relief the Court deems just and proper.

Dated: February 10, 2026
White Plains, New York

Respectfully Submitted,
**KAUFMAN DOLOWICH LLP**
*Attorneys for Defendants*

By: _____
Charles B. Bergin
Melissa C. Cartaya
John E. Mancebo
245 Main Street, Suite 330
White Plains, NY 10601
(914) 470-0001
cbergin@kaufmandolowich.com
mcartaya@kaufmandolowich.com
jmancebo@kaufmandolowich.com

**<u>CERTIFICATION</u>**

  I hereby certify pursuant to the Court's Individual Rules of Practice 3.C. that the enclosed brief is produced using 12-point Times New Roman type and the total number of words in the foregoing document including footnotes and exclusive of the caption, table of contents, table of authorities, and signature block, is less than 8,750 words according to the "Word Count" function of Microsoft Word, the word-processing system used to prepare the document, and thus that the document complies with the word count limit set forth in Rule 3.C.