UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAMUEL RICARLOS MITCHELL, JR.,

Plaintiff,

-against-

PLANNED PARENTHOOD OF GREATER NEW YORK, INC., WENDY STARK individually, ANDREA HAGAN individually, GILLIAN DEAN individually, KEITH CORSO individually, and ANNE DAVIS individually,

Defendants.

Case No. 1:23-cv-01932 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Defendants Planned Parenthood of Greater New York, Inc. ("Defendant" or "PPGNY"), Wendy Stark ("Defendant Stark" or "Stark"), and Andrea Hagan ("Defendant Hagan" or "Hagan," and, together with PPGNY and Stark, "Defendants") moved for summary judgment dismissing the remaining claims in the Third Amended Complaint ("TAC") of Plaintiff Samuel R. Mitchell, Jr. ("Plaintiff" or "Mitchell") for retaliation in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.* (as to all Defendants), as well as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act ("ADA") of 1990, 42 U.S.C. § 12101 *et seq.*, and 42 U.S.C. § 1981 (as to PPGNY).[1] PPGNY also moved for summary judgment on liability for its breach of contract and fraud amended counterclaims. Finally, Mitchell moved for leave to file a belated answer to

[1] On June 30, 2025, the Court dismissed with prejudice the claims against Defendants Gillian Dean, Keith Corso, and Anne Davis. *See Mitchell v. Planned Parenthood of Greater N.Y., Inc.* (*Mitchell II*), No. 23-cv-01932 (JLR), 2025 WL 1795378, at *19 (S.D.N.Y. June 30, 2025).

those counterclaims. For the following reasons, the Court GRANTS Plaintiff's motion to file an answer to PPGNY's amended counterclaims and GRANTS in part and DENIES in part Defendants' motion for summary judgment.

## BACKGROUND

### I. Factual Background

#### A. Mitchell Hired as Interim COO

PPGNY is a non-profit organization that provides, among other services, health treatment, and counseling surrounding women's and reproductive health. Dkt. 109-1 ("Pl. SUF") ¶ 1. In August 2021, Mitchell applied to be PPGNY's Interim Chief Operating Officer ("COO"). *Id.* ¶ 4. Mitchell applied for the position through a recruitment firm named HealthTechS3. *Id.* ¶ 5; Dkt. 106-6 ("Ex. D"). As part of his application, Plaintiff submitted his resume and biography, among other materials. Pl. SUF ¶ 6; Dkt. 106-5 ("Ex. C"). On August 25, 2021, Mitchell provided these materials via email to Joy Calloway ("Calloway"), PPGNY's then-Interim CEO, Pl. SUF ¶ 14; Ex. C at 2. In his email, Plaintiff stated that "[w]ithin the last 15 years, [Mitchell] ha[d] taken a private company public, . . . managed budgets and revenues in excess of $200MM, [and] led and managed teams of 1000+ [full-time employees], including CEO's, COO's, CFO's, EVP's, VP's, [and] Legal Counsels." Ex. C at 2. Mitchell's biography repeats much of the same. *See id.* at 16-19.

Mitchell's resume provides his "Executive Experience" from October 2004 to April 2021. *Id.* at 20-22. Looking at the jobs listed on Plaintiff's resume immediately prior to his employment at PPGNY, from January 2015 to May 2018, Plaintiff represented he was "Chief Executive Officer / Corporate Chief Operating Officer" for Rennova Health, Inc. ("Rennova"). *Id.* at 21. In describing his responsibilities at Rennova, Mitchell's resume provides, among other things, that he was "[a]ccountable for the parent and subsidiary company's day-to-day

operating activities of a multi-entity/multiservice line NASDAQ listed healthcare company." *Id.* Thereafter, Plaintiff was the "Chief Operating Officer" at Global Institutes on Addictions, Inc. ("GIA") from June 2018 to April 2021. *Id.* As part of his responsibilities at GIA, Mitchell was "[a]ccountable for the company's day-to-day operating and financial activities." *Id.* Two days after sending his application and materials to Calloway, Mitchell sent a follow-up email to Calloway providing much of the same information and also noting that he had "taken a private healthcare company public and managed the IPO process" and "led and managed a fully integrated healthcare IT company." *Id.* at 23.

On September 9, 2021, Mitchell sent an email to HealthTechS3 regarding the results of his background check.[2] Dkt. 110-10 ("Ex. 10"). In "provid[ing] additional information and [to] add context to the report," Mitchell stated that with respect to Rennova, he was the CEO of its subsidiary, Health Technology Solutions, and the "Corporate Chief Operating Officer" of the parent company. *Id.* at 2. Mitchell also stated that he "was affiliated with" GIA "as a consultant since 2018" and became a W-2 employee in 2019. *Id.*

Mitchell was offered the Interim COO position and, on September 27, 2021, began his employment at PPGNY. Pl. SUF ¶ 10.

### B. Mitchell's Promotion to Permanent COO

When the permanent COO opportunity presented itself shortly after Mitchell was hired as Interim COO, Mitchell applied for it through a recruiter. *See* Dkt. 110-4 ("Calloway Dep.") at 17:5-23. Calloway supported Mitchell's application. Pl. SUF ¶ 14; *see* Calloway Dep. at 18:15-18. Members of PPGNY's Board raised concerns regarding Mitchell's background and experience. Pl. SUF ¶ 15; Dkt. 110-2 ("Hagan Dep.") at 24:25-26:5; Calloway Dep. at 23:11-

---

[2] Because the Court was not provided with the results themselves, nor any other communications from HealthTechS3, it is unclear why Plaintiff was providing this information.

23; *id.* at 26:9-27:5. For example, Hagan, then-Treasurer of the Board, Pl. SUF ¶ 3, voiced concerns to Calloway and others regarding "gaps" and "overlaps" in Mitchell's work history as provided in his resume. Hagan Dep. at 32:14-15; *see id.* at 30:4-14, 31:23-34:9; Calloway Dep. at 23:24-25:21. Calloway did not agree with these concerns and trusted the information that the search firm gave her. Calloway Dep. at 25:10-12.

During his background check process, Mitchell, without first notifying Calloway, *see* Dkt. 106-13 ("Ex. K") at 2, wrote an email to Board member Leslie Lindenbaum ("Lindenbaum") stating that "[e]very other day, [he] ha[d] been insulted, disrespected, and questioned about [his] background and experience." Dkt. 110-8 ("Ex. 8") at 2. He told Lindenbaum that "the Board[']s inquisitive approach concerning [his] experience, . . . ha[d] now become harassing and an all-out witch hunt." *Id.* In communicating with Calloway, Mitchell said "this shit is ridiculous," Ex. K at 2, and called the Board's concerns "discrimination at the highest level," Pl. SUF ¶ 19; *see* Calloway Dep. at 110:17-111:2.

Ultimately, Calloway was satisfied with the information Mitchell provided, and she, along with two other individuals in her executive cabinet, made the final decision to offer Mitchell the position of permanent COO. *See* Calloway Dep. at 30:14-24; *id.* at 19:12-20:3; *see also* Dkt. 106-14 ("Ex. L"). On February 23, 2022, Mitchell signed his employment agreement. Dkt. 110-12 ("Employment Agreement" or the "Agreement") at 6.

Despite being hired as the permanent COO, questions regarding Mitchell's background and work experience continued. Calloway Dep. at 31:20-24; *id.* at 124:13-18. In response to the Board's concerns, Calloway met with Mitchell in her office, *id.* at 125:2-3, and asked him, "Is there anything in your background that I need to know? Is there anything that you did not tell me or us? Is there anything that we asked you weren't honest with?" *Id.* at 126:18-23; *see also id.* at 124:18-127:9 ("Is there anything in your background or in your resume, in your

experience, is there anything . . . I need to know before I continue to put my career on the line with this organization?"); *id.* at 125:23-126:3. Mitchell responded that there was not. *See id.* at 125:25-126:3. Based on this representation, Calloway provided a presentation to the Board regarding Mitchell's background and defended the decision to hire him. *Id.* at 30:25-31:11, 31:22-32:3; *see id.* at 74:10-16 ("I completely supported Sam. I believed what Sam told me; and because of that, I presented that to the board. I trusted my judgment in believing the search firm that they did a complete and thorough job of presenting this candidate to us; and so I hired him as a permanent.").

### C. Mitchell's Complaints to PPGNY

During Mitchell's employment at PPGNY, he made numerous complaints to Calloway, the Board, and others regarding the alleged discrimination, retaliatory behaviors, and hostile work environment that he, and others, experienced. *See* Dkt. 111-3 (February 28, 2023 email); Dkt. 110-15 (March 21, 2023 email); Dkt. 111-4 (March 28, 2023 email); *see, e.g.*, Dkt. 110-3 ("Colarossi Dep.") at 30:23-32:11 (describing how Mitchell shared he believed he was being discriminated against); *see generally* Dkt. 110-6 ("Eaton Dep.") (describing Mitchell's complaints and PPGNY's related investigations). For example, on March 28, 2022, he complained to Calloway and Lisa Williams that, during a group call, Gillian Dean ("Dean") interrupted Mitchell and talked over him, prompting him to ask her not to do that moving forward. *See* Dkt. 111-2 at 1-2. Mitchell detailed how Dean and another employee became "more combative" and demanded information that had previously been addressed. *Id.* at 2. In another instance, on September 15, 2022, Mitchell complained that Hagan "led and orchestrated one of the most embarrassing, defaming, discriminatory, insulting, disrespectful, harassing, and demoralizing campaigns" against him when he started at PPGNY. *See* Dkt. 111-1 at 1-2. He

shared that an individual at a partner company informed Mitchell that Hagan approached them to accuse Mitchell of not being a good partner. *Id.* at 2.

**D. Mitchell's Residency While at PPGNY**

While Mitchell was PPGNY's Interim COO, PPGNY provided for his housing costs, paying $5,220 per month at the Mint House in New York City. Pl. SUF ¶ 12. As a condition to his employment as permanent COO, Mitchell was required to establish residency in New York within 90 days of February 23, 2022, *i.e.*, by May 31, 2022. Employment Agreement at 2; Pl. SUF ¶ 24. Until the earlier of May 31, 2022 or when Mitchell "ha[d] rented or bought a residence in New York State," PPGNY would "continue to cover the expenses for Mint House." Employment Agreement at 2; Pl. SUF ¶ 23.

The parties agree that PPGNY paid for Mitchell's accommodation at Mint House through May 31, 2022. Pl. SUF ¶ 25. From June 1, 2022 through September 1, 2022, Mitchell extended his stay at Mint House, at his own expense. *Id.* ¶ 27. Thereafter, across the last seven months of Mitchell's employment at PPGNY, from September 2, 2022 through March 28, 2023, he spent a total of 23 nights in New York.[3] *See* Ex. 5 at 15-26. Of these, 13 nights were at Mint House, 5 nights were at a hotel in Brooklyn, and 5 nights were spent at a hotel in Albany.[4] *See id.* at 15-18 (Mint House); *id.* at 19-20 (Brooklyn hotel); *id.* at 25-26 (Albany). The parties agree that Plaintiff's nights in Albany were in connection with a business trip for which Mitchell was reimbursed by PPGNY. Pl. SUF ¶ 30; *see also* Dkt. 106-20. Therefore, Mitchell

---

[3] Exhibit Y includes a September 2, 2022 hotel charge in Chicago. Dkt. 106-27 ("Ex. Y") at 2-3. Exhibit 5 provides for a room charge at Mint House in New York for the same day. Dkt. 110-5 ("Ex. 5") at 15. The Court therefore counts September 2, 2022, as a night spent in New York because the limited Chicago hotel charge ($32.41), Ex. Y at 2, does not appear to be for a room.

[4] The Court notes that on two occasions, Mitchell also spent four nights in Newark, New Jersey. Ex. 5 at 28-33.

spent 18 nights in New York where he paid for his own accommodations. Mitchell has testified that his occasional stays at local hotels were because Mint House "already had the room booked" for another guest. Dkt. 110-1 ("Mitchell Dep. (Oct.)") at 229:7-16. Mitchell's family never lived with him at Mint House. *Id.* at 125:17-20. At least one PPGNY employee has testified that in 2023 they barely saw Mitchell in the New York office. *See* Dkt. 106-26 at 95:5-96:6.

Mitchell's stays at Mint House were governed by the Guest Accommodation Agreement. Dkt. 113-4 at 8-20 ("Guest Agreement"). There are a number of provisions in the Guest Agreement that speak to a guest's access to the building. *See, e.g.*, *id.* at 9 ("[W]e reserve the right to refuse service to any individual, including terminating an active reservation[.]"); *id.* at 12 ("You acknowledge that your reservation does not confer exclusive possession or exclusive access to the Property."); *id.* at 15 ("You agree that in connection with a termination of your reservation, we . . . may remove you and all visitors, pets and belongings from the property.") (emphasis omitted). There is also a tenancy provision, which reads:

> THIS AGREEMENT, WHETHER IN WHOLE OR PART, IS NOT A LEASE OR RESIDENTIAL TENANCY AGREEMENT, AND DOES NOT CONVEY OR OTHERWISE TRANSFER OR PROVIDE ANY PROPERTY, LEGAL, OR BENEFICIAL RIGHTS OR INTEREST IN REAL ESTATE TO YOU. YOU ARE NOT A TENANT OF, AND HAVE NOT BEEN GRANTED EXCLUSIVE POSSESSION OF, THE PROPERTY. YOU AGREE THAT THE PROPERTY IS NOT YOUR PERMANENT RESIDENCE.

*Id.*

### E. The March 2023 Complaint and Press Conference

On March 7, 2023, while PPGNY's COO, Mitchell filed his initial complaint with this Court, Dkt. 1 ("Complaint"), against PPGNY, Hagan, and Stark, PPGNY's Chief Executive Officer, Pl. SUF ¶ 2. That same day, Mitchell and his attorneys held a press conference publicizing the Complaint, during which he compared PPGNY to Harvey Weinstein, the Ku

Klux Klan, and confederate generals. *Id.* ¶ 33; Dkt. 106-23. The press conference garnered the attention of some PPGNY employees, including those over whom Mitchell still held a leadership position. Pl. SUF ¶ 34; *see also* Hagan Dep. at 47:4-23; Dkt. 110-14 ("Stark Dep.") at 8:21-25.

### F. Discovery of HealthCare Express and Mitchell's Termination

On March 9, 2023, a PPGNY employee forwarded PPGNY senior leadership an article she found referencing Mitchell's employment at an entity named HealthCare Express ("HCE") in Texarkana, Texas. Pl. SUF ¶ 35; Dkt. 106-24 ("Ex. V"). HCE, like PPGNY, is a healthcare provider. Pl. SUF ¶ 36. Plaintiff served as HCE's COO immediately prior to his employment at PPGNY, moving his entire family to Texas for the position. *Id.* ¶ 37; *see also* Dkt. 106-25 ¶¶ 18-21 (Mitchell's allegation, in his suit against HCE, that HCE hired him "on or about July 23, 2018" and that he and his family relocated on or about August 1, 2018).

Upon this discovery, Stark reviewed the news article and Mitchell's resume. *See* Stark Dep. at 89:17-24, 110:20-111:2. She confirmed that HCE was not listed on his resume or biography. *See id.* at 73:4-9; Pl. SUF ¶ 38; Ex. C at 15-22. Instead, the last employer Mitchell listed prior to joining PPGNY was GIA. Ex. C at 21; *see* Pl. SUF ¶ 39. Until March 9, 2023, PPGNY was not aware that Mitchell's prior employer was HCE, that he had ever worked for HCE, or that he had ever worked in the state of Texas. Pl. SUF ¶ 43. After investigating and consulting with PPGNY leadership and outside counsel, Stark made the decision to terminate Mitchell's employment. *Id.* ¶ 45; *see* Stark Dep. at 14:12-13. Hagan had no role in Plaintiff's termination, nor was Hagan aware of the discussions to terminate his employment. Hagan Dep. at 77:11-14; *id.* at 78:24-79:4; Mitchell Dep. (Oct.) at 150:24-151:7; Pl. SUF ¶ 46.[5] On March

---

[5] While Plaintiff denied this fact, his Rule 56.1 response did not provide any record support for his conclusory denial and therefore is deemed admitted. *See Robinson v. De Niro*, 739 F. Supp.

28, 2023, PPGNY terminated Mitchell's employment for cause "due to [his] misrepresentation of [his] employment history." Dkt. 110-17 ("Ex. 20").

### G. Information Regarding Mitchell's Resume

#### *1. HCE*

Mitchell admits that he omitted HCE from his resume. Dkt. 113-1 ("Def. Reply SUF") ¶ 59; Mitchell Dep. (Oct.) at 52:8-13, 118:19-23. The reason for the omission, Mitchell claims, is because he had a confidential settlement agreement with HCE,[6] which he understood "required strict confidentiality for which he could be liable if he violated it by mentioning the company." Def. Reply SUF ¶ 59; Dkt. 113-5 ("Mitchell Dep. (Nov.)") at 57:17-20 ("I have

---

3d 33, 70 n.6 (S.D.N.Y. 2023) ("Where the opposing party does not specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party 'will be deemed to be admitted.'" (quoting Local Civ. R. 56.1(c))).

[6] On February 24, 2026, Plaintiff requested to file his settlement agreement with HCE under seal, Dkt. 108, which the Court granted on July 22, 2026, Dkt. 119. It was thereafter filed on July 23, 2026. Dkt. 120-6 ("HCE Agreement"). Although the common law right of public access to judicial documents is "firmly rooted in our nation's history," this right is not absolute and courts "must balance competing considerations" against the presumption of access. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006) (quotation marks and citation omitted); *see Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978) ("[T]he decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case.). Under *Lugosch*, courts must consider three factors in evaluating the common law right of access — first, whether the information to be sealed is a "judicial document" to which the presumption of public access applies, *Lugosch*, 435 F.3d at 119; second, the "weight of that presumption," *id.*; and third, "balance competing considerations against," that access *id.* at 120 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995)). Here, the Court finds the factors weigh in favor of unsealing the portions of the HCE Agreement quoted in this Opinion. The HCE Agreement is a judicial document to which the presumption of public access applies because it was filed in connection with the Court's review and resolution of the parties' claims. *See Lugosch*, 435 F.3d at 119. Because the Court relies on this agreement in this Opinion, the second factor also weighs in favor of unsealing. Finally, while the Court recognizes Plaintiff's interest in resisting disclosure given the nature of a settlement agreement, Plaintiff put the terms of the Agreement at issue in in this case as the reason for his failure to disclose HCE as an employer. Therefore, the Court unseals the portions of the HCE Agreement that are quoted in this Opinion and leaves the remainder of the Agreement under seal.

never disclosed this employer [HCE] because of the confidentiality clause or provision that is within this agreement."); *see also* Mitchell Dep. (Oct.) at 247:14-248:5. The confidentiality provision, in relevant part, provides:

> Except as provided in Paragraph 5 [charges and complaints with government agencies or certain disclosures of trade secrets], *[Mitchell] agrees that this Agreement, as well as the nature and terms of this settlement and the subject matter thereof, will be forever treated as confidential and that [Mitchell] shall make no disclosure or reference to the terms of this Agreement* to any person or entity, except to [Mitchell]'s attorneys, [Mitchell]'s spouse or partner and, as necessary, tax preparers, provided that each such person agrees to be bound by the confidential nature of this Agreement. . . . [Mitchell] acknowledges and agrees that [Mitchell]'s promises to *maintain the confidentiality of the Agreement* is an important element of the consideration for and inducement of [HCE] to enter into this Agreement. [Mitchell] further agrees that [Mitchell]'s breach of this Agreement's confidentiality clause constitutes irreparable harm to [HCE]. . . . *Nothing in this Agreement shall preclude [Mitchell] from stating, in response to any inquiry that "this dispute has been resolved,"* but it is expressly agreed that [Mitchell] shall make no further comment.

HCE Agreement at 6 (emphasis added).

In addition to the confidentiality clause, Mitchell claims that "portions of th[e] non-disparagement clause" also led him to believe that he could not disclose the existence of HCE as a former employer. Mitchell Dep. (Nov.) at 52:4-8. The non-disparagement provision provides, in relevant part:

> *[Mitchell] shall not make any statements or take any actions that disparage, hold out to public embarrassment, or ridicule [HCE]*, its services, products, management, employees, image, tradecraft, practices, office environment, culture, or otherwise harm its reputation. . . . *[HCE] agree[s] to provide a neutral reference to any prospective employer of [Mitchell] which will include only [Mitchell]'s date of hire and date of separation. [Mitchell] should refer all prospective employers to the Director of Human Resources at HealthCare Express who will provide this information.*

HCE Agreement at 7 (emphasis added).

Rather than include a gap in his resume for his time at HCE, Mitchell misattributed this time to being employed at GIA. Mitchell admits that while his resume provides that he was

COO of GIA for almost three years, from June 2018 to April 2021, Ex. C at 21, he actually held the position for approximately eight months, Mitchell Dep. (Oct.) at 78:13-16. Interestingly, Mitchell was not listed as COO on any of GIA's SEC filings. *See id.* at 74:22-76:8. Most of Plaintiff's time with GIA was spent as either an unpaid or part-time consultant. Dkt. 106-3 at 68:2-69:4 (agreeing that it is "more accurate" that Mitchell was the COO at HCE from July 2018 until March 2019, during which he provided unpaid services to GIA until December 2019, when he became a paid consultant; he then became a full-time employee in March 2020).

*2. Other Inaccuracies in Mitchell's Resume*

There appear to be additional inaccuracies in Mitchell's resume that are not directly at issue in the present motion. The Court will touch on them here for context given that the parties have referenced the companies in their papers. For example, Mitchell admits that his characterization on his resume of his positions at Rennova from January 2015 to May 2018 was false. Def. Reply SUF ¶ 58. Mitchell's resume provided he was the "Chief Executive Officer / Corporate Chief Operating Officer" of Rennova for almost three years, overseeing a $200M budget for a NASDAQ-listed corporation. Pl. SUF ¶ 16. Mitchell also represented that he took Rennova public. Mitchell Dep. (Oct.) at 50:23-51:3; Ex. C at 20-21.

Despite this resume entry, Mitchell admits that he was not the CEO of Rennova. Mitchell Dep. (Oct.) at 90:11-13. Instead, he worked as a "corporate Chief Operating Officer" for Rennova, *id.*; worked for Rennova's IT subsidiary, Health Technology Solutions; and was fired about a week after Rennova was listed on the NASDAQ. Pl. SUF ¶ 16; *see also* Mitchell Dep. (Oct.) at 20:18-21:12; *id.* at 83:17-84:3. Rennova's November 12, 2015 8K provides that Mitchell's last day as COO of Health Technology Solutions was January 11, 2016. Dkt. 106-28 at 3. Mitchell contends that he worked with a recruiter who advised him against listing every subsidiary and affiliate of Rennova and, as a result, he consolidated all the relevant experiences

under the parent company, Rennova, Def. Reply SUF ¶ 58, to supply "the whole, entire scope of the work [he] provided while being employed either as corporate Chief Operating Officer or as a consultant or as a CEO for one of the subsidiaries." Mitchell Dep. (Oct.) at 85:24-86:4. During the time Mitchell claimed to be Rennova's CEO/COO, he was working for three other companies, two he claims were Rennova "subsidiaries," and a third he claims Rennova considered acquiring but did not. Pl. SUF ¶ 16. None of these companies appear on his resume. *Id.*; *see* Mitchell Dep. (Oct.) at 88:5-90:5.

In addition, there appear to be a myriad of other inaccuracies in the resume he provided to PPGNY when compared to the resume Mitchell provided to HCE, Mitchell Dep. (Oct.) at 105:24-106:6, and employment documentation from other employers, *id.* at 103:6-11. *See id.* at 100:25-102:3 (resume providing he was COO for a company but an SEC filing states that he was not); *id.* at 103:8-105:6 (resume providing he worked with a company for almost four years when he admitted that he only worked there for about one year); *id.* at 106:14-107:10 (resume providing he worked at one company when he admits that he worked for a different company); *id.* at 108:5-15 (same); *id.* at 109:15-110:15 (resume omitting employment at Nova Southeastern University).

## II. Procedural History

On March 7, 2023, prior to the termination of his employment, Mitchell sued PPGNY and some of its officers for employment discrimination under federal and state law. *See generally* Complaint. Plaintiff amended his complaint three times, *see* Dkt. 14 ("First Amended Complaint"); Dkt. 34 ("Second Amended Complaint"); Dkt. 49 ("Third Amended Complaint"), and the Court granted in part motions to dismiss the Second and Third Amended Complaints, *see Mitchell v. Planned Parenthood of Greater N.Y., Inc.* (*Mitchell I*), 745 F. Supp. 3d 68 (S.D.N.Y. 2024); *Mitchell II*, 2025 WL 1795378.

After *Mitchell II*, PPGNY filed its answer, asserting counterclaims against Plaintiff for breach of contract and fraud. *See* Dkt. 64 ("Answer and Counterclaims"). Plaintiff then filed a motion to dismiss, Dkt. 65, after which PPGNY amended its Answer and Counterclaims, Dkt. 69 ("Amended Counterclaims"), and Plaintiff refiled his motion to dismiss the Amended Counterclaims, Dkt. 83. On January 2, 2026, the Court granted in part Plaintiff's motion to dismiss but held that PPGNY stated plausible counterclaims for breach of contract and fraud. *Mitchell v. Planned Parenthood of Greater N.Y., Inc. (Mitchell III)*, No. 23-cv-01932 (JLR), 2026 WL 18897 (S.D.N.Y. Jan. 2, 2026). Plaintiff did not file an answer to the Amended Counterclaims by the required deadline of February 16, 2026.

On February 10, 2026, Defendants moved for summary judgment. *See* Dkt. 106; Dkt. 107 ("Br."). On February 24, 2026, Plaintiff filed his opposition brief. *See* Dkt. 109 ("Opp."); Dkt. 110; Dkt. 111. Defendants replied on March 3, 2026. *See* Dkt. 113 ("Reply"). The motion is fully briefed.

On March 5, 2026, Plaintiff filed a motion for leave to file an answer to the Amended Counterclaims, Dkt. 114; Dkt. 115 ("Answer Br."), as well as his answer, Dkt. 116. On March 19, 2026, Defendants opposed the motion, Dkt. 117 ("Answer Opp."). On March 26, 2026, Plaintiff replied, Dkt. 118 ("Answer Reply"); Dkt. 118-1 ("Brown Decl."). That motion is also fully briefed.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the moving party's burden to demonstrate the absence of any genuine factual dispute, and the Court "constru[es] the evidence in the light most favorable to the nonmoving party . . . [,] drawing all reasonable inferences and resolving all ambiguities in its favor." *Jaffer*

*v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (alterations adopted) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 22 (2d Cir. 2017)). To defeat such a motion, the non-movant must provide "evidence . . . such that a reasonable jury could return a verdict" in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002).

## DISCUSSION

For the following reasons, Defendants are entitled to summary judgment as to Plaintiff's retaliation claims under Title VII, the ADA, Section 1981, the NYSHRL, and the NYCHRL. The Court also grants Plaintiff's motion to file an answer to PPGNY's amended counterclaims and denies PPGNY's motion for summary judgment as to its counterclaims for breach of contract and fraud.

### I. Plaintiff's Title VII and ADA Retaliation Claims

The anti-retaliation provisions of Title VII and the ADA are "substantially similar," *Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 170 (2d Cir. 2024), and retaliation claims under both statutes are analyzed using "the well-known *McDonnell Douglas* burden-shifting framework," *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (Title VII); *accord Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023) (ADA). To prevail on a retaliation claim under either statute, the plaintiff must first prove "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of New York*, 795 F.3d 297, 316 (2d Cir. 2015) (citation omitted).

Once the plaintiff establishes this *prima facie* case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the employer

provides such a reason, the burden then shifts back to the plaintiff to demonstrate that "'the proffered legitimate reason [is] merely a pretext' for discrimination." *Ferraro v. Kellwood Co.*, 440 F.3d 96, 100 (2d Cir. 2006) (quoting *Richardson v. N.Y. State Dep't of Corr. Servs.*, 180 F.3d 426, 443 (2d Cir. 1999)). The Court begins with Plaintiff's *prima facie* showing.

### A. Mitchell's *Prima Facie* Case

#### *1. Protected Activity*

The first element of a retaliation claim is participation in a protected activity. *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 239 (2d Cir. 2024). Title VII and the ADA prohibit employers from "retaliat[ing] on account of an employee's having opposed, complained of, or sought remedies for, unlawful workplace discrimination." *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 842 (2d Cir. 2022) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013)). "A plaintiff seeking to demonstrate that he engaged in protected activity need not show that the behavior he opposed in fact violated Title VII or the ADA, but rather that his protected activity was motivated by a good faith, reasonable belief that the underlying employment practice was unlawful." *Mitchell I*, 745 F. Supp. 3d at 97 (internal quotation marks and citation omitted).

Defendants concede, and the Court agrees, that Mitchell's filing of the Complaint is a protected activity under Title VII and the ADA. Br. at 10. Plaintiff's Complaint "was motivated by a good faith, reasonable belief that the underlying employment practice[s] w[ere] unlawful" under Title VII and the ADA. *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (quotation marks and citation omitted). In the Complaint, Plaintiff asserted, among other things, that his coworkers' insensitive comments and conduct created a hostile work environment, and that PPGNY refused to take remedial disciplinary action despite Plaintiff making multiple formal complaints. *See* Complaint ¶¶ 44-45, 48-49, 58-61, 65-66, 70-

71, 93-98, 110, 112-14. In doing so, Plaintiff had a good-faith, reasonable belief that he was "challeng[ing] employment practices that, if proven, were unlawful under Title VII and the [ADA]." *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006); *see Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 149 (2d Cir. 2014) ("[Under Title VII, [e]mployers are under an independent duty to investigate and curb racial harassment by lower level employees of which they are aware."); *Phillips v. Fashion Inst. of Tech.*, No. 23-375, 2024 WL 1005500, at *3 (2d Cir. Mar. 8, 2024) (summary order) (finding that plaintiff's official complaint was "protected activity because she had a good faith, reasonable belief that the racially insensitive comments about which she complained amounted to an unlawful employment practice, namely, a discriminatory hostile work environment" (quotation marks and citation omitted)); *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 212 (2d Cir. 2010) (summary order) (finding, where plaintiff complained about two isolated incidents of race-based comments that occurred more than seven months apart, that even if this conduct was not severe or pervasive enough to constitute a violation of Title VII, it was enough to support a plausible retaliation claim). Thus, Plaintiff satisfies the first element of his *prima facie* case.

*2. Defendants' Knowledge of the Protected Activity*

The second element of a retaliation claim is that the employer knew about the protected activity. *Moll*, 94 F.4th at 239. Defendants do not contest that this element is met because they were aware that Plaintiff filed the Complaint, *see, e.g.*, Hagan Dep. at 47:4-23; Stark Dep. at 8:21-25. Plaintiff therefore satisfies the second element of his *prima facie* case.

*3. Materially Adverse Action*

The third element of a retaliation claim is the occurrence of a materially adverse action. *Moll*, 94 F.4th at 239. "An action qualifies as materially adverse if it is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of

discrimination." *Id.* (alteration adopted) (internal quotation marks and emphasis omitted). "[T]he significance of any given act of retaliation will often depend upon the particular circumstances." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 175 (2011) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006)).

Defendants concede, and this Court agrees, that the termination of Mitchell's employment is a materially adverse action. *See* Br. at 10; *Taylor v. Seamen's Soc. for Child.*, No. 12-cv-03713 (PAE), 2013 WL 6633166, at *12 (S.D.N.Y. Dec. 17, 2013) ("Termination of employment is the quintessential materially adverse employment action under Title VII."); *Bonnen v. Coney Island Hosp.*, No. 16-cv-04258 (AMD) (CLP), 2017 WL 4325703, at *11 (E.D.N.Y. Sept. 6, 2017), *report and recommendation adopted*, 2017 WL 4296733 (E.D.N.Y. Sept. 26, 2017) ("[T]ermination constitutes an adverse employment action within the meaning of the ADA."). Thus, Plaintiff satisfies the third element of his *prima facie* case.

*4. Causal Connection*

With respect to causation, "'Title VII retaliation claims must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (quoting *Nassar*, 570 U.S. at 360). The ADA also "requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action." *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019). But-for causation "does not require proof that retaliation was the only cause of the employer's action." *Kwan*, 737 F.3d at 846. Rather, a plaintiff need only establish that "the adverse action would not have occurred in the absence of the retaliatory motive." *Id.*; *Nassar*, 570 U.S. at 360.

"A causal connection may be established 'either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 166 (S.D.N.Y. 2020) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)), *aff'd*, No. 20-3624-cv (L), 2021 WL 5986999 (2d Cir. Dec. 17, 2021) (summary order); *see also Duplan*, 888 F.3d at 625-26 ("Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity[,]" including "that protected activity is followed by discriminatory treatment" (quoting *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980))); *Curcio v. Roosevelt Union Free Sch. Dist.*, No. 10-cv-05612 (SJF) (AKT), 2012 WL 3646935, at *14 (E.D.N.Y. Aug. 22, 2012) (explaining that "'pattern of antagonism' over the intervening period" "may . . . demonstrate the causal connection" (quoting *Chan v. NYU Downtown Hosp.*, No. 03-cv-03003 (CBN) (KNF), 2004 WL 213024, at *3 (S.D.N.Y. Feb. 3, 2004))). "While temporal proximity is enough to satisfy a plaintiff's minimal burden at the prima facie [pleading] stage, '[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage.'" *Rumsey v. Ne. Health, Inc.*, 89 F. Supp. 3d 316, 338 (N.D.N.Y. 2015) (second alteration in original) (quoting *Kwan*, 737 F.3d at 847), *aff'd*, 634 F. App'x 318 (2d Cir. 2016) (summary order), *as corrected* (Jan. 29, 2016). In addition, "where temporal proximity might otherwise suffice to raise the inference" of causation, "[a]n intervening event between the protected activity and the adverse employment action may defeat the inference." *Joseph v. Marco Polo Network, Inc.*, No. 09-cv-01597 (DLC), 2010 WL 4513298, at *18 (S.D.N.Y. Nov. 10, 2010) (collecting cases); *see also Ziparo v. CSX Transp., Inc.*, 160 F.4th 314, 336 (2d Cir. 2025) (providing that "courts should also consider not only the 'passage of a

significant amount of time,' but also whether 'some legitimate intervening event' severs the causal connection" (quoting *Feldman v. L. Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014))).

Defendants argue that Mitchell fails to provide any evidence of causation beyond the temporal proximity of filing his Complaint on March 7, 2023, and his termination on March 28, 2023. Br. at 10. They further argue that PPGNY's discovery of Mitchell's "dishonesty and fraud during the hiring process" — namely, the omission of HCE as a prior employer — was a legitimate intervening event that severs any inference of a causal connection. *Id.* at 11.

Mitchell argues that both retaliatory animus and temporal proximity are present and support a finding of causation. Opp. at 7-9. First, Mitchell argues that "the discovery and circulation" of the news article regarding his discrimination lawsuit against HCE "was no accident," as it was an "attempt to dig for dirt against" him following the filing of his Complaint. Opp. at 7. Mitchell contends that this effort "occurred against the backdrop of Defendant Hagan's continuous mining for any disparaging information about [him] since his hiring was first announced at PPGNY." *Id.* Second, Mitchell responds that "[g]iven the close temporal proximity . . . it is apparent that Defendants immediately engaged in a retaliatory investigation" of him, which resulted in finding the article. *Id.*

Plaintiff's assertions of retaliatory animus do not create a genuine issue of material fact with respect to causation. Mitchell's sole argument is that the discovery of the article occurred against "the backdrop" of Hagan's alleged mining for disparaging information. *Id.* But Mitchell has not provided any evidence linking Hagan's concerns (from 2021 and 2022) regarding his employment history, *see* Hagan Dep. at 30:4-14, 31:23-34:9, to the March 2023 search for, and discovery of, the article referencing his employment at HCE. Indeed, a *different* employee found the article and sent it to PPGNY leadership. Pl. SUF ¶ 35; Ex. V at 2. Thus,

Mitchell has not identified any record evidence from which a jury could find retaliatory animus sufficient to defeat summary judgment. *See Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) ("[P]laintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive.").

Most importantly, the record reflects that a legitimate intervening event occurred between the filing of the Complaint and his termination, sufficiently severing the causal connection. In the three-week period between the filing of the Complaint and Mitchell's termination, *see* Pl. SUF ¶ 32; Ex. 20, PPGNY discovered the article concerning Mitchell's prior employment with HCE, Pl. SUF ¶ 35; Ex. V, which showed Mitchell had misrepresented his employment history to PPGNY by omitting HCE from his resume when applying to be interim COO at PPGNY, Pl. SUF ¶ 38, and not otherwise disclosing it when asked by the then-Interim CEO about his background, *see* Calloway Dep. at 124:18-125:5, 125:23-126:3, 126:18-127:9. This intervening event breaks the causal connection inference between Plaintiff's Complaint and his termination three weeks later. *See Joseph*, 2010 WL 4513298, at *18 (finding intervening security breach sufficient to break inference of causation where ten days between complaint and termination); *Rumsey*, 89 F. Supp. 3d at 336 (finding intervening inappropriate workplace conduct broke causal connection in case relying solely on temporal proximity where two months between investigation interview and termination). Thus, no reasonable jury could find that Plaintiff has established a *prima facie* case of unlawful retaliation under Title VII and the ADA.

**B. PPGNY's Legitimate, Non-Retaliatory Reason for Termination**

Even assuming that a reasonable jury could find that Mitchell had established a *prima facie* case of retaliation, PPGNY has shown a legitimate, non-retaliatory reason for Mitchell's

termination sufficient to defeat this claim as a matter of law. *See McDonnell Douglas*, 411 U.S. at 802; *see also Rumsey*, 89 F. Supp. 3d at 337. PPGNY has provided evidence that, following the discovery of the March 2023 article, it learned that Mitchell misrepresented his employment history, *see* Stark Dep. at 89:17-24; Ex. 20, by omitting HCE from his resume and biography. Stark Dep. at 73:4-9; Pl. SUF ¶ 38; Ex. C at 15-22; Def. Reply SUF ¶ 59; Mitchell Dep. (Oct.) at 52:8-13, 118:19-23. Mitchell also did not simply omit the time period for which he was working at HCE from his materials; he falsely claimed that he was working as the COO of GIA during that time. Ex. C at 21; *see* Pl. SUF ¶ 39. Further, Mitchell lied to Calloway when she asked him directly about his background; specifically, Calloway asked whether there was anything in his background that PPGNY did not know about, that Mitchell did not disclose, or that Mitchell was not fully honest about. Calloway Dep. at 126:18-127:9; *see also id.* at 124:18-125:5, 125:23-126:3. Despite his omission of HCE from his resume and misrepresentations regarding GIA, Mitchell responded that there wasn't anything else. *See* Calloway Dep. at 125:2-3, 125:23-126:3. The misrepresentations on Mitchell's resume and false statements to Calloway are legitimate, non-retaliatory reasons for his termination. *See Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 169 (2d Cir. 2001) ("[I]t is common sense and entirely lawful for an employer to select for termination an employee who the employer in good faith believes . . . engaged in fraud relating to the employment."); *Gurry v. Merck & Co.*, No. 01-cv-05659 (RLC), 2003 WL 1878414, at *7 & n.9 (S.D.N.Y. Apr. 14, 2003) (finding "misrepresentation on [plaintiff's] employment application" is a legitimate, non-retaliatory reason to fire her, and plaintiff's "subjective belief that she did not misrepresent her employment history is insufficient to rebut" that reason); *Ghirardelli v. McAvey Sales & Serv., Inc.*, 287 F. Supp. 2d 379, 389 (S.D.N.Y. 2003) (finding, among other reasons, employee's "admi[ssion] to exaggerating her qualifications" was a legitimate business reason for

termination), *aff'd*, 98 F. App'x 909 (2d Cir. 2004) (summary order); *Robinson v. NYC Health Dep't*, No. 00-cv-08969 (NRB), 2001 WL 863418, at *6 (S.D.N.Y. July 30, 2001) (finding that legitimate, non-retaliatory reason for termination was established where employee misrepresented employment history by omitting prior employers); *Paulsen v. CSC Holdings, LLC*, No. 15-cv-07054 (DRH), 2016 WL 951535, at *11 (E.D.N.Y. Mar. 8, 2016) ("An employer may rightfully rely on [employment application] . . . and terminate an employee who lies on an employment application no matter the nature of the untruth."). Given this, "the burden returns to [P]laintiff." *Rumsey*, 89 F. Supp. 3d at 337 (where legitimate, non-retaliatory reasons for termination are presented, the burden returns to plaintiff).

### C. Pretext and "But-For" Causation

"Under the *McDonnell Douglas* framework, after the defendant has articulated a non-retaliatory reason for the employment action, the presumption of retaliation arising from the establishment of the prima facie case drops from the picture. The plaintiff must then come forward with [evidence that the proffered] non-retaliatory reason is a mere pretext for retaliation." *Kwan*, 737 F.3d at 845 (citation omitted); *Ferraro*, 440 F.3d at 100. Importantly, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Kwan*, 737 F.3d at 847.

Mitchell has not identified evidence sufficient for a jury to find that PPGNY's reason for terminating him was a pretext for retaliation. Mitchell argues that, because of the temporal proximity of his termination to the filing of his Complaint, there is a triable question of fact as to whether "any of the routine omissions from and organization of, [his] resume would have caused PPGNY to terminate [him] had they been known under non-retaliatory circumstances." Opp. at 8. Mitchell also contests PPGNY's termination of his employment based on alleged misrepresentations in his work history concerning GIA and Rennova because he provided

personal references from GIA and Rennova, Ex. C at 7, and these "glowing references . . . do not support Defendants' contentions." Opp. at 8. Finally, Mitchell states that he "provided uncontested testimony and documentary evidence regarding the specific roles and timelines of each position and duties performed at GIA and Rennova." *Id.*

But Mitchell's understanding of PPGNY's reason for his termination is incorrect: PPGNY has pointed to record evidence that it terminated Mitchell because he omitted *HCE* from his resume and application materials, which it discovered upon finding the March 9, 2023 article. *See* Stark Dep. at 73:4-9; Pl. SUF ¶ 38; Ex. C at 15-22; *see also* Reply at 3 n.2. Therefore, Mitchell's citation to the record evidence of a list of references from Rennova and GIA (which is a list of references as opposed to "glowing" reviews), Ex. C at 7, are inconsequential. Mitchell has not pointed to any evidence to refute PPGNY's non-retaliatory basis for his termination because he misrepresented his prior employment concerning HCE. Mitchell's continued insistence on temporal proximity is further insufficient to defeat summary judgment at the pretext stage as a matter of law. *Kwan*, 737 F.3d at 847. Mitchell therefore does not meet his burden to show that there is a genuine issue of material fact as to whether PPGNY's reason for his termination was a pretext for retaliation.

* * *

Based on the foregoing, Defendants' motion for summary judgment as to Plaintiff's Title VII and ADA retaliation claims is granted.

## II. Plaintiff's Section 1981 Retaliation Claim

Defendants also move for summary judgment on Mitchell's Section 1981 claim for retaliation. Br. at 1, 9-17. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "[T]he term 'make and enforce contracts' includes the

making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). Section 1981 therefore protects employment contracts. *See Patterson v. County of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004) ("[Section 1981] thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment[.]").

Because retaliation claims under Section 1981 are "subject to the same standards" as retaliation claims under Title VII, *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 275 (2d Cir. 2023), Defendants are entitled to summary judgment as to Plaintiff's Section 1981 retaliation claim for the reasons set forth above. *See* Section I, *supra*.

## III. Plaintiff's New York State and City Human Rights Law Claims

Defendants next move for summary judgment as to Mitchell's NYSHRL and NYCHRL retaliation claims. Br. at 1, 9-19. "Retaliation claims under the NYCHRL and NYSHRL are assessed under a 'similar but slightly broader standard'" than federal retaliation claims. *Ronen v. RedRoute, Inc.*, 763 F. Supp. 3d 319, 333 (E.D.N.Y. 2025) (quoting *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024)). "[A] plaintiff claiming retaliation must demonstrate 'that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action.'" *Qorrolli*, 124 F.4th at 122 (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013)); *see also id.* at 122-23 (explaining that this standard applies to both NYSHRL and NYCHRL claims). As to causation, "[u]nder the NYCHRL and NYSHRL[,] a plaintiff need only show that [their] protected 'activity was a motivating factor behind the defendant's retaliatory action.'" *Reach v. Healthfirst, Inc.*, No. 23-cv-08085 (JPO), 2024 WL 4493769, at *8 (S.D.N.Y. Oct. 15, 2024) (quoting *Philip v. Gtech*

*Corp.*, No. 14-cv-09261 (PAE), 2016 WL 3959729, at *11 (S.D.N.Y. July 20, 2016)). *See also Ronen*, 763 F. Supp. 3d at 333 ("'[T]he NYCHRL only requires that the protected activity be a "motivating factor" in the adverse action, and not its "but-for" cause, as would be required under federal law.'" (quoting *Lee v. Riverbay Corp.*, 751 F. Supp. 3d 259, 284 (S.D.N.Y. 2024))). "[A] defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives." *Mihalik*, 715 F.3d at 113. Claims under the NYSHRL and the NYCHRL "are analyzed using the *McDonnell Douglas* burden-shifting framework." *Delgado v. Donald J. Trump for President, Inc.*, No. 19-cv-11764 (AT), 2025 WL 2636259, at *6, *9 (S.D.N.Y. Sept. 11, 2025).

The only argument Mitchell makes as to his NYSHRL and NYCHRL claims is a conclusory statement that he has "established that he was retaliated against" "as the mixed motive standard illustrates that one of the factors motivating Defendants' decision to terminate him was clearly his protected activity of filing the public lawsuit against them." Opp. at 9. Conclusory statements aside, Mitchell again does not point to any record evidence that supports a finding of any discriminatory or retaliatory motive by Defendants. Plaintiff's reliance on the temporal proximity between the filing of his complaint and the termination of his employment is again not enough at the summary judgment stage. *See Forrester v. Corizon Health, Inc.*, 752 F. App'x 64, 66 (2d Cir. 2018) (summary order) (holding "evidence of temporal proximity alone is not enough to demonstrate retaliation under the NYCHRL" and affirming lower court dismissal of retaliation claim on summary judgment); *Smith v. Revival Home Health Care, Inc.*, No. 97-cv-04415 (RJD), 2000 WL 335747, at *7 (E.D.N.Y. Mar. 28, 2000) (granting summary judgment on Title VII, NYSHRL, and NYCHRL retaliation claims in part because "mere temporal proximity cannot support a claim of retaliation"). Although retaliation claims under the NYCHRL and NYSHRL are assessed under a slightly broader standard than federal

retaliation claims, Mitchell has failed "to prove the conduct is caused at least in part by discriminatory or retaliatory motives." *Mihalik*, 715 F.3d at 113; *see* Sections I.A.4 and I.C, *supra*. Therefore, Defendants' motion for summary judgment on Plaintiff's NYSHRL and NYCHRL claims against Defendants is granted.[7]

## IV. PPGNY's Counterclaims

The Court now turns to PPGNY's counterclaims. As a threshold issue, the Court must first address Mitchell's motion to file a late answer to PPGNY's Amended Counterclaims.

---

[7] Mitchell's claims against Hagan fail for the additional reason that no reasonable jury could find that the standard for individual liability against her has been met. "Under the NYSHRL, individual liability may be imposed if (1) a defendant has an ownership interest in the employer or, alternatively, has the authority to hire or terminate its employees; or (2) if a defendant aided and abetted the unlawful discriminatory acts of others." *Mitura v. Finco Servs., Inc.*, 712 F. Supp. 3d 442, 460-61 (S.D.N.Y. 2024) (quotation marks and citation omitted). "An individual, however, must actually participate in the conduct giving rise to a discrimination claim." *Id.* (alteration adopted) (quotation marks and citation omitted). Individual liability under the NYCHRL similarly requires that the individual is a "supervisor[] who actually participated in the conduct giving rise to the [plaintiff's claim]." *Espinoza v. CGJC Holdings LLC*, No. 23-cv-09133 (DLC), 2024 WL 3520662, at *5 n.5 (S.D.N.Y. July 23, 2024); *see also Mitura*, 712 F. Supp. at 461.

Mitchell has not provided any evidence linking Hagan's actions with his termination. Rather, the record, including Mitchell's own admission, reflects that Hagan had no ability to terminate him. *See* Mitchell Dep. (Oct.) at 150:24-151:7 (testifying that Stark is "the only person to whom he reported and who had the authority to terminate his employment"). Mitchell has not provided, nor has the Court located, any record evidence demonstrating that Hagan had any role in Mitchell's termination, nor that she was aware of the discussions to terminate his employment. *See* Hagan Dep. at 77:11-14 (testifying that when Stark notified the Board of Mitchell's termination, it was the first she learned of it); *id.* at 78:24-79:4 (testifying that she did not know who made the decision to terminate Mitchell). Mitchell's citations to the Colarossi and Eaton depositions, *see* Opp. at 21, do not raise a genuine issue of material fact because the cited testimony does not pertain to Mitchell's termination. *See* Colarossi Dep. at 21:22-24:13 (testifying as to conversations regarding Mitchell *prior* to his start as interim COO); Eaton Dep. at 169:21-173:23 (testifying that Hagan instructed another employee to "say negative things" about Mitchell in January or February of 2023, not in March).

### A. Mitchell's Motion to File Answer to Amended Counterclaims

By way of background, on January 2, 2026, the Court granted in part Plaintiff's motion to dismiss PPGNY's Amended Counterclaims. *See generally Mitchell III*, 2026 WL 18897. PPGNY was granted leave to amend within thirty days (by February 2, 2026), *id.* at *11, but it declined to do so. Therefore, Mitchell's answer to the Amended Counterclaims was due fourteen days after that deadline, or by February 16, 2026. Fed. R. Civ. P. 12(a)(4)(A) (providing that if a court denies a motion, "responsive pleading must be served within 14 days after notice of the court's action"). Mitchell did not timely file his answer and, instead, filed his opposition brief to Defendants' motion for summary judgment on February 24, 2026. *See* Opp. In Defendants' Reply brief filed on March 3, 2026, they pointed out that Mitchell had failed to answer and requested that all factual allegations be deemed admitted as a matter of law. Reply at 6; *see* Fed. R. Civ. P. 8(b)(6) ("An allegation — other than one relating to the amount of damages — is admitted if a responsive pleading is required and the allegation is not denied."). In response, on March 5, 2026, Mitchell filed a motion for leave to file an answer, Dkt. 114; Answer Br., as well as his answer, Dkt. 116, and the parties briefed that motion. Answer Opp., Answer Reply; Brown Decl.

Under Federal Rule of Civil Procedure ("Rule") 6(b)(1)(B), courts may extend a deadline for good cause, "on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). "The burden of proving excusable neglect lies with the late-claimant." *In re Enron Corp.*, 419 F.3d 115, 121 (2d Cir. 2005) (quoting *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir. 2000)). In deciding whether a movant has carried this burden, courts consider: "(1) the danger of prejudice to the non-movant, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the

movant acted in good faith." *Alexander v. Saul*, 5 F.4th 139, 142 (2d Cir. 2021) (citation modified) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). The reason for the delay is the "most important" factor. *Id.* at 149. "[I]gnorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect." *Pioneer*, 507 U.S. at 392.

With respect to the first and second factors, there has been no undue delay, as Plaintiff filed his answer only about two weeks late, albeit after Defendants' motion for summary judgment had been filed. But Defendants were well aware of the defenses and objections that Plaintiff had to the counterclaims through the prior motion to dismiss and summary judgment briefing. Indeed, even though the answer was filed in the context of summary judgment briefing, "a district court may . . . entertain [unpleaded] affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." *Rose v. AmSouth Bank of Fla.*, 391 F.3d 63, 65 (2d Cir. 2004) (omission and alteration in original) (quoting *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003)). Thus, the prejudice to Defendants and the impact on the judicial proceedings are not significant. Looking to the third factor, Plaintiff's proffered reason for his delay is "inadvertence" "due to a calendaring error." Brown Decl. ¶ 3; *see also* Answer Br. at 1; Answer Reply at 1. Proper calendaring of deadlines is well within Plaintiff's reasonable control and therefore supports denial of the motion. As to the fourth factor, Defendants do not argue, and the Court does not find, that Plaintiff acted in bad faith when he inadvertently failed to file his answer, and therefore this factor weighs in favor of permitting the belated answer. Finally, courts also prefer to decide cases on the merits rather than in a default context. *See New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005) (noting that

the Second Circuit has "expressed a strong 'preference for resolving disputes on the merits'" (quoting *Powerserve Int'l, Inc. v. Lavi*, 239 F.3d 508, 514 (2d Cir. 2001))).

In sum, after balancing all of the *Pioneer* factors, although Plaintiff has not provided a particularly compelling reason for his failure to file his answer in a timely fashion, the Court will nonetheless grant Mitchell leave to file his untimely answer.[8] The Court will accept Plaintiff's answer filed at Dkt. 116 and will not consider all of the counterclaim allegations to be admitted, as requested by Defendants.

**B. PPGNY's Breach of Contract Counterclaim**

Moving next to the merits of PPGNY's counterclaims, PPGNY moves for summary judgment on its counterclaim that Mitchell breached his employment contract with PPGNY by failing to establish residency in New York. Br. at 1, 23-25. To prevail, PPGNY must demonstrate that there is no genuine issue of material fact as to "(1) the existence of an agreement, (2) adequate performance of the contract by [PPGNY], (3) breach of contract by [Mitchell], and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)); *see also 34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022).

Neither the existence of the February 23, 2022 Employment Agreement and its residency condition, *see* Employment Agreement, nor PPGNY's performance under the Agreement, Pl. SUF ¶ 25, is in dispute. The Court therefore examines the two remaining elements of the breach of contract claim.

---

[8] Mitchell also seeks leave to amend under Rule 55(c), but this Rule does not provide Plaintiff with the remedy he seeks. Rule 55(c) allows courts to "set aside an entry of default for good cause" or "set aside a final default judgment under Rule 60(b)." Fed. R. Civ. P. 55(c). There has been no default entered against Mitchell, and therefore this rule is inapplicable.

*1. Mitchell's Breach*

There is no genuine issue of material fact that Mitchell breached the residency condition of the Employment Agreement. As a condition of Mitchell's employment as permanent COO, he was required to establish residency in New York within 90 days of the Agreement, *i.e.*, by May 31, 2022. Employment Agreement at 2; Pl. SUF ¶ 24. Until then, or until Mitchell "ha[d] rented or bought a residence in New York State," PPGNY would "continue to cover the expenses for Mint House." Employment Agreement at 2; Pl. SUF ¶ 23.

Defendants argue that Mitchell breached the Agreement because he "never intended to establish residency in New York State, and, in fact, at no point did he ever establish residency in New York State." Br. at 23. Specifically, they argue that Mitchell has provided no documentation demonstrating that he leased or purchased a home in New York State, or even took any steps to do so, from June 2022 through the end of his employment with PPGNY. *Id.* Defendants direct the Court to Mitchell's housing documentation. *Id.* at 24; *see* Ex. 5, Dkt. 106-20; *see also* Pl. SUF ¶¶ 27, 30. These documents show that from June 1, 2022, through September 1, 2022, Mitchell continued to stay at Mint House. Pl. SUF ¶ 27. Thereafter, from September 2, 2022, until his employment was terminated in March 2023, Mitchell spent eighteen nights in New York. *See* Section I.D (Mitchell's Residency While at PPGNY), *supra*.

In response, Mitchell argues that triable questions of fact exist concerning the definitions contained in the residency provision of the Employment Agreement. Opp. at 20-21. Specifically, Mitchell argues that because the Agreement does not define the terms "rent," "residence," and "residency," the terms are ambiguous and therefore their meanings must be determined by a jury. *Id.* at 20. Mitchell next argues that his "renting at Mint House was completely compliant" under the Employment Agreement because "he paid rent for the

possession, use, and occupancy of real property within the City of New York that he used as a primary residence." *Id.*

"For the purposes of a summary judgment motion, the Court must decide whether significant contractual ambiguity exists." *Fin. Techs. Int'l, Inc. v. Smith*, 247 F. Supp. 2d 397, 405 (S.D.N.Y. 2002). "If the language of the contract is 'unambiguous and conveys a definite meaning,' then the interpretation of the contract is a question of law for the court." *Id.* (quoting *Bourne v. Walt Disney Co.*, 68 F.3d 621, 629 (2d Cir. 1995)).

As this Court has previously stated in *Mitchell III*, "[t]he terms of the [Employment Agreement] with respect to residency are clear and unambiguous. The first sentence of the paragraph regarding establishing residency within 90 days is clarified by the second sentence that expressly refers to the deadline for Mitchell to rent or buy a residence in New York." 2026 WL 18897, at *5. Mitchell has not pointed to any terms in the Employment Agreement that demonstrates this provision is ambiguous. "Given the plain language of the contract provision, there is no need to resort to the extraneous information on which Mitchell relies in support of his argument," *id.*, such as the New York Constitution, Election Law, or Vehicle and Traffic Law, Opp. at 20 (citing N.Y. Const. art. II, § 1; N.Y. Elec. Law § 5-102(1); N.Y. Veh. & Traf. Law § 250(5)). *See Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) ("If the document as a whole makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement." (alteration adopted) (internal quotation marks and citation omitted)); *see also JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) ("In interpreting an unambiguous contract, the court is to consider its particular words not in isolation but in the light of the obligation as a whole and the intention of the parties as manifested thereby[.]" (alterations adopted) (internal quotation marks and citation omitted)).

Mitchell's purported alternative subjective understanding of what it means to "rent" or establish "residency" in New York, Opp. at 20, also does not alter the clarity of the terms. Where a contract is unambiguous, "the court is to consider its 'particular words . . . in light of the obligation as a whole and the intention of the parties as manifested thereby,' but the court is not to consider any extrinsic evidence as to the parties' intentions." *Kennedy v. Basil*, 531 F. Supp. 3d 828, 841-42 (S.D.N.Y. 2021) (omission in original) (citation omitted) (quoting *Kass v. Kass*, 696 N.E.2d 174, 180-81 (N.Y. 1998)). *See also Sugerman v. MCY Music World, Inc.*, 158 F. Supp. 2d 316, 323 (S.D.N.Y. 2001) ("The rule is well settled that the construction of a plain and unambiguous contract is for the court to pass on, and the circumstances extrinsic to the agreement will not be considered when the intention of the parties can be gathered from the instrument itself." (quoting *Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*, 430 N.Y.S.2d 179, 184 (N.Y. App. Div. 1980))).

Therefore, Mitchell was required under the Employment Agreement to establish residency in New York either by rental or purchase of a property. Defendants point to record evidence that Mitchell did not lease or purchase property in New York; nor is there evidence that Mitchell even attempted to do so. Mitchell's only response is that he rented Mint House. Opp. at 16. That is not enough. Mint House is a hotel, which Mitchell admits. *Id.* at 20. Despite Mitchell's position that he "lived . . . in New York," Mitchell Dep. (Oct.) at 228:18, because he purchased cleaning products, extra bedding, and extra pots and pans, *id.* at 123:18-23, the Mint House Guest Agreement does not convey property rights. Guest Agreement at 15. In fact, the Guest Agreement explicitly states that there is "no tenancy," that it "is not a lease or residential tenancy agreement," and that guests "are not a tenant of, and have not been granted exclusive possession of, the property." *Id.* It further provides that guests "agree that the property is not your permanent residence." *Id.* Indeed, on at least a couple of occasions,

Mitchell was required to stay at different local hotels because Mint House "already had the room booked" for another guest. Mitchell Dep. (Oct.) at 229:7-16. Further, spending eighteen nights across seven months in New York is a far cry from residing there. *See* Section I.D (Mitchell's Residency While at PPGNY), *supra*. Therefore, no reasonable juror could find that Mitchell did not breach the Employment Agreement when he failed to establish residency in New York by the required date under his contract.

Moving to the final element for the breach of contract claim, Mitchell argues that PPGNY has not shown that it was damaged by paying for his stay at Mint House from March through May 2022 because it agreed to do so for those 90 days and then stopped paying for housing after that point. Opp. at 15-16. Defendants contend that they have been damaged by Mitchell's breach because they fully funded his temporary stay at Mint House for the three months that Mitchell was supposed to be looking for a rental property or a property to purchase, which he did not do. Br. at 23.

PPGNY has established the damages element for its breach of contract claim. As this Court has previously explained, "if Mitchell had abided by his contractual obligation to secure residency in New York within 90 days [of the Employment Agreement], PPGNY may not have incurred the costs for his temporary housing during at least some of that period." *Mitchell III*, 2026 WL 18897, at *6. More importantly, though, under New York law, "nominal damages are always available for breach of contract." *T & N PLC v. Fred S. James & Co. of N.Y.*, 29 F.3d 57, 60 (2d Cir. 1994). Therefore, "the availability of nominal damages for breach satisfies the fourth element of the claim," leaving "[t]he amount of damages [a]s an issue of fact for the jury at trial." *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05-cv-09292 (DLC), 2008 WL 463884, at *15 (S.D.N.Y. Feb. 20, 2008); *Kitchen Winners NY Inc. v. Rock Fintek LLC*, No. 22-cv-05276 (PAE), 2024 WL 3676931, at *17 (S.D.N.Y. Aug. 6, 2024) ("It is well established that '[u]nder

New York law, where actual damages have not been proven with the requisite certainty, and indeed even if the breach of contract caused no loss at all, nominal damages are available "as a formal vindication of plaintiff's legal right to compensation."'" (citation omitted)); *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, No. 10-cv-05762 (PAE), 2016 WL 3098842, at *17-18 (S.D.N.Y. June 1, 2016) (rejecting defendants' argument that plaintiffs' failure to show damages is alone sufficient for summary judgment because of the availability of nominal damages).

Notwithstanding the foregoing, issues of fact remain as to Plaintiff's affirmative defenses to this breach of contract claim, including waiver and whether PPGNY mitigated any damages incurred. *See* Answer at 5. Mitchell argues that there is a triable question of fact as to whether PPGNY waived the residency requirement because it did not terminate him for failure to comply with the residency condition, even though the Employment Agreement required Mitchell to reimburse PPGNY for the total he received for Mint House from March to May 2022 "[i]n the event that [his] employment with PPGNY terminates for any reason within six (6) months after [his] Start Date," Opp. at 18 (quoting Employment Agreement at 2), and PPGNY instead continued to employ him "for approximately 300 days" following his alleged breach, *id.* at 19. Mitchell further argues that even if PPGNY did not discover the breach until after this six-month period, a triable question of fact exists as to whether PPGNY waived the requirement when it did not terminate him within a reasonable time after learning of the breach. *Id*. at 20. The Court agrees that there are thus issues of fact regarding when PPGNY learned of the breach and whether it expressed a clear manifestation of its intent to relinquish its rights under the Agreement. *See Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd.*, 681 F. Supp. 3d 81, 96 (S.D.N.Y. 2023) ("The party asserting waiver has the burden of proving the non-breaching party expressed a clear manifestation of its intent to relinquish its right. Because

it is a question of intent, whether a party waived is generally a matter of fact."); *Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.*, No. 92-cv-01430 (JSM), 1992 WL 296397, at *2 (S.D.N.Y. Oct. 6, 1992) ("[T]he existence of a waiver is a question of fact.").

Issues of fact also exist with respect to whether PPGNY mitigated any damages it incurred. *Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp. 3d 323, 346 (S.D.N.Y. 2021) ("Failure to mitigate damages . . . 'requires the defendant to establish not only that the plaintiff unreasonably failed to mitigate, but that reasonable efforts would have reduced the damages. Whether a party puts forth sufficient effort to mitigate damages is a question of fact and typically resolved during trial.'" (quoting *Robin Bay Assocs., LLC v. Merrill Lynch & Co.*, No. 07-cv-00376 (JMB), 2008 WL 2275902, at *8 (S.D.N.Y. June 3, 2008))), *opinion clarified sub nom. Mohegan Lake Motiors, Inc. v. Maoli*, No. 16-cv-06717 (NSR), 2023 WL 1070247 (S.D.N.Y. Jan. 27, 2023).

Therefore, the Court denies PPGNY's motion for summary judgment on liability for its counterclaim for breach of contract given that issues of fact exist regarding affirmative defenses to the counterclaim. The jury will also determine the amount of damages, if any, from the breach.

**C. PPGNY's Fraud Counterclaim**

PPGNY next moves for summary judgment on its counterclaim for fraud. To establish that Mitchell committed fraud, PPGNY "must establish by clear and convincing evidence (1) a material misrepresentation or omission of fact; (2) that the defendant knew was false; (3) that the defendant made with the intent to defraud; (4) on which the plaintiff reasonably relied; and (5) that caused injury to the plaintiff." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12-cv-07372 (AT), 2019 WL 13414324, at *7 (S.D.N.Y. Sept. 10, 2019); *see also Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*, 112 F. Supp. 3d 83, 105-06 (S.D.N.Y. 2015). For

evidence to be clear and convincing, it must make "the fact to be proved 'highly probable.'" *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007) (quoting *Abernathy–Thomas Eng'g Co. v. Pall Corp.*, 103 F. Supp. 2d 582, 595-96 (E.D.N.Y. 2000)), *aff'd*, 354 F. App'x 496 (2d Cir. 2009) (summary order). "Clear and convincing evidence may, however, be circumstantial, even on summary judgment." *Id.* A claim of fraudulent concealment or omission requires a plaintiff to also prove "that the defendant had a duty to disclose the material information." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995); *see also Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 213 (S.D.N.Y. 2007). This duty can arise where one party has made a partial or ambiguous statement or "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Manhattan Motorcars*, 244 F.R.D. at 213 (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)); *accord N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*, 998 F. Supp. 2d 301, 318 (S.D.N.Y. 2014). "[A] valid fraud claim may be premised on misrepresentations that were made before the formation of the contract and that induced the plaintiff to enter the contract." *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994).

While the parties agree that Mitchell knowingly omitted HCE from his resume and that his response to Calloway regarding the accuracy and completeness of his background information was false because he had not disclosed the existence of his former employer to PPGNY, *see* Section I.G.i (Information Regarding Mitchell's Resume), *supra*; Opp. at 9-10, there are genuine issues of fact regarding other elements of this claim.

Examining materiality first, "[a] matter is material if '(a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction

in question'; or '(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.'" *Chase Manhattan Bank v. Motorola, Inc.*, 184 F. Supp. 2d 384, 394 (S.D.N.Y. 2002) (quoting Restatement (Second) of Torts § 538). "An omitted fact is material if there is a substantial likelihood that a reasonable [person] would consider it important in deciding how to [act]." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Materiality is a "mixed question of law and fact." *Id.* at 450. At summary judgment, a materiality determination requires "assessments of the inferences a reasonable [person] would" make from the "facts and the significance of those inferences to him." *Id.* "Only if the established omissions are 'so obviously important to a [person], that reasonable minds cannot differ on the question of materiality'" is materiality appropriately resolved at summary judgment. *Id.* (quoting *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970)).

While it is undisputed that Mitchell both omitted HCE from his resume and affirmatively lied to Calloway when she asked whether there was anything about his background that he had not told PPGNY, *see* Def. Reply SUF ¶ 59; Mitchell Dep. (Oct.) at 52:8-13, 118:19-23; Calloway Dep. at 126:18-127:9; *see also id.* at 124:18-126:3, there is a genuine issue of fact as to whether the omission and misrepresentation about one prior job were material to PPGNY given Mitchell's other background and work experience. Indeed, "[t]he issue of materiality is generally a question of fact for the jury." *Parmar v. Hermitage Ins. Co.*, 800 N.Y.S.2d 726, 728 (N.Y. App. Div. 2005).

Drawing all inferences in Mitchell's favor, there are also genuine issues of material fact with respect to his intent. Intent "may be shown where a plaintiff demonstrates an intentional or reckless misstatement made with the intent that plaintiff rely on it, or by evidence of the

defendant's motive and opportunity to commit fraud or 'conscious misbehavior or recklessness.'" *Zurich Am. Life Ins. Co. v. Nagel*, 590 F. Supp. 3d 702, 723-24 (S.D.N.Y. 2022) (citations omitted) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)); *see also King Cnty. v. IKB Deutsche Industriebank AG*, 916 F. Supp. 2d 442, 447 (S.D.N.Y. 2013) ("The standard for evaluating whether plaintiffs have presented sufficient evidence of scienter is the same under New York common law as it is under Section 10(b) of the Securities Exchange Act of 1934."); *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (describing intent to defraud as a misrepresentation "which the defendant made with the intention of inducing reliance"); *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 641 (S.D.N.Y. 2015); *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012). "An egregious refusal to see the obvious . . . may in some cases give rise to an inference of gross negligence which can be the functional equivalent of recklessness." *Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F. Supp. 256, 259 (S.D.N.Y. 1989); *see also Jordan v. Madison Leasing Co.*, 596 F. Supp. 707, 710 (S.D.N.Y. 1984). The Second Circuit is "'lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences,' because such issues are 'appropriate for resolution by the trier of fact.'" *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)).

There are genuine issues of fact as to whether Mitchell's omission of HCE from his resume and his misrepresentation to Calloway were done with the intention to deceive. Mitchell has testified that he understood that his settlement agreement with HCE "required strict confidentiality for which he could be liable if he violated it by mentioning the company." Def. Reply SUF ¶ 59; Mitchell Dep. (Nov.) at 57:17-20; *see also* Mitchell Dep. (Oct.) at 247:14-248:5. The Court is very skeptical of this understanding given that the settlement agreement

expressly provides language for prospective employer inquiries to HCE. *See* HCE Agreement at 7 (stating that "[HCE] agree[s] to provide a neutral reference to any prospective employer of [Mitchell] which will include only [Mitchell]'s date of hire and date of separation. [Mitchell] should refer all prospective employers to the Director of Human Resources at HealthCare Express who will provide this information"). But intent implicates state of mind and Plaintiff has testified that he lacked an intent to defraud. Because the Court must draw all inferences in favor of Mitchell at this juncture, it is best left to the trier of fact to determine whether Mitchell had the requisite intent. *See Golden Budha Corp. v. Canadian Land Co. of Am., N.V.*, 931 F.2d 196, 201-02 (2d Cir. 1991) ("Ordinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual question involving the parties' states of mind.").

Additionally, "[t]o prevail on its fraud claim, [the claimant] must also demonstrate that its 'actual reliance on the misrepresentations was reasonable.'" *Fin. Guar. Ins. Co.*, 2019 WL 13414324, at *11 (quoting *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 118 (S.D.N.Y. 2009)). "In assessing the reasonableness of a plaintiff's alleged reliance, [the Court] considers the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 459 (S.D.N.Y. 2007) (citation omitted). "[R]easonable reliance is largely an issue of fact." *Meisel*, 651 F. Supp. 2d at 118.

Calloway testified that she "believed what [Mitchell] told [her]," Calloway Dep. at 74:10-16, and provided a PowerPoint presentation to the Board regarding his background, defending management's decision to hire him, *id.* at 30:25-31:11, 31:22-32:3. Whether it was reasonable for PPGNY to rely on Mitchell's resume and representations about his background, given the concerns and questions previously raised by the Board, the availability of background

checks, and other information that PPGNY had from the recruiter or otherwise, is another question for a trier of fact.

In light of these factual issues, the Court denies PPGNY's motion for summary judgment on its amended counterclaim for fraud.

**CONCLUSION**

For all the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. The Court GRANTS Defendants' motion as to Plaintiff's remaining retaliation claims under Title VII, the ADA, Section 1981, the NYSHRL, and the NYCHRL.

Plaintiff's motion to file an answer to PPGNY's Amended Counterclaims is GRANTED. Finally, the Court DENIES PPGNY's summary judgment motion as to its amended counterclaims for breach of contract and fraud.

In preparation for trial on the amended counterclaims, the parties are hereby ORDERED to submit a Joint Pretrial Order prepared in accordance with Rule 26(a)(3) and other pretrial submissions pursuant to the Court's Individual Rules and Practices in Civil Cases by **September 14, 2026**. A trial will be held on **November 16, 2026** and a final pretrial conference shall be held on **October 29, 2026 at 2:00 p.m.**

The Clerk of Court is respectfully directed to terminate the motions at Dkts. 106 and 114.

Dated: August 14, 2026
New York, New York

SO ORDERED.

Jennifer Rochon

JENNIFER L. ROCHON
United States District Judge